[No. C064293. Third Dist. Dec. 7, 2011.]

QUANTIFICATION SETTLEMENT AGREEMENT CASES.

766

770

## Counsel

Allen Matkins Leck Gamble Mallory Natsis, David L. Osias, Mark J. Hattam; Horton, Knox, Carter & Foote and John Penn Carter for Plaintiff and Appellant Imperial Irrigation District.

Rutan & Tucker, Joel D. Kuperberg and Michelle Molko for Defendant and Appellant Vista Irrigation District.

Endeman, Lincoln, Turek & Heater, Donald R. Lincoln; and Jeffrey R. Epp, City Attorney, for Defendant and Appellant City of Escondido.

Brownstein Hyatt Farber Schreck, Lisabeth D. Rothman, Amy M. Steinfeld; Todd R. Leishman; and Daniel S. Hentschke for Defendant and Appellant San Diego County Water Authority.

Redwine and Sherrill, Steven B. Abbott, Julianna K. Strong; Law Offices of Best Best & Krieger, Michelle Ouellette and Melissa R. Cushman for Defendant and Appellant Coachella Valley Water District.

Karen L. Tachiki, Linus Masouredis, Adam C. Kear and John Schlotterbeck for Defendant and Appellant The Metropolitan Water District of Southern California.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Kathleen A. Kenealy, Assistant Attorney General, Sara J. Russell, Daniel Fuchs, Clifford T. Lee, Marilyn Levin and Gary Tavetian, Deputy Attorneys General, for Defendant and Appellant State of California acting by and through the Department of Fish and Game and the Department of Water Resources.

Michael L. Rood, County Counsel, Katherine Turner, Deputy County Counsel; Jackson DeMarco Tidus Peckenpaugh, Michael L. Tidus, Alene M. Taber and Kathryn M. Casey for Defendant and Appellant Imperial County Air Pollution Control District.

Michael L. Rood, County Counsel, Katherine Turner, Deputy County Counsel; Rossmann and Moore, Antonio Rossmann, Roger B. Moore, Laurie Mikkelsen and Barton Lounsbury for Defendant and Appellant County of Imperial.

Michael B. Jackson; and Rose M. Zoia for Defendant and Appellant Protect Our Water and Environmental Rights.

Ignacia S. Moreno, United States Assistant Attorney General, John L. Smeltzer; Stephen M. MacFarlane, Aaron P. Avila, Robert F. Snow and M. Rodney Smith, Jr., for the United States of America as Amicus Curiae on behalf of Defendants and Appellants.

Robert S. Pelcyger; and Barbara Karshmer for San Luis Rey Indian Water Authority as Amicus Curiae on behalf of Defendants and Appellants.

772

Law Offices of Patrick J. Maloney, Patrick J. Maloney, Thomas S. Virsik; Law Office of Cressey H. Nakagawa and Cressey H. Nakagawa for Defendants and Respondents Walter Holtz, Toni Holtz, Michael W. Morgan, John J. Elmore, Richard Elmore, Gary Foster and Rodney Foster.

Ronald Leimgruber, in pro. per., and Laura Leimgruber, in pro. per., for Defendants and Respondents.

Larry Porter, in pro. per., for Defendant and Respondent.

Sutherland & Gerber and Lowell F. Sutherland for Defendants and Respondents Donald V. Barioni, Beach Line Citrus, LLC, Bixby Land Company, Robert S. Chell, Coast Imperial Partners, Donald L. Howard and Kimberlee A. Howard as Trustees, Chrisman B. Jackson and Mary A. Jackson as Trustees, John D. Jackson, Jr., Individually and as Trustee, Margaret M. Lillywhite and Daniel H. Lillywhite as Trustees, Daniel H. Lillywhite and Robin J. Lillywhite as Trustees, Rosal Randes, Sali Properties, The Sinclair Ranches, LLC, TAC Land, LLC, Charles H. Westmoreland and Alexa Westmoreland as Trustees.

Lewis Brisbois Bisgaard & Smith, Malissa Hathaway McKeith, Kara E. Granowitz, Kimberly A. Huangfu and Lisa W. Cooney for Defendant and Respondent Cuatro Del Mar.

Lippe Gaffney Wagner, Keith G. Wagner; and Caryn Mandelbaum for Planning and Conservation League and Environment Now as Amici Curiae on behalf of Defendants and Respondents.

Kenyon Yeates and Bill Yeates for Defenders of Wildlife, Audubon California and Pacific Institute as Amici Curiae on behalf of Defendants and Respondents.

Youtz & Valdez, Shane Youtz; Law & Resource Planning Associates, Charles T. DuMars and Stephen Curtice for Citizens for a Reliable Water Supply as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

**ROBIE, Acting P. J.**—For the better part of 100 years, citizens of the American Southwest have been fighting over the right to water from the Colorado River. While the United States Supreme Court largely settled the interstate conflict over that water nearly 50 years ago, in *Arizona v. California* (1963) 373 U.S. 546 [10 L.Ed.2d 542, 83 S.Ct. 1468], the court's resolution of the dispute *between* the states—which limited California's share of the river to far less than the state can use—ensured the fight would continue *within* the state for years to come.

And so it has. In 2003, three of the major stakeholders in California's share of the Colorado River—the Imperial Irrigation District (the Irrigation District), the Coachella Valley Water District (Coachella), and the Metropolitan Water District of Southern California (Metropolitan)—purported to end a long-running series of disputes over Colorado River water by signing the "Quantification Settlement Agreement" and (along with numerous other parties) various related agreements, the purpose of which was to "budget their portion of California's apportionment of Colorado River water among themselves" and to "provide a framework for conservation measures and water transfers for a period of up to 75 years." If they thought they were buying peace, however, they were sorely mistaken, for a drop of water cannot do two things at once, and every drop the residents of coastal Southern California want to drink is one that cannot be used to sustain the endangered Salton Sea—which is what brings us to where we are today.

As will be shown, for years after the United States Supreme Court determined that California's share of the water from the Colorado River was to be only 4.4 million acre-feet during normal water years, California was nonetheless able to use much more than that because Arizona and Nevada were not yet able to use their full entitlements. (See, e.g., *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1153 [77 Cal.Rptr.3d 578, 184 P.3d 709].) During this period, vast quantities of irrigation return flow from the Irrigation District sustained the Salton Sea—that accidental body of water that owes its very existence to the quest for Colorado River water for the Imperial Valley. Eventually, however, pressure built on California to live within its annual 4.4 million acre-feet entitlement and on the Irrigation District to curb its wasteful water use. At the same time, the water needs of coastal Southern California continued to grow.

The Quantification Settlement Agreement and related agreements sought to address these problems in part by making Colorado River water conserved within the Irrigation District's service area available for use by the denizens of coastal Southern California, from San Diego to Los Angeles, in exchange for money to fund the conservation efforts. But environmental interests fear that shipping more Colorado River water to the coast will doom the Salton Sea.

It is within the context of this fight that we are called on to review the judgments in three coordinated cases connected with the Quantification Settlement Agreement.[1] In the first case—*Imperial Irrigation Dist. v. All Persons Interested*—the Irrigation District sought a court determination that

---

[1] Actually, the trial court purported to render only a single judgment "as to all cases adjudicated in Trial Phase 1 of the QSA Coordinated Proceeding"; however, under the court rules governing the coordination of complex actions, we construe that document as consisting

the Quantification Settlement Agreement and 12 related agreements were valid (Code Civ. Proc., § 860 et seq.). (We will refer to this case as the validation action.) In the second case—*County of Imperial v. Metropolitan Water Dist. of Southern California*—the County of Imperial (the County)—taking a position at odds with the Irrigation District, which supplies all of the County's water—asserted various violations of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) and the Water Code in connection with the Quantification Settlement Agreement. And in the third case—*Protect our Water & Environmental Rights v. Imperial Irrigation Dist.*—an environmental organization (Protect our Water and Environmental Rights (POWER)) asserted CEQA violations in connection with the proposed transfer of conserved Colorado River water from the Irrigation District to the San Diego County Water Authority (San Diego), as well as Coachella and Metropolitan.[2]

In January 2010, the coordination trial judge found that one of the 12 agreements related to the Quantification Settlement Agreement—specifically, the "Quantification Settlement Agreement Joint Powers Authority Creation and Funding Agreement" (the Joint Powers Agreement)—was unconstitutional. The Joint Powers Agreement was supposed to provide the principal mechanism for ensuring the mitigation required for implementation of the Quantification Settlement Agreement was completely funded. According to the trial court, the State of California's "unconditional contractual obligation," as part of the Joint Powers Agreement, to pay all of the mitigation costs beyond a particular amount for which the Irrigation District, Coachella, and San Diego were to be liable, was contrary to the appropriation requirement of article XVI, section 7 of the California Constitution, which provides that money may be drawn from the Treasury only through an appropriation enacted by the Legislature. In the trial court's view, the unconditional commitment of an uncertain amount of state funds contravened this appropriation requirement. Accordingly, the trial court entered a judgment in the validation action determining that all but one of the agreements the Irrigation District sought to validate—including the Quantification Settlement Agreement—were invalid.[3] Based on its determination that the various

---

of separate judgments for each of the actions that was resolved. (See Cal. Rules of Court, rule 3.545(c) [referring to "[t]he judgment entered in each coordinated action"].)

[2] On occasion, we will refer to the County's CEQA action and POWER's CEQA action jointly as the two CEQA actions.

[3] The court concluded the remaining agreement was "not properly subject to validation" in the first place.

agreements were invalid, the trial court then dismissed the two CEQA actions as moot, without adjudicating any of the claims in those actions.[4]

Ten different parties filed three notices of appeal and two notices of cross-appeal, challenging the trial court's judgment in the validation action and the two CEQA actions. Numerous other parties have filed responsive or amicus curiae briefs. The parties supporting the Quantification Settlement Agreement and related agreements contend the trial court erred in finding the Joint Powers Agreement unconstitutional, while the parties opposing the agreements assert that the trial court did not err and that, in any event, there are other bases to uphold the trial court's judgment in the validation action. As to the CEQA actions, the proponents of those actions contend the trial court erred in dismissing them as moot, and they importune us to adjudicate their CEQA claims in the first instance, to avoid further delay, while the CEQA opponents contend those matters must be addressed by the trial court on remand.

As we explain more fully below, we conclude the trial court erred in determining that the Joint Powers Agreement violates article XVI, section 7 of the California Constitution. While the agreement does unconditionally obligate the state to pay the excess mitigation costs beyond those for which the Irrigation District, Coachella, and San Diego are responsible, the imposition of that obligation on the state does *not* violate the appropriation requirement of article XVI, section 7 of the California Constitution because nothing in the Joint Powers Agreement gives those three water agencies (or anyone else for that matter) the right to *enforce* that obligation by drawing money from the Treasury without an appropriation by the Legislature. While the state cannot assert the failure of the Legislature to appropriate funds to pay the excess mitigation costs as a defense to a breach of contract claim under the Joint Powers Agreement—because the state's obligation is "unconditional"—the state cannot be compelled to appropriate funds to *satisfy* its obligation, although the water agencies might, in appropriate circumstances, be able to enforce the state's obligation against other funds already appropriated. Read in this manner, the Joint Powers Agreement is constitutional.

Nor do we find any other basis for affirming the trial court's judgment in the validation action. To the extent the parties contend the Joint Powers Agreement violates the debt limitation in section 1 of article XVI of the California Constitution, we conclude they are wrong because the state's commitment to pay the excess mitigation costs is contingent on there *being* excess costs to pay, and a contingent obligation does not qualify as a "debt"

---

[4] The sole exception was that the court entered judgment against the County on its claim under sections 1810 through 1814 of the Water Code (the wheeling statutes), which the court had previously summarily adjudicated against the County.

or "liability" within the meaning of that constitutional provision. We likewise reject other challenges to the Joint Powers Agreement based on various principles of contract law and reject arguments based on conflict of interest, allegations of misconduct, and the propriety of validation in the first place.

For guidance on remand in the validation action, we also conclude that the trial court lacks subject matter jurisdiction to adjudicate claims under the federal Clean Air Act[5] and the National Environmental Policy Act of 1969 (Pub.L. No. 91-190 (Jan. 1, 1970) 83 Stat. 852; NEPA).[6]

As for the two CEQA actions, we conclude that the argument by the Imperial County Air Pollution Control District (the Air District) that the trial court erred in denying its motion to intervene in those actions is not properly before us because the Air District did not appeal from the order denying leave to intervene. We further conclude that the trial court properly granted summary adjudication on the cause of action in the County's CEQA action based on the wheeling statutes. We also conclude that the trial court erred in finding the CEQA actions moot, but we decline to adjudicate those actions in the first instance and instead we remand those actions to the trial court for adjudication. Finally, we conclude the trial court did not abuse its discretion in denying a pretrial motion to dismiss the County's CEQA action because the County failed to name the United States and various other parties as real parties in interest.

For the foregoing reasons, and as explained more fully below, we will reverse the judgments and remand the validation action and the two CEQA actions for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

*The War Between the States, or "The Court Preferred Asparagus"—The Interstate Fight over Colorado River Water*

Illustrating how deep the roots of the disputes before us go, we draw a substantial amount of the general background of these cases from the United States Supreme Court's decision nearly 50 years ago in *Arizona v. California, supra,* 373 U.S. 546 [10 L.Ed.2d 542], which involved the earlier, *interstate* aspect of the fight over Colorado River water. In an opinion authored by Justice Hugo Black, the Supreme Court explained as follows:

---

[5] Title 42 United States Code section 7401 et seq.
[6] Title 42 United States Code section 4321 et seq.

"The Colorado River . . . rises in the mountains of Colorado and flows generally in a southwesterly direction for about 1,300 miles through Colorado, Utah, and Arizona and along the Arizona-Nevada and Arizona-California boundaries, after which it passes into Mexico and empties into the Mexican waters of the Gulf of California. On its way to the sea it receives tributary waters from Wyoming, Colorado, Utah, Nevada, New Mexico, and Arizona. The river and its tributaries flow in a natural basin almost surrounded by large mountain ranges and drain 242,000 square miles, an area about 900 miles long from north to south and 300 to 500 miles wide from east to west—practically one-twelfth the area of the continental United States excluding Alaska. Much of this large basin is so arid that it is, as it always has been, largely dependent upon managed use of the waters of the Colorado River System to make it productive and inhabitable. . . . In the second half of the nineteenth century a group of people interested in California's Imperial Valley conceived plans to divert water from the mainstream of the Colorado to give life and growth to the parched and barren soil of that valley. As the most feasible route was through Mexico, a Mexican corporation was formed and a canal dug partly in Mexico and partly in the United States. Difficulties which arose because the canal was subject to the sovereignty of both countries generated hopes in this country that some day there would be a canal wholly within the United States, an all-American canal.

"During the latter part of the nineteenth and the first part of the twentieth centuries, people in the Southwest continued to seek new ways to satisfy their water needs, which by that time were increasing rapidly as new settlers moved into this fast-developing region. But none of the more or less primitive diversions made from the mainstream of the Colorado conserved enough water to meet the growing needs of the basin. The natural flow of the Colorado was too erratic, the river at many places in canyons too deep, and the engineering and economic hurdles too great for small farmers, larger groups, or even States to build storage dams, construct canals, and install the expensive works necessary for a dependable yearround water supply. Nor were droughts the basin's only problem; spring floods due to melting snows and seasonal storms were a recurring menace, especially disastrous in California's Imperial Valley where, even after the Mexican canal provided a more dependable water supply, the threat of flood remained at least as serious as before. Another troublesome problem was the erosion of land and the deposit of silt which fouled waters, choked irrigation works, and damaged good farmland and crops.

"It is not surprising that the pressing necessity to transform the erratic and often destructive flow of the Colorado River into a controlled and dependable water supply desperately needed in so many States began to be talked about and recognized as far more than a purely local problem which could be solved on a farmer-by-farmer, group-by-group, or even state-by-state basis,

desirable as this kind of solution might have been. The inadequacy of a local solution was recognized in the Report of the All-American Canal Board of the United States Department of the Interior on July 22, 1919, which detailed the widespread benefits that could be expected from construction by the United States of a large reservoir on the mainstream of the Colorado and an all-American canal to the Imperial Valley. Some months later, May 18, 1920, Congress passed a bill offered by Congressman Kinkaid of Nebraska directing the Secretary of the Interior to make a study and report of diversions which might be made from the Colorado River for irrigation in the Imperial Valley. The Fall-Davis Report, submitted to Congress in compliance with the Kinkaid Act, began by declaring, 'The control of the floods and development of the resources of the Colorado River are peculiarly national problems . . .' and then went on to give reasons why this was so, concluding with the statement that the job was so big that only the Federal Government could do it. Quite naturally, therefore, the Report recommended that the United States construct as a government project not only an all-American canal from the Colorado River to the Imperial Valley but also a dam and reservoir at or near Boulder Canyon.

"The prospect that the United States would undertake to build as a national project the necessary works to control floods and store river waters for irrigation was apparently a welcome one for the basin States. But it brought to life strong fears in the northern basin States that additional waters made available by the storage and canal projects might be gobbled up in perpetuity by faster growing lower basin areas, particularly California, before the upper States could appropriate what they believed to be their fair share. These fears were not without foundation, since the law of prior appropriation prevailed in most of the Western States. Under that law the one who first appropriates water and puts it to beneficial use thereby acquires a vested right to continue to divert and use that quantity of water against all claimants junior to him in point of time. 'First in time, first in right' is the shorthand expression of this legal principle. In 1922, only four months after the Fall-Davis Report, this Court in *Wyoming* v. *Colorado* [(1922)] 259 U. S. 419 [66 L.Ed. 999, 42 S.Ct. 552] . . . held that the doctrine of prior appropriation could be given interstate effect. This decision intensified fears of Upper Basin States that they would not get their fair share of Colorado River water. In view of California's phenomenal growth, the Upper Basin States had particular reason to fear that California, by appropriating and using Colorado River water before the upper States, would, under the interstate application of the prior appropriation doctrine, be 'first in time' and therefore 'first in right.' Nor were such fears limited to the northernmost States. Nevada, Utah, and especially Arizona were all apprehensive that California's rapid declaration of appropriative claims would deprive them of their just share of basin water available after construction of the proposed United States project. It seemed for a time that

these fears would keep the States from agreeing on any kind of division of the river waters. Hoping to prevent 'conflicts' and 'expensive litigation' which would hold up or prevent the tremendous benefits expected from extensive federal development of the river, the basin States requested and Congress passed an Act on August 19, 1921, giving the States consent to negotiate and enter into a compact for the 'equitable division and apportionment . . . of the water supply of the Colorado River.'

"Pursuant to this congressional authority, the seven States appointed Commissioners who, after negotiating for the better part of a year, reached an agreement at Santa Fe, New Mexico, on November 24, 1922. The agreement, known as the Colorado River Compact, failed to fulfill the hope of Congress that the States would themselves agree on each State's share of the water. The most the Commissioners were able to accomplish in the Compact was to adopt a compromise suggestion of Secretary of Commerce Herbert Hoover, specially designated as United States representative. This compromise divides the entire basin into two parts, the Upper Basin and the Lower Basin, separated at a point on the river in northern Arizona known as Lee Ferry. . . . Article III (a) of the Compact apportions to each basin in perpetuity 7,500,000 acre-feet of water a year from the Colorado River System, defined in Article II (a) as 'the Colorado River and its tributaries within the United States of America.' In addition, Article III (b) gives the Lower Basin 'the right to increase its beneficial consumptive use of such waters by one million acre-feet per annum.' Article III (c) provides that future Mexican water rights recognized by the United States shall be supplied first out of surplus over and above the aggregate of the quantities specified in (a) and (b), and if this surplus is not enough the deficiency shall be borne equally by the two basins. Article III (d) requires the Upper Basin not to deplete the Lee Ferry flow below an aggregate of 75,000,000 acre-feet for any 10 consecutive years. Article III (f) and (g) provide a way for further apportionment by a compact of 'Colorado River System' waters at any time after October 1, 1963. While these allocations quieted rivalries between the Upper and Lower Basins, major differences between the States in the Lower Basin continued. Failure of the Compact to determine each State's share of the water left Nevada and Arizona with their fears that the law of prior appropriation would be not a protection but a menace because California could use that law to get for herself the lion's share of the waters allotted to the Lower Basin. Moreover, Arizona, because of her particularly strong interest in the Gila, intensely resented the Compact's inclusion of the Colorado River tributaries in its allocation scheme and was bitterly hostile to having Arizona tributaries, again particularly the Gila, forced to contribute to the Mexican burden. Largely for these reasons, Arizona alone, of all the States in both basins, refused to ratify the Compact.

"Seeking means which would permit ratification by all seven basin States, the Governors of those States met at Denver in 1925 and again in 1927. As a result of these meetings the Governors of the upper States suggested, as a fair apportionment of water among the Lower Basin States, that out of the average annual delivery of water at Lee Ferry required by the Compact— 7,500,000 acre-feet—Nevada be given 300,000 acre-feet, Arizona 3,000,000, and California 4,200,000, and that unapportioned waters, subject to reapportionment after 1963, be shared equally by Arizona and California. Each Lower Basin State would have 'the exclusive beneficial consumptive use of such tributaries within its boundaries before the same empty into the main stream,' except that Arizona tributary waters in excess of 1,000,000 acre-feet could under some circumstances be subject to diminution by reason of a United States treaty with Mexico. This proposal foundered because California held out for 4,600,000 acre-feet instead of 4,200,000 and because Arizona held out for complete exemption of its tributaries from any part of the Mexican burden.

"Between 1922 and 1927 Congressman Philip Swing and Senator Hiram Johnson, both of California, made three attempts to have Swing-Johnson bills enacted, authorizing construction of a dam in the canyon section of the Colorado River and an all-American canal. These bills would have carried out the original Fall-Davis Report's recommendations that the river problem be recognized and treated as national, not local. Arizona's Senators and Congressmen, still insisting upon a definite guaranty of water from the mainstream, bitterly fought these proposals because they failed to provide for exclusive use of her own tributaries, particularly the Gila, and for exemption of these tributaries from the Mexican burden.

"Finally, the fourth Swing-Johnson bill passed both Houses and became the Boulder Canyon Project Act of December 21, 1928, 45 Stat. 1057. The Act authorized the Secretary of the Interior to construct, operate, and maintain a dam and other works in order to control floods, improve navigation, regulate the river's flow, store and distribute waters for reclamation and other beneficial uses, and generate electrical power. The projects authorized by the Act were the same as those provided for in the prior defeated measures, but in other significant respects the Act was strikingly different. The earlier bills had offered no method whatever of apportioning the waters among the States of the Lower Basin. The Act as finally passed did provide such a method, and, as we view it, the method chosen was a complete statutory apportionment intended to put an end to the long-standing dispute over Colorado River waters. To protect the Upper Basin against California should Arizona still refuse to ratify the Compact, § 4 (a) of the Act as finally passed provided that, if fewer than seven States ratified within six months, the Act should not take effect unless six States including California ratified and unless California, by its legislature, agreed 'irrevocably and unconditionally . . . as an express

covenant' to a limit on its annual consumption of Colorado River water of 'four million four hundred thousand acre-feet of the waters apportioned to the lower basin States by paragraph (a) of Article III of the Colorado River compact, plus not more than one-half of any excess or surplus waters unapportioned by said compact.' Congress in the same section showed its continuing desire to have California, Arizona, and Nevada settle their own differences by authorizing them to make an agreement apportioning to Nevada 300,000 acre-feet, and to Arizona 2,800,000 acre-feet plus half of any surplus waters unapportioned by the Compact. The permitted agreement also was to allow Arizona exclusive use of the Gila River, wholly free from any Mexican obligation, a position Arizona had taken from the beginning. Sections 5 and 8 (b) of the Project Act made provisions for the sale of the stored waters. The Secretary of the Interior was authorized by § 5 'under such general regulations as he may prescribe, to contract for the storage of water in said reservoir and for the delivery thereof at such points on the river and on said canal as may be agreed upon, for irrigation and domestic uses . . . .' Section 5 required these contracts to be 'for permanent service' and further provided, 'No person shall have or be entitled to have the use for any purpose of the water stored as aforesaid except by contract made as herein stated.' Section 8 (b) provided that the Secretary's contracts would be subject to any compact dividing the benefits of the water between Arizona, California, and Nevada, or any two of them, approved by Congress on or before January 1, 1929, but that any such compact approved after that date should be 'subject to all contracts, if any, made by the Secretary of the Interior under section 5 hereof prior to the date of such approval and consent by Congress.'

"The Project Act became effective on June 25, 1929, by Presidential Proclamation, after six States, including California, had ratified the Colorado River Compact and the California legislature had accepted the limitation of 4,400,000 acre-feet as required by the Act.[7] Neither the three States nor any two of them ever entered into any apportionment compact as authorized by §§ 4 (a) and 8 (b). After the construction of Boulder [now Hoover] Dam the Secretary of the Interior, purporting to act under the authority of the Project Act, made contracts with various water users in California for 5,362,000 acre-feet, with Nevada for 300,000 acre-feet, and with Arizona for 2,800,000 acre-feet of water from that stored at Lake Mead." (*Arizona v. California, supra*, 373 U.S. at pp. 552–562 [10 L.Ed.2d at pp. 551–556], fns. omitted.)

Following the enactment of the Boulder Canyon Project Act (43 U.S.C. § 617 et seq.), disputes continued between the states over their respective rights to Colorado River water. "The principal dispute that became increasingly pressing over the years concerned the respective shares of the Lower-Basin States, particularly the shares of California and Arizona. [¶] Th[e]

---

[7] Statutes 1929, chapter 16, pages 38–39 (the California Limitation Act of 1929).

litigation [that led to the first *Arizona v. California* decision in 1963] began in 1952 when Arizona, to settle this dispute, invoked [the Supreme Court's] original jurisdiction [citation] by filing a motion for leave to file a bill of complaint against California and seven public agencies of the State. Arizona sought to confirm its title to water in the Colorado River system and to limit California's annual consumptive use of the river's waters. Nevada intervened, praying for determination of its water rights; Utah and New Mexico were joined as defendants; and the United States intervened, seeking water rights on behalf of various federal establishments, including the reservations of five Indian Tribes . . . .

"After lengthy proceedings, Special Master Simon Rifkind filed a report recommending a certain division of the Colorado River waters among California, Arizona, and Nevada. The parties' respective exceptions to the Master's report were extensively briefed and the case was twice argued. The Court for the most part agreed with the Special Master, 373 U. S. 546 . . . , and [the court's] views were carried forward in the decree found at 376 U. S. 340 [11 L.Ed.2d 757, 84 S.Ct. 755] (1964).

". . . [The court] agreed with the Special Master that the allocation of Colorado River water was to be governed by the standards set forth in the [Boulder Canyon] Project Act rather than by the principles of equitable apportionment which in the absence of statutory directive th[e] Court ha[d] applied to disputes between States over entitlement to water from interstate streams. Nor was the local law of prior appropriation necessarily controlling. The Project Act itself was held to have created a comprehensive scheme for the apportionment among California, Nevada, and Arizona of the Lower Basin's share of the mainstream waters of the Colorado River, leaving each State its tributaries. Congress had decided that a fair division of the first 7.5 million acre-feet of such mainstream waters would give 4.4 million acre-feet to California, 2.8 million acre-feet to Arizona, and 300,000 acre-feet to Nevada. Arizona and California would share equally in any surplus." (*Arizona v. California* (1983) 460 U.S. 605, 608–609 [75 L.Ed.2d 318, 326–327, 103 S.Ct. 1382], fn. omitted.)

As the Supreme Court explained further, "Congress intended the Secretary of the Interior, through his § 5 contracts, both to carry out the allocation of the waters of the main Colorado River among the Lower Basin States and to decide which users within each State would get water" "without regard to the law of prior appropriation." (*Arizona v. California, supra,* 373 U.S. at pp. 580, 581 [10 L.Ed.2d at pp. 566, 567].) Thus, "it is the [Boulder Canyon Project] Act and the Secretary's contracts, not the law of prior appropriation, that control the apportionment of water among the States. *Moreover, . . . the Secretary in choosing between users within each State and in settling the*

*terms of his contracts is not bound . . . to follow state law." (Id.* at p. 586 [10 L.Ed.2d at pp. 569–570], italics added.) "[W]here *the Secretary's contracts, as here, carry out a congressional plan for the complete distribution of waters to users, state law has no place." (Id.* at p. 588 [10 L.Ed.2d at p. 571], italics added.) "[T]*he Secretary's power must be construed to permit him, within the boundaries set down in the Act, to allocate and distribute the waters of the mainstream of the Colorado River." (Id.* at p. 590 [10 L.Ed.2d at p. 572], italics added.) Thus, in the absence of an agreement, concurred in by the Secretary of the Interior, a determination of which entity in California received Colorado River water would be up to the Secretary of the Interior, notwithstanding any provisions of California law.

In 1999, in comments recognizing and celebrating the service of Justice Stanley Mosk on the California Supreme Court, then Chief Justice Ronald George noted that Mosk had argued the *Arizona v. California* case before the United States Supreme Court during his service as California Attorney General; Chief Justice George described Mosk's argument, and the decision in the case, as follows: "He argued in that case, 'Are we going to give Colorado River water to the people of California to drink or to Arizona for asparagus?' The court preferred asparagus." (*Recognition of Service of Justice Stanley Mosk* (1999) 21 Cal.4th 1314, 1321.)

Justice Mosk's argument to the United States Supreme Court recognized that California's interest in maximizing its share of Colorado River water was largely driven by the increasing demand for water for domestic use by the ever-growing population of coastal Southern California. As will be seen, it is the conflict between this growing thirst for water from San Diego to Los Angeles and the desire that that same water be used to save the Salton Sea which is the driving force behind the litigation from which these appeals arise.

### The War Within the State, or They Really Do Want What They Haven't Got—Allocating California's Share of Colorado River Water

In 1929, the year after the Boulder Canyon Project Act took effect, the Secretary of the Interior requested from California's Division of Water Resources a recommendation of the proper apportionments of California's share of Colorado River water among the various applicants and water users within the state. This request led to the "Seven-Party Agreement" of August 1931. The terms of this agreement, which apportioned a total of 5.362 million acre-feet of water annually between the parties, were incorporated into contracts between the Secretary of the Interior and various California water users for delivery of Colorado River water under the Boulder Canyon Project Act.

Among the seven parties to the agreement were the Irrigation District, Coachella, and Metropolitan.[8] As these parties are central to these appeals, we pause a moment to provide background on them, along with the fourth water agency that is central to these consolidated cases—San Diego.

The Irrigation District was organized in 1911. Its service area covers the Imperial Valley, which is situated in the County between the Colorado River and Arizona on the east, Mexico on the south, Riverside County and the Salton Sea on the north, and San Diego County on the west. The district is the sole source of fresh water for the Imperial Valley, and all of that water comes from the Colorado River. The Irrigation District diverts water equating to a consumptive use of about 3.1 million acre-feet annually, and 98 percent of that water is used for agriculture on nearly 500,000 acres in the Imperial Valley. The remaining 2 percent serves residential customers in nine cities. The water is diverted at Imperial Dam and conveyed through the All American Canal to a 1,667-mile network of canals throughout the district's service area.

Coachella was organized in 1918 to conserve and protect the Coachella Valley's water supplies. Today, those water supplies come from various sources, including Colorado River water transported to the valley via the Coachella Canal, a branch of the All American Canal. Almost all of the Colorado River water that reaches the Coachella Valley is delivered for agricultural use.

Metropolitan was organized in 1928 to provide supplemental water to the coastal plain of Southern California. At its outset, Metropolitan was made up of 11 cities, including Los Angeles. (Cooper, *Aqueduct Empire: A Guide to Water in California, Its Turbulent History and Its Management Today* (1968) p. 82 (Cooper, Aqueduct Empire).) Today, Metropolitan has 26 member agencies. Metropolitan diverts Colorado River water at Parker Dam on Lake Havasu and conveys that water to its service area via the Colorado River Aqueduct.

San Diego, which is one of Metropolitan's member agencies, was organized in 1944 to bring imported water to the San Diego region. Consisting of 23 member agencies itself, San Diego purchases more water from Metropolitan than any of the 25 other member agencies of Metropolitan. The majority of the imported water San Diego receives from Metropolitan comes from the Colorado River (a lesser amount comes from the State Water Project). Imported water accounts for between 75 and 95 percent of all water used in San Diego's service area.

---

[8] The other parties were the Palo Verde Irrigation District, the City of Los Angeles, and the City and County of San Diego.

Returning to 1931 and the Seven-Party Agreement, the agreement apportioned Colorado River water among the various parties by priority but without quantifying exactly how much water each party was entitled to receive. Thus, for example, while 3,850,000 acre-feet of water per year was apportioned to the first three priorities, the agreement did not specify exactly how much of that water was to go to each of the parties entitled to water under those priorities. For instance, the Palo Verde Irrigation District was to receive the first priority for "such waters as may be required" for beneficial use on 104,500 acres of land within the district and between the district and the Colorado River. Obviously, this lack of specificity left the potential for future conflict between the parties.

Even more conducive to future conflict was the fact that the amount of water apportioned in the Seven-Party Agreement (and provided for in the contracts with the Secretary of the Interior) was nearly a million acre-feet more than the basic annual allotment of 4.4 million acre-feet of Colorado River water allocated to California in the Boulder Canyon Project Act—to which the California Legislature had "irrevocably and unconditionally" agreed. This problem was particularly significant to Metropolitan and its member agencies. Under the Seven-Party Agreement, Metropolitan was entitled to a fourth priority of 550,000 acre-feet annually, as well as a fifth priority in the same amount.[9] However, because the total amount of water apportioned to the first four priorities was 4.4 million acre-feet—the total amount of California's basic allotment—if California was limited to receiving its basic allotment then Metropolitan would feel the brunt of the shortfall, receiving none of its fifth priority water. As the trial court noted here, "[W]hen California receives [only its basic allotment], [Metropolitan]'s priority [under the Seven-Party Agreement] is only about 550,000 [acre-feet], leaving the [Colorado River Aqueduct, which has an approximate capacity of more than 1.2 million acre-feet per year] over half empty."

For a long time, California was able to regularly use approximately 800,000 acre-feet more than its basic annual allotment of Colorado River water because Arizona and Nevada were not using their full allotments. With growing demand for water in both of those states, however, pressure increased on California to reduce its annual use of Colorado River water in normal years to the 4.4 million acre-feet to which it had agreed. In turn, this pressure led to increased potential for conflict between the parties to the Seven-Party Agreement.

---

[9] The fifth priority in the agreement also entitled the City and/or County of San Diego to 112,000 acre-feet. Ultimately, however, that water right was transferred to Metropolitan when San Diego became a member of Metropolitan, so that Metropolitan's fifth priority amounted to 662,000 acre-feet.

*The Accidental Sea*

In large part, the foregoing chronology sets the stage for the conflicts and resulting negotiations among the various users of California's share of Colorado River water that led to the Quantification Settlement Agreement and its related agreements and, in turn, to the litigation that gave rise to these appeals. One very important element, however, is missing from the story told so far, and that is the Salton Sea. It is the fate of that accidental body of water—along with the ever-growing thirst for water from San Diego to Los Angeles, and the pressure on California to "live within its means" when it comes to water from the Colorado River—that is the real driving force behind the litigation that has brought us here today. Accordingly, we turn to the history of the sea.

Before the 20th century, various temporary lakes had existed in the depression early settlers named the Salton Sink, created by heavy precipitation or the flow of the Colorado River. (Cooper, Aqueduct Empire, *supra*, at pp. 69–70 <http://www.saltonsea.ca.gov/history_chronology.html> [as of Dec. 7, 2011].) By 1900, however, there was nothing there but salt pools. (Cooper, Aqueduct Empire, *supra*, at p. 70.)

Around that time, the California Development Company dredged a 60-mile ditch from the Colorado River westward to the Imperial Valley as part of the company's effort to promote settlement in the valley. (Cooper, Aqueduct Empire, *supra*, at pp. 70–71.) When that ditch became clogged with silt, the company made a new 60-foot cut in the riverbank, and by the fall of 1903 the water from the new canal was irrigating up to 100,000 acres. (*Id.* at p. 71.) In the summer of 1904, however, heavy flood waters rushed through the cut, washed out the canal, and began to inundate broad areas of farmland. (*Ibid.*) An effort to stem the flood was almost complete when, in November 1905, "the second largest flood in the river's known history came thundering down from its Gila River tributary" and cut a break in the riverbank a mile wide. (*Ibid.*) For two years, the Colorado River flowed into the Salton Sink instead of the Gulf of California, and the Salton Sea was formed. (*Id.* at pp. 71–72.)

After the flow of the Colorado River was restored to its channel in 1907, the Salton Sea eventually would have evaporated but for the growth in agriculture that was supported by increasing diversions from the river, as agricultural drainage from the Imperial, Mexicali, and Coachella Valleys continued to feed the sea. (Cooper, Aqueduct Empire, *supra*, at pp. 72, 74–75.) Indeed, by the late 1970's approximately 1 million acre-feet of irrigation return flow was entering the Salton Sea from the Irrigation District's service area alone, comprising about 71 percent of all inflow into the sea.

While this inflow may have been a boon for the accidental sea, it was the bane of John Elmore, a farmer with land adjacent to the sea who had to protect his land with dikes against the rising sea level and who, in 1980, complained to the Department of Water Resources that the rising waters threatening his property were the result of the Irrigation District's wasteful water management and marketing practices. Upon investigation, the Department of Water Resources determined that misuse of water was indeed occurring. When the Irrigation District failed to take steps to correct the problem to the satisfaction of the Department of Water Resources, the department referred the matter to the State Water Resources Control Board (the Board) for hearing.

The result was Water Rights Decision No. 1600 in June 1984. In that decision, the Board found considerable evidence that water loss within the Irrigation District could be reduced through reasonable conservation measures. The Board noted that beneficial use of water conserved by the Irrigation District could be made by both Coachella and Metropolitan, but the Board also recognized that such conservation would have a significant effect on both the level and the salinity of the Salton Sea. Nevertheless, acknowledging there would soon be insufficient Colorado River water available to satisfy the existing level of demand within California, the Board ordered the Irrigation District to undertake additional conservation measures and to develop a detailed and comprehensive water conservation plan.

In the wake of Water Rights Decision No. 1600, the Irrigation District engaged in negotiations with Metropolitan to transfer conserved water to Metropolitan in exchange for payments that would be used to fund the conservation program. Unfortunately, those negotiations proved fruitless when the Irrigation District's board of directors rejected a proposed memorandum of understanding that would have transferred 100,000 acre-feet of water annually to Metropolitan in exchange for annual payments of $10 million.

Four years after Water Rights Decision No. 1600, the Board conducted further hearings on the Irrigation District's unreasonable water use practices and its failure to correct them. As a result of those hearings, in Order No. WR 88-20 the Board ordered the Irrigation District to enter into an agreement with a separate entity willing to finance water conservation measures in the district or take other measures. Thereafter, the Irrigation District entered into an agreement with Metropolitan for the transfer of approximately 100,000 acre-feet annually from the Irrigation District to Metropolitan.

From 1990 through 1999, California consistently used between 100,000 and 800,000 acre-feet more Colorado River water annually than the 4.4

million acre-feet to which it had irrevocably and unconditionally agreed to limit itself. In 1996, the Secretary of the Interior declared that California must implement a strategy to enable the state to limit its annual use of Colorado River water to the promised amount in normal years and to develop alternate means of meeting its water needs without jeopardizing the use or delivery of Colorado River water to other states.

To that end, in 1998 the Irrigation District entered into an agreement with San Diego for the transfer of up to 300,000 acre-feet of conserved water to San Diego annually (the Transfer Agreement). This was the largest agricultural-to-urban water transfer in United States history. In connection with the agreement, the Irrigation District and San Diego jointly petitioned the Board for approval of the transfer. (See *County of Imperial v. Superior Court* (2007) 152 Cal.App.4th 13, 20 [61 Cal.Rptr.3d 145].) Metropolitan, Coachella, and the County protested the transfer petition. Metropolitan and Coachella also filed court actions challenging the agreement. Around this same time, Metropolitan asked the Secretary of the Interior to revisit whether the allocations of California's share of Colorado River water provided for in the Seven-Party Agreement should be continued.

### *The Quantification Settlement Agreement and Related Agreements*

Thereafter, negotiations ensued "to consensually settle [the] longstanding disputes regarding the priority, use and transfer of Colorado River water." In October 1999, the Irrigation District, Metropolitan, Coachella, and the state issued a document memorializing the " 'Key Terms' " for a proposed Quantification Settlement Agreement between and among those parties. Three years passed, however, without any definitive settlement being reached.

In 2002, the Irrigation District, San Diego, Coachella, and Metropolitan entered into an agreement whereby Coachella and Metropolitan dismissed their protests to the transfer petition in exchange for the Irrigation District making 100,000 acre-feet of conserved water available annually to Coachella or Metropolitan, leaving 200,000 acre-feet annually for San Diego. Thereafter, in December 2002, the Board approved the Transfer Agreement.

When no definitive Quantification Settlement Agreement was signed by the end of 2002, however, the Secretary of the Interior reduced the Irrigation District's water allocation for 2003. After the Irrigation District obtained a preliminary injunction from a federal court to halt the reduction, the Secretary of the Interior reduced Metropolitan's and Coachella's deliveries instead to keep California within its annual 4.4 million acre-feet allocation.

Thereafter, in October 2003, the Quantification Settlement Agreement and a number of related agreements were finally approved and executed. Among the related agreements was an agreement for acquisition of conserved water between the Irrigation District and Coachella (the Acquisition Agreement).

As described in one of the agreements, the Quantification Settlement Agreement "settle[d] a variety of long-standing Colorado River disputes regarding the priority, use and transfer of Colorado River water, establishe[d] the terms for the further distribution of Colorado River water among [Coachella, the Irrigation District, and Metropolitan] for a period of time based upon the water budgets set forth therein and include[d] as a necessary component thereof the implementation of the . . . Transfer Agreement and the . . . Acquisition Agreement. These conserved water transfers and the [Quantification Settlement Agreement] are critical components of the State's efforts to comply with the California Limitation Act of 1929, Section 4 of the Boulder Canyon Project Act of 1928 and to implement the California Constitutional mandate of Article X, Section 2."[10]

In connection with the Quantification Settlement Agreement, the Irrigation District, Coachella, Metropolitan, and San Diego—acting as "co-lead agencies"—prepared a program environmental impact report (EIR) evaluating the potential environmental impacts from the implementation of the agreement (the Quantification Settlement Agreement PEIR). The Irrigation District also prepared an EIR for the water transfers from the Irrigation District to San Diego, Coachella, and Metropolitan (the Transfer Project EIR). (*County of Imperial v. Superior Court, supra*, 152 Cal.App.4th at p. 23.)

To resolve and allocate responsibility between the Irrigation District, San Diego, and Coachella for environmental mitigation relating to the Transfer Agreement and the Acquisition Agreement, those parties entered into the "Environmental Cost Sharing, Funding and Habitat Conservation Plan Development Agreement." Those parties, along with the State of California (by and through the Department of Fish and Game), also entered into the Joint Powers Agreement, which was to serve as "the principal mechanism for ensuring that required mitigation under [state and federal environmental laws] for the[ water] transfers w[ould] be fully paid for." The Joint Powers Agreement allocated responsibility for the environmental mitigation costs among the four parties to that agreement, with the aggregate liability of the three water agencies (the Irrigation District, San Diego, and Coachella) capped at a then present value of $133 million (the environmental mitigation cost limitation) and with responsibility for any additional costs (excess

---

[10] That constitutional provision "mandates that water be put to reasonable and beneficial use." (*City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1236 [99 Cal.Rptr.2d 294, 5 P.3d 853].)

mitigation costs) to be borne by the state. On this latter point, section 9.2 of the Joint Powers Agreement specifically provided: "[t]he State is solely responsible for the payment of the costs and liability for Environmental Mitigation Cost Requirements in excess of the Environmental Mitigation Cost Limitation," which amount was to "be determined by the affirmative vote of three Commissioners [of the Joint Powers Authority], including the Commissioner representing the State, which determination shall be reasonably made." The agreement further provided that "[t]he State obligation is an unconditional contractual obligation of the State of California, and such obligation is not conditioned upon an appropriation by the Legislature, nor shall the event of non-appropriation be a defense."[11]

### The Litigation

On November 5, 2003, the Irrigation District commenced the validation action by filing a validation complaint in Imperial County Superior Court seeking to validate the Quantification Settlement Agreement and 12 related agreements, including the Joint Powers Agreement, the Transfer Agreement, and the Acquisition Agreement (*Imperial Irrigation Dist. v. All Persons Interested* (Super. Ct. Imperial County, No. ECU01649)). A week later, the Irrigation District filed its first amended complaint.

On November 7, 2003, POWER commenced its CEQA action by filing a mandamus petition in Imperial County Superior Court challenging the Transfer Project EIR (*Protect Our Water and Environmental Rights v. Imperial Irrigation Dist.* (Super. Ct. Imperial County, No. ECU01653) (*POWER v. Imperial Irrigation Dist.*)). POWER later filed an answer in the validation action, asserting (among other things) that the Irrigation District was asking "for validation of unconstitutional agreements" and that the Irrigation District had failed "to comply with all environmnental [*sic*] regulations and laws prior to execution of the contracts."

On November 10, 2003, the County commenced its CEQA action by filing a mandamus petition in Imperial County Superior Court challenging the Quantification Settlement Agreement PEIR (*County of Imperial v. Metropolitan Water Dist. of Southern California* (Super. Ct. Imperial County, No. ECU01656)). The County also filed an answer in the validation action, asserting (among other things) that the Irrigation District did not properly

---

[11] We note that "mitigation" of the environmental effects of the Transfer Agreement and the Acquisition Agreement is not the same as "restoration" of the Salton Sea, as the concept of "restoration" encompasses addressing detrimental environmental impacts to the Salton Sea that stem from causes beyond simply the actions taken under the Transfer Agreement and the Acquisition Agreement. (See, e.g., Fish & G. Code, § 2930 et seq. [the Salton Sea Restoration Act].)

comply with the CEQA before finalizing the Transfer Agreement and approving the Quantification Settlement Agreement.

Parties that filed answers in the validation action supporting the Irrigation District's position included the State of California ex rel. Department of Water Resources and Department of Fish and Game, San Diego, Coachella, Metropolitan, Vista Irrigation District (Vista), and the City of Escondido (Escondido). Parties other than POWER and the County that filed answers in the validation action opposing the Irrigation District's position included the Air District, Cuatro Del Mar (Cuatro),[12] Ronald and Laura Leimgruber, the Morgan/Holtz parties,[13] Andrew S. Krutzsch, and the Barioni parties.[14] Another answering party who aligned himself against the Irrigation District's position was Larry Porter.[15]

In December 2003, San Diego moved to transfer the validation action and the two CEQA actions from Imperial County to Sacramento County. While those motions were pending, the Irrigation District filed a petition to coordinate the validation action with eight other actions relating to the Quantification Settlement Agreement, two of which were pending in Sacramento County and six of which were pending in Imperial County (including the two CEQA actions).[16]

---

[12] Cuatro is a business entity that "farms a 1,200 acre citrus and palm tree ranch on the south shore of the Salton Sea."

[13] In the trial court, the Morgan/Holtz parties consisted of Walter J. Holtz; Michael W. Morgan; John J. Elmore; Richard Elmore; John N. and Cathleen B. Fifeld; Gary Foster; Rodney Foster; Foster Feed Yard, Inc.; Toni F. Holtz; JR Norton Ventures Limited Partnership; John R. Norton, trustee, Norton Family Living Trust; Mark N. Osterkamp; Osterkamp Farms, Inc.; R & R Land and Cattle Co.; Steve Scaroni Inc.; Clifford Strahm; Rodney Strahm; Ernest Strahm; Michael Strahm; Victor Thomson; Daniel H. and Robin J. Lillywhite, trustees; John Smith; Pauline E. Hawk; John Hawk; Susan M. Hawk; Jon J. Vessey Irrevocable Trust; Vessey Land Co., LLC; and Vessey & Co., Inc. On appeal, the Morgan/Holtz parties are limited to Walter J. Holtz, Michael W. Morgan, John J. Elmore, Richard Elmore, Gary Foster, Rodney Foster, and Toni F. Holtz.

[14] The Barioni parties are Donald V. Barioni; Beach Line Citrus, LLC; Bixby Land Company; Robert S. Chell; Coast Imperial Partners; Donald L. Howard and Kimberlee A. Howard as trustees; Chrisman B. Jackson; Mary A. Jackson and Chrisman B. Jackson as trustees; John D. Jackson, Jr., individually and as trustee; Margaret M. Lillywhite and Daniel H. Lillywhite as trustees; Daniel H. Lillywhite and Robin J. Lillywhite as trustees; Rosal Randes; Sali Properties; The Sinclair Ranches, LLC; TAC Land, LLC; and Charles H. Westmoreland and Alexa Westmoreland as trustees.

On appeal, Andrew Krutzsch has apparently thrown in his lot with the Barioni parties, as a single respondents' brief has been filed on behalf of the "Barioni/Krutzsch parties."

[15] On appeal, Larry Porter has joined with the Leimgrubers and the Morgan/Holtz parties in filing a single respondents' brief. Hereafter, we will refer to all of these parties as the Morgan/Holtz parties.

[16] One of the Imperial County cases the Irrigation District sought to coordinate (*County of Imperial v. Metropolitan Water Dist. of Southern California, supra,* No. ECU01643) had

In January 2004, the Imperial County Superior Court granted the motion to transfer the two CEQA actions to Sacramento County but continued the hearing on the motion to transfer the validation action to February. In February, the court granted the motion to transfer the validation action as well. A couple of days later, the Chief Justice of California and Chairperson of the Judicial Council authorized the presiding judge of the Imperial County Superior Court to assign a coordination motion judge to determine whether coordination of the nine actions was appropriate.

In March 2004, the presiding judge of the Imperial County Superior Court assigned Judge Donal B. Donnelly as the coordination motion judge. In May 2004, Judge Donnelly ordered the nine actions coordinated, selected this court as the reviewing court with appellate jurisdiction, and recommended that the coordinated proceeding be assigned to a trial judge in Sacramento with CEQA experience.

Later that month, the Chief Justice of California and Chairperson of the Judicial Council authorized the presiding judge of the Sacramento County Superior Court to assign a coordination trial judge. In June 2004, the presiding judge assigned the coordinated proceeding to Judge Roland L. Candee.

In July 2004, the validation action and the two CEQA actions were formally received by the Sacramento County Superior Court and assigned Sacramento County case numbers.[17]

In August 2004, the County filed an amended mandamus petition in its CEQA action. The first cause of action in that petition purported to allege a claim under the wheeling statutes. The second cause of action contained the County's CEQA claims challenging the Quantification Settlement Agreement PEIR.

Subsequently, two add-on cases (Super. Ct. Imperial County, Nos. ECU01834 & ECU01886)—sometimes referred to as the Western Farms cases—were coordinated with the original nine actions.

In January 2005, the trial court sustained demurrers without leave to amend in two of the coordinated cases filed by the County (Super. Ct. Imperial

---

actually been dismissed five days earlier. Despite this fact, the dismissed case was ultimately included in the coordinated proceeding.

[17] The validation action was assigned case No. 04CS00875 (*Imperial Irrigation Dist. v. All Persons Interested* (Super. Ct. Sac. County)), POWER's CEQA action was assigned case No. 04CS00877 (*Protect Our Water & Environmental Rights v. Imperial Irrigation Dist.* (Super. Ct. Sac. County) (*POWER v. Imperial Irrigation Dist.*)), and the County's CEQA action was assigned case No. 04CS00878 (*County of Imperial v. Metropolitan Water Dist. of Southern California* (Super. Ct. Sac. County)).

County, No. ECU01650; *County of Imperial v. State Water Resources Control Bd.* (Super. Ct. Sac. County, No. 03CS00082)).[18] The County sought writ relief from this court, and on March 30, 2005, this court issued an alternative writ and stayed *all* proceedings in the coordinated cases.

In June 2007, this court affirmed the trial court's ruling. (*County of Imperial v. Superior Court, supra,* 152 Cal.App.4th at p. 13.) In August 2007, the stay on the coordinated proceeding was finally lifted.

In February 2008, the trial court sustained a demurrer without leave to amend with respect to another of the coordinated cases (*South Coast Air Quality Management Dist. v. State Water Resources Control Bd.* (Super. Ct. Sac. County, No. 03CS00083)), and a judgment dismissing that case was entered in April 2008. (An appeal from that judgment is presently pending in this court.) (*Imperial County Air Pollution Control Dist. v. State Water Resources Control Bd.* (C059264).) That left six of the coordinated cases pending, including the three cases that are at issue in these appeals.[19]

Following a status conference in September 2009, the trial court published a "list of remaining issues" and tentatively set trial dates. The court divided the trial into three phases. Phases 2 and 3—which are not at issue here—were to address the Western Farms cases and the Meyers Farms matter respectively.[20] Phase 1, which was divided into three subphases, was to address everything else. Phase 1B was to address the CEQA issues relating to the Quantification Settlement Agreement PEIR, raised primarily in the County's CEQA action (but also raised in answers to the validation action). Phase 1C was to address CEQA and NEPA issues relating to the Transfer Project EIR, raised primarily in POWER's CEQA action. Phase 1A was to address all matters in the validation action not within the scope of phases 1B and 1C. The court tentatively set 11 trial days in November and December 2009 for the trial of phase 1A, 4 trial days in December 2009 for the trial of phase 1B, and 11 trial days in January 2010 for the trial of phase 1C.

The trial of phase 1A went forward as scheduled. On December 10, 2009, the court issued its tentative ruling, in which the court proposed to invalidate 11 of the 12 agreements the Irrigation District had sought to validate and to dismiss the CEQA challenges as moot. Based on this tentative ruling, the trial court vacated the phase 1B and phase 1C trial dates.

---

[18] The trial court also sustained a demurrer without leave to amend, and granted another dispositive motion, with respect to one of the other coordinated cases (Super. Ct. Imperial County, No. ECU01646), and judgment was entered in that action in February 2005.

[19] The three of the six remaining coordinated cases that are not at issue here are the Western Farms cases and another CEQA action discussed further below.

[20] The Meyers Farms matter refers to a cross-complaint in the validation action.

Following the receipt of written comments and oral argument from the parties, the trial court issued its "Statement of Decision Following Phase 1A Trial" on January 13, 2010. After determining that one of the 13 agreements before it in the validation action was "not properly subject to validation," the trial court concluded the Joint Powers Agreement was unconstitutional because it violated article XVI, section 7 of the California Constitution, which provides that "[m]oney may be drawn from the Treasury only through an appropriation made by law and upon a Controller's duly drawn warrant." The trial court apparently concluded that the language of section 9.2 of the Joint Powers Agreement, which made the state's obligation to pay the excess mitigation costs unconditional, notwithstanding the lack of an appropriation by the Legislature, could not be read consistently with the state Constitution, given that the excess mitigation costs were "expressly projected . . . to cost well in excess of the constitutional debt limit."

Having determined that the Joint Powers Agreement was unconstitutional, the trial court found that the 11 other contracts had to be invalidated as well because they were "interdependent with the [Joint Powers Agreement]." The court then determined that all of "the CEQA, NEPA and Clean Air Act claims and defenses" in the validation action and the two CEQA actions were moot because of the invalidation of the Quantification Settlement Agreement and the 11 related agreements.[21]

Subsequently, on February 11, 2010, the trial court issued its judgment. In the validation action, the court decreed that the 12 agreements subject to validation were "void and invalid." The court then dismissed POWER's CEQA action and the County's CEQA action as moot, with the exception that the court entered judgment against the County on its first cause of action in its CEQA action (for violation of the wheeling statutes).

### The Appeals

On February 19, 2010, the Irrigation District appealed. That same day, San Diego, Coachella, Metropolitan, Vista, and Escondido filed a joint notice of appeal. On February 23, 2010, the state appealed.

On March 9, 2010, the County and the Air District filed a joint notice of cross-appeal, asserting the trial court had committed various errors in the validation action, the County's CEQA action, and POWER's CEQA action.

---

[21] This conclusion also applied to a third CEQA action that was still pending at that point (case No. ECU01658). The subsequent judgment also encompassed that action. Because no appeal was taken with respect to that aspect of the judgment, however, we do not address that action any further, and nothing we do or say herein affects the judgment of dismissal with respect to that action.

On March 16, 2010, POWER filed a notice of cross-appeal likewise asserting the trial court had committed various errors in the County's CEQA action and POWER's CEQA action.

On March 1, 2010, all of the appellants, with the exception of the state, filed a petition for writ of supersedeas. The state filed its own supersedeas petition on March 30, 2010. On May 7, 2010, we granted both petitions, staying enforcement of the judgment in the coordinated proceedings pending the finality of our decision on the various appeals and cross-appeals.

With this factual and procedural background in mind, we turn now to the various arguments offered in the hundreds of pages of opening, responding, reply, and amicus curiae briefs. We first address the arguments relating to the validation action, then address those that relate to the two CEQA actions.[22]

---

[22] Before we proceed with our discussion of the arguments on appeal, we dispose of a few preliminary matters. First, the Irrigation District has moved to strike what it contends are certain "incorrect statements" in Cuatro's respondent's brief. Because the statements at issue—correct or not—are irrelevant to our resolution of these appeals and cross-appeals, we deny that motion.

Second, numerous requests for judicial notice were made during the briefing in these cases, and we deferred ruling on six of them pending calendaring and assignment of the panel. We also have not yet ruled on a seventh request filed after the case was calendared for oral argument. As to three of those requests (the request filed by Cuatro on Dec. 2, 2010; the request filed by the County and the Air District on Feb. 10, 2011; and the request filed by the Irrigation District on Apr. 1, 2011), no opposition was filed, so those requests are granted. As to the remaining four requests, we rule as follows:

(1) With respect to the request filed by the County and the Air District on November 23, 2010, opposed by Coachella, Metropolitan, and San Diego, we conclude the subject documents are irrelevant to our resolution of these appeals and cross-appeals. Accordingly, we deny this request. (See *Hughes Electronics Corp. v. Citibank Delaware* (2004) 120 Cal.App.4th 251, 266, fn. 13 [15 Cal.Rptr.3d 244] ["As a general matter, judicial notice is not taken of matters irrelevant to the dispositive points on appeal."].)

(2) With respect to the request filed by the Irrigation District on January 7, 2011, opposed by Cuatro, the County, and the Air District, we likewise conclude the subject documents are irrelevant to our resolution of these appeals and cross-appeals and therefore deny this request also.

(3) With respect to the request filed by Coachella, Metropolitan, and San Diego on January 10, 2011, opposed by the County and the Air District, we also find the subject documents irrelevant to our resolution of these appeals and cross-appeals and deny this request on that basis.

(4) Finally, with respect to the request filed by the County and the Air District on October 31, 2011, opposed by the Irrigation District and San Diego, we also deny this request on the ground that the subject documents are irrelevant to our resolution of these appeals and cross-appeals.

DISCUSSION

I

*The Validation Action*

A

*Constitutionality of the Joint Powers Agreement*

1. *Article XVI, Section 7 of the California Constitution—The Appropriation Requirement*

On appeal, the state, the Irrigation District, Coachella, Metropolitan, and San Diego all argue the trial court erred in determining the Joint Powers Agreement is unconstitutional under section 7 of article XVI of the California Constitution. As we have noted, that section provides that "[m]oney may be drawn from the Treasury only through an appropriation made by law and upon a Controller's duly drawn warrant."

The trial court's explanation in its statement of decision of how the Joint Powers Agreement violates article XVI, section 7 of the California Constitution is not entirely clear; however, the court appeared to be concerned that because section 9.2 of the Joint Powers Agreement makes the state's obligation to pay the excess mitigation costs "an unconditional contractual obligation" that is "not conditioned upon an appropriation by the Legislature," and because "the event of non-appropriation [is not] a defense," the intended effect of section 9.2 of the Joint Powers Agreement was to entitle the Irrigation District, Coachella, and San Diego (which, along with the state, were the parties to the Joint Powers Agreement) to money from the Treasury to satisfy the state's obligation to pay the excess mitigation costs even without an appropriation of that money by the Legislature. To the extent this was the court's reasoning, the trial court understandably concluded that such a result would contravene section 7 of article XVI of the California Constitution, which allows money to be drawn from the Treasury only by means of an appropriation.

As we will explain, however, we conclude the trial court erred in its interpretation of section 9.2 of the Joint Powers Agreement because under California law there is a fundamental difference between an *obligation* of the state and the right of the party to whom the obligation is owed to *enforce* that obligation. While section 9.2 of the Joint Powers Agreement unconditionally obligates the state to pay the excess mitigation costs, the imposition of that

obligation on the state does not violate the appropriation requirement of section 7, article XVI of the California Constitution because nothing in the Joint Powers Agreement gives the Irrigation District, Coachella, or San Diego (or anyone else for that matter) the right to enforce that obligation by drawing money from the Treasury without an appropriation.

Under a proper understanding of the Joint Powers Agreement, read consistently with article XVI of section 7 of the California Constitution, if the conditions for the state's payment of excess mitigation costs were to arise but the state refused to appropriate money from the Treasury to pay those costs, then the Irrigation District, Coachella, and San Diego would have a breach of contract claim against the state based on the state's breach of the Joint Powers Agreement, and the state would not be able to assert the lack of an appropriation as a defense to that claim. Nevertheless, even if the water agencies obtained a judgment against the state, they could not force the state to draw money from the Treasury to satisfy that judgment because the separation of powers doctrine precludes the courts from compelling the Legislature to enact an appropriation measure. Thus, in the face of legislative intransigence, it is possible the water agencies could be left with an unenforceable judgment for the unpaid excess mitigation costs, despite the state's unconditional contractual obligation to pay those costs.

■ While that possible result might appear to make the state's obligation to pay the excess mitigation costs illusory, it does not. This is so because a contract with the government cannot be found illusory just because the Legislature can refuse to appropriate the funds necessary to perform its obligation under the contract; otherwise, many contracts with the government would be illusory.

■ Thus, as explained more fully hereafter, while the Joint Powers Agreement imposes an unconditional contractual obligation on the state to pay the excess mitigation costs, the agreement does not give the Irrigation District, Coachella, San Diego, or anyone else the right to enforce that obligation by taking money from the Treasury in the absence of an appropriation by the Legislature. Construed in this manner, the Joint Powers Agreement does not violate article XVI of section 7 of the California Constitution, and the trial court erred in concluding otherwise.

a. *Standard of Review and Rules of Interpretation*

■ "[W]e apply de novo review, exercising our independent judgment as to the meaning of the" Joint Powers Agreement because "[i]t is a judicial function to interpret a contract or written document unless the interpretation turns upon the credibility of extrinsic evidence. . . . We are guided by the

well-settled rules of interpretation of a contract, endeavoring to effectuate the mutual intent of the parties as it existed at the time of contracting insofar as it is ascertainable and lawful." (*City of El Cajon v. El Cajon Police Officers' Assn.* (1996) 49 Cal.App.4th 64, 70–71 [56 Cal.Rptr.2d 723].)

■ In interpreting the Joint Powers Agreement, the following principles of contract interpretation are of particular significance: " 'A contract must be interpreted to give effect to the mutual, expressed intention of the parties. Where the parties have reduced their agreement to writing, their mutual intention is to be determined, whenever possible, from the language of the writing alone.' [Citations.] 'Contract formation is governed by objective manifestations, not the subjective intent of any individual involved. [Citations.] The test is "what the outward manifestations of consent would lead a reasonable person to believe." ' " (*Allen v. Smith* (2002) 94 Cal.App.4th 1270, 1277 [114 Cal.Rptr.2d 898].) "It is the outward expression of the agreement, rather than a party's unexpressed intention, which the court will enforce." (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166 [6 Cal.Rptr.2d 554].) Thus, in interpreting the Joint Powers Agreement, we are not concerned as much with what the parties might tell us they meant by the words they used as with how a reasonable person would interpret those words.[23]

■ Of equal importance is the rule that " '[a] contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties.' (Civ. Code, § 1643; see also *id.*, § 3541.) Pursuant to this rule, we will not construe a contract in a manner that will render it unlawful if it reasonably can be construed in a manner which will uphold its validity." (*People v. Parmar* (2001) 86 Cal.App.4th 781, 802 [104 Cal.Rptr.2d 31].)

"[I]t will not be supposed that the parties entered into agreements contemplating a violation of the law. On the contrary, it will be deemed that they intended a lawful, rather than an unlawful, act, and their agreements will be construed, if possible, as intending something for which they had the power to contract." (*Barham v. Barham* (1949) 33 Cal.2d 416, 429 [202 P.2d 289].) "The court may not assume, in the absence of evidence, that the parties intended to make an unlawful contract." (*Davidson v. Kessler* (1935) 10 Cal.App.2d 89, 91 [51 P.2d 174].)

---

[23] For this reason, there is no merit in the Morgan/Holtz parties' argument that the trial court's determination that the Joint Powers Agreement was unconstitutional under section 7 of article XVI of the California Constitution should be upheld because of arguments made by counsel on behalf of the state and the Irrigation District at trial. What counsel may have argued the Joint Powers Agreement meant cannot constrain our interpretation of the agreement any more than statements by those who signed the agreement about what *they* thought it meant.

Finally, we note that "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.) "[E]ven if one provision of a contract is clear and explicit, it does not follow that that portion alone must govern its interpretation; the whole of the contract must be taken together so as to give effect to every part." (*Alperson v. Mirisch Co.* (1967) 250 Cal.App.2d 84, 90 [58 Cal.Rptr. 178].) "An interpretation which renders part of the instrument to be surplusage should be avoided." (*Ticor Title Ins. Co. v. Rancho Santa Fe Assn.* (1986) 177 Cal.App.3d 726, 730 [223 Cal.Rptr. 175].)

### b. *What Is an Appropriation*

In addressing the propriety of the trial court's conclusion that section 9.2 of the Joint Powers Agreement violates article XVI, section 7 of the California Constitution, it is also important to understand a few things about appropriations. As we have noted already, section 7 of article XVI of the California Constitution requires an appropriation to draw money from the Treasury. But what exactly is an appropriation? Under California law, "An appropriation is a legislative act setting aside 'a certain sum of money for a specified object in such manner that the executive officers are authorized to use that money and no more for such specified purpose.' " (*California Assn. for Safety Education v. Brown* (1994) 30 Cal.App.4th 1264, 1282 [36 Cal.Rptr.2d 404], quoting *Ryan v. Riley* (1924) 65 Cal.App. 181, 187 [223 P. 1027].) "To [be] an appropriation within the meaning of the Constitution, nothing more is requisite than a designation of the amount, and the fund out of which it shall be paid." (*McCauley v. Brooks* (1860) 16 Cal. 11, 28–29.) The designation of a specific amount, however, is actually required only when the appropriation is from the state's general fund. "Where the appropriation is made by the legislature and the money is to be paid out of the general fund . . . the appropriation must be specific both as to purpose and amount; neither of these requisites can be left indefinite nor uncertain." (*Ryan,* at pp. 187–188.) On the other hand, "It cannot be questioned that a statute making available a specific fund for a definite object constitutes a valid appropriation of such fund, and it is not even necessary that the amount thereof be fixed or specified." (*California Toll Bridge Authority v. Kelly* (1933) 218 Cal. 7, 14 [21 P.2d 425].)

### c. *Appropriation as a Legislative Act*

It is also important to understand that the power of appropriation rests in the legislative branch alone. An early case that illustrates this point is *Myers v. English* (1858) 9 Cal. 341. In *Myers,* the plaintiff sought a writ of mandamus to compel the State Treasurer to pay certain warrants drawn for

the payment of portions of the salaries of district judges. (*Id.* at p. 341.) On appeal from the denial of his petition, the plaintiff tried to avoid the impact of a legislative enactment providing that no such warrants should be paid by arguing that the constitutional provision providing for the payments of compensation to judges, "taken in connection with the statute fixing . . . the amount of the salary of a Judge, and the stated times at which that salary shall be paid, is, in fact, an appropriation of so much money in the treasury for that purpose; and that, therefore, no further appropriation is required by act of the Legislature, nor can that body defeat the payment of the prior appropriation made by the Constitution . . . ." (*Id.* at pp. 346–347, italics omitted.)

The Supreme Court disagreed, concluding that "the Legislature possesses the power to stop the whole machinery of government, whenever it is willing to take the responsibility of doing so." (*Myers v. English, supra,* 9 Cal. at p. 349.) According to the court, "the power to collect and appropriate the revenue of the State is one peculiarly within the discretion of the Legislature," and while "[i]t is within the legitimate power of the judiciary, to declare the *action* of the Legislature unconstitutional, where that action exceeds the limits of the supreme law," "the Courts have no means, and no power, to avoid the effects of *non-action.* . . . Therefore, when the Legislature fails to make an appropriation, we cannot remedy that evil. It is a discretion specially confined by the Constitution to the body possessing the power of taxation." (*Ibid.*)

Thus, "the separation of powers doctrine has generally been viewed as prohibiting a court from directly ordering the Legislature to enact a specific appropriation . . . ." (*Mandel v. Myers* (1981) 29 Cal.3d 531, 540 [174 Cal.Rptr. 841, 629 P.2d 935].) "[I]t is equally well established[, however,] that once funds have already been appropriated by legislative action, a court transgresses no constitutional principle when it orders the State Controller or other similar official to make appropriate expenditures from such funds," "[a]lthough such an order will normally issue only when the Legislature has authorized the use of the appropriated funds for the purpose for which an expenditure is sought." (*Ibid.*)

> d. *The Constitutional Appropriation Requirement and the Joint Powers Agreement*

With the background set forth above in mind, we turn to the question of whether, interpreting the Joint Powers Agreement as a whole, section 9.2 of the Joint Powers Agreement can reasonably be construed as lawful and consistent with the appropriation requirement of article XVI, section 7 of the California Constitution. We conclude that it can.

As we have suggested already, the key to understanding how section 9.2 of the Joint Powers Agreement can be read so as not to violate the constitutional appropriation requirement lies in the difference between an *obligation* of the state and the *enforcement* of that obligation—or, as the state expresses the point in its opening brief, the difference between a "promise to pay" and "actual payment." According to the state, "There is a material difference between a contract term that promises payment if certain conditions arise, and a contract term addressing how payments are to be made." In the state's view, section "9.2 [of the Joint Powers Agreement] provides that the State's obligation [to pay the excess mitigation costs] is not conditioned upon an appropriation, and that the lack of an appropriation is no defense," "[b]ut [section] 9.2 [of the Joint Powers Agreement] does not call for or describe payment by the State at all, much less in unconditional terms. Thus, . . . while the State's promise to perform its duties under [the Joint Powers Agreement] is not dependent on the existence of an appropriation, the [actual payment] of such costs is."

The state finds support for this distinction in *White v. Davis* (2003) 30 Cal.4th 528 [133 Cal.Rptr.2d 648, 68 P.3d 74]. One of the issues the Supreme Court addressed in *White* was whether "under the provision of the California Constitution barring the impairment of contracts (Cal. Const., art. I, § 9), the state is constitutionally required during a budget impasse to pay state employees, on their regular payday, their regular and full salaries for work performed during that period." (*White*, at p. 564.) A state employees' union argued for the requirement, asserting "that the Controller is authorized to pay a state employee's salary on his or her regular payday even in the absence of a duly enacted and available appropriation, because the failure to pay an employee's salary at such time would amount to an unconstitutional impairment of contract." (*Ibid.*)

The Supreme Court first observed that "past California cases clearly establish that although the conditions of public employment generally are established by statute rather than by the terms of an ordinary contract, once a public employee has accepted employment and performed work for a public employer, the employee obtains certain rights arising from the legislative provisions that establish the terms of the employment relationship—rights that are protected by the contract clause of the state Constitution from elimination or repudiation by the state." (*White v. Davis, supra*, 30 Cal.4th at p. 566.) The court then turned to the question of whether those rights included "the right to receive payment of earned salary in the absence of an available appropriation." (*Ibid.*, italics omitted.)

Based on the appropriation requirement in section 7 of article XVI of the California Constitution, as well as several Government Code provisions that,

read together, stand for the proposition that "the actual payment of a state employee's salary is dependent upon the availability of a duly enacted appropriation" (*White v. Davis, supra,* 30 Cal.4th at p. 569), the Supreme Court concluded that "the employment rights of state employees reasonably must be viewed as including a condition that the actual payment of an employee's salary is dependent upon the existence of an available appropriation" (*id.* at pp. 568–569). Thus, the court concluded that "the state constitutional contract provision does not afford state employees the right to obtain the actual payment of salary from the treasury prior to the enactment of an applicable appropriation." (*Id.* at p. 571.) The court further observed, however, that while "state employees have no right under the contract clause to the *immediate* payment of salary in the absence of a duly enacted appropriation for payment of such salaries, it should be emphasized that this conclusion does *not* mean that state employees who work during a budget impasse do so as 'volunteers.' " (*Id.* at pp. 570–571.) On the contrary, "employees who work during a budget impasse obtain a right, protected by the contract clause, to the ultimate payment of salary that has been earned." (*Id.* at p. 571, italics omitted.)

The Supreme Court's decision in *White* supports the distinction the state draws in this case in support of a constitutional reading of section 9.2 of the Joint Powers Agreement. Under *White,* a state employee who performs services for the state during a budget impasse has a right to be paid for those services, and the state has a corresponding obligation to pay for those services. But the employee does not have a right to payment in the absence of an appropriation. Thus, while the state has an obligation to pay the employee, the employee does not have a right to enforce that obligation if there has been no applicable appropriation. (See also *Valdes v. Cory* (1983) 139 Cal.App.3d 773, 789 [189 Cal.Rptr. 212] [if the Legislature fails to appropriate funds to satisfy an obligation of the state, the courts cannot compel the Legislature to make an appropriation or to order payment of the obligation].)

This distinction between an *obligation* of the state and the right of the party to whom the obligation is owed to *enforce* that obligation explains the "unconditional obligation" language of section 9.2 of the Joint Powers Agreement in a way that avoids the constitutional infirmity the trial court found in that language. Under the terms at issue here, the state's "obligation" to the Irrigation District, Coachella, and San Diego to pay the excess mitigation costs is "unconditional" in the sense that it is "not conditioned upon an appropriation by the Legislature" to pay those costs; in other words, the state owes that obligation to the water agencies as a matter of contract law regardless of whether an appropriation has been made, and the state cannot assert the lack of appropriation as a defense to a contract claim against the state under the California Tort Claims Act (see Gov. Code, § 905.2, subd. (b)(3) [requiring presentation of a claim for "money or damages on

express contract"]) or to a subsequent court action for breach of contract. That does not mean, however, that the water agencies have the right to *enforce* the state's obligation by drawing money from the Treasury to satisfy the obligation in the absence of an appropriation. Notwithstanding the unconditional nature of the state's obligation to pay the excess mitigation costs, the ability of the water agencies to enforce that obligation—whether by means of a judgment or otherwise—is still subject to the appropriation requirement of article XVI, section 7 of the California Constitution, and to the separation of powers principles that preclude the courts from ordering the Legislature to make an appropriation. Thus, to paraphrase Coachella, Metropolitan, and San Diego in their opening brief, the "contract with the State is not voided by a lack of appropriation," "but [the water agencies] must wait for payment [on the contract] until there is an appropriation."

This reading of section 9.2 of the Joint Powers Agreement is consistent with section 14.2 of the agreement, which addresses the action to be taken "[i]f the Authority anticipates that the Environmental Mitigation Cost Limitation will be exceeded within two years." In that circumstance, section 14.2 of the Joint Powers Agreement provides that "the Authority shall submit a written notice to the State stating the reasons for that anticipation, as well as estimates of the projected cost of remaining Environmental Mitigation Requirements." Then, "as soon as it appears that the expenditures of the Authority are within $5,000,000 of the Environmental Mitigation Requirement Cost Limitation," "[t]he State will seek, with the support of the other Parties, to obtain Legislative appropriation of funds sufficient to satisfy the State obligation, if any, for costs of the Environmental Mitigation Requirements . . . so long as the Authority has encumbered the total amount owed pursuant to Article IX by [Coachella], the [Irrigation District] and [San Diego]."

Thus, section 14.2 of the Joint Powers Agreement provides for efforts to be made to obtain an appropriation to satisfy the state's obligation to pay the excess mitigation costs. This commitment to seek an appropriation would have been unnecessary if the trial court's interpretation of section 9.2 of the Joint Powers Agreement were correct and the parties' intent was that the water agencies could enforce the obligation against the state *without* an appropriation. Thus, reading the Joint Powers Agreement as a whole supports a construction of section 9.2 of the Joint Powers Agreement that is consistent, rather than inconsistent, with the constitutional appropriation requirement of article XVI, section 7 of the California Constitution.

■ Of course, under our construction of the Joint Powers Agreement, the state potentially could avoid satisfying its obligation to pay the excess mitigation costs simply by having the Legislature refuse to appropriate money

from the Treasury to pay those costs. At first glance, the state's power to avoid paying the excess mitigation costs in this manner might appear to render the Joint Powers Agreement void as an illusory contract, but that is not true. "The rule that a bilateral contract not binding on one party is illusory is subject to many exceptions. [Citations.] As pointed out in section 84(e) of the Restatement [of Contracts], a contract does not lack mutuality where the promise of one of the parties is unenforceable or voidable because of 'a special privilege not expressly reserved in the promise but given by the law.' Well-known examples of such exceptions are voidable contracts of infants and insane persons. Of particular significance is illustration 8 of section 84(e) of the Restatement, which reads: 'A makes a bilateral agreement with the United States Government. The promise of the Government though unenforceable is not, because of that, insufficient consideration for A's promise.' [Citation.] A similar exception must be recognized here. . . . [I]f the rule were otherwise, [many] contracts between the state and its subdivisions would be void." (*Metropolitan Water Dist. v. Marquardt* (1963) 59 Cal.2d 159, 179 [28 Cal.Rptr. 724, 379 P.2d 28].) Thus, just because the state might be able to avoid satisfying its payment obligation under the Joint Powers Agreement by failing to appropriate funds to make the payment does not make the contract void as lacking mutuality.

Additionally, it must be noted that just because the Legislature might, hypothetically, refuse to appropriate funds for the specific purpose of paying the excess mitigation costs does not necessarily mean the water agencies would be left with no ability to enforce the state's obligation to pay those costs. As we have noted already, while a court cannot order the Legislature to enact a specific appropriation—including an appropriation to satisfy a judgment against the state—"once funds have already been appropriated by legislative action, a court transgresses no constitutional principle when it orders the State Controller or other similar official to make appropriate expenditures from such funds . . . when the Legislature has authorized the use of the appropriated funds for the purpose for which an expenditure is sought." (*Mandel v. Myers, supra*, 29 Cal.3d at p. 540.) For example, in *Mandel* the Supreme Court determined that money that had been appropriated for the " 'operating expenses and equipment' " of the Department of Health Services "was generally available for payment of court-awarded attorney fees." (*Id.* at pp. 542–545.) Thus, to the extent the Legislature had already appropriated money for purposes that could be deemed to encompass the payment of excess mitigation costs under the Joint Powers Agreement, and to the extent that money was still available for expenditure under such an appropriation, the three water agencies could seek a court order for that money to enforce the state's payment obligation under the agreement even in the absence of an appropriation made specifically to satisfy that obligation.

That the Irrigation District, Coachella, and San Diego have this enforcement option available to them not only illustrates why the Joint Powers Agreement is not illusory, but also provides further support for the conclusion that the agreement is consistent with article XVI, section 7 of the California Constitution. In essence, the "unconditional contractual obligation" language of section 9.2 of the Joint Powers Agreement ensures that the state cannot avoid its obligation to pay the excess mitigation costs by claiming that the Legislature's failure to appropriate money for that specific purpose negates that obligation. This leaves the water agencies the opportunity to enforce the state's obligation by reaching other funds that have been appropriated already for purposes consistent with environmental mitigation for which the state is financially responsible under the Joint Powers Agreement.

For all of the foregoing reasons, we conclude the trial court erred in finding that the Joint Powers Agreement violated the appropriation requirement of article XVI, section 7 of the California Constitution.

### 2. Article XVI, Section 1 of the California Constitution—The Debt Ceiling

Having rejected the sole reason the trial court gave for invalidating the Joint Powers Agreement—and the other agreements with it—we next turn to the various other arguments offered by respondents to uphold the trial court's decision. We do this because "we review the judgment, not the rationale, and may affirm if the judgment is correct on any theory." (*Airlines Reporting Corp. v. Renda* (2009) 177 Cal.App.4th 14, 21 [99 Cal.Rptr.3d 66].) "In other words, it is judicial action, and not judicial reasoning or argument, which is the subject of review; and, if the former be correct, we are not concerned with the faults of the latter." (*Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 330 [48 P. 117].)

One of the alternate rationales offered for the trial court's decision is based on section 1 of article XVI of the California Constitution, which provides, in pertinent part, that "[t]he Legislature shall not, in any manner create any debt or debts, liability or liabilities, which shall, singly or in the aggregate with any previous debts or liabilities, exceed the sum of three hundred thousand dollars ($300,000), except in case of war to repel invasion or suppress insurrection, unless the same shall be authorized by law for some single object or work . . . but no such law shall take effect unless it has been passed by a two-thirds vote of all the members elected to each house of the Legislature and until, at a general election or at a direct primary, it shall have been submitted to the people and shall have received a majority of all the votes cast for and against it at such election . . . ."

In its final list of issues to be litigated in phase 1A of the trial, the trial court specifically included Cuatro's argument that the agreements the Irrigation District sought to validate were void because the state's funding commitment in the Joint Powers Agreement violated the debt limitation provisions of article XVI, section 1 of the California Constitution and Cuatro argued that issue at length in its trial brief. In its tentative ruling, the trial court appeared to find that the Joint Powers Agreement violated not only section 7 of article XVI of the California Constitution, but section 1 as well. In its statement of decision, however, while the court continued to discuss section 1 of article XVI of the California Constitution, the court limited its finding of a constitutional violation to of article XVI, section 7 of the California Constitution.

On appeal, the County and Cuatro both rely on article XVI, section 1 of the California Constitution in arguing that the trial court correctly found the Joint Powers Agreement unconstitutional. Accordingly, we must address whether the Joint Powers Agreement is consistent with section 1 as well as with section 7 of article XVI of the California Constitution. We conclude that it is.

 An early explanation of section 1 of article XVI of the California Constitution can be found in *Bickerdike v. State* (1904) 144 Cal. 681 [78 P. 270]. As the court explained there, "such debts and liabilities as had been authorized by the people of the state at a general election, in the manner provided by [article XVI of section 1 of the California Constitution], cannot be taken into consideration in determining the question as to the power of the legislature to itself create an indebtedness. The section was not designed to limit the amount of indebtedness that might be created by the state, for under its express provisions an indebtedness may be created for any amount, and there is no other provision in the constitution prescribing a limit of aggregate indebtedness. The section goes entirely to the manner of the creation of indebtedness. It was recognized that without some such provision the legislative department might at will create indebtedness to any amount, and it was thought that some limit should be placed upon this power. The language used indicates the intention and object of this provision very clearly, which was simply to put a limit upon the amount of indebtedness that might at any time be created by the legislature itself. That body was to have power to create debts to the extent of three hundred thousand dollars only. The indebtedness created by the legislature itself must at no time exceed three hundred thousand dollars. It was deemed proper that the legislature should have the power at all times to go to this extent, because of possible needs of the state government. If any further indebtedness became necessary, the people must authorize it by their votes at a general election, but an indebtedness so authorized became in effect one created by the people, and one excluded from the category of debts created by the legislature, within the meaning of this constitutional provision. So far as is material here, the section, in effect, simply provides that the legislature shall not, in any

manner, create any debt or liability which shall, singly or in the aggregate, with any previous existing debts or liabilities created by the legislature, exceed the sum of three hundred thousand dollars." (*Id.* at pp. 695–696, italics omitted.)

The County and Cuatro premise their argument that the Joint Powers Agreement violates article XVI, section 1 of the California Constitution on the assertion that mitigation costs are expected to exceed by far more than $300,000 the $133 million the Irrigation District, Coachella, and San Diego committed to pay. According to Cuatro, because "the State's expected obligations would exceed $300,000," the state's commitment to pay the excess mitigation costs would pass constitutional muster under article XVI, section 1 of the California Constitution only if the Legislature "passed [legislation authorizing the expenditure] by two-thirds vote in each house and place[d] a bond initiative on the ballot" or if the Legislature "appropriate[d] monies to cover the State's Obligation."[24] (Italics omitted.) Because the state did neither, the argument goes, the Joint Powers Agreement violates section 1, article XVI of the California Constitution.

 The Irrigation District, Coachella, Metropolitan, San Diego, and the state offer several responses to this argument, but we need address only one. They argue the state's commitment in the Joint Powers Agreement to pay the excess mitigation costs does not violate section 1, article XVI of the California Constitution because the state's commitment is contingent on there *being* excess mitigation costs, and a contingent obligation does not qualify as a "debt" or "liability" within the meaning of section 1, article XVI of the California Constitution. We agree.

Long ago, the California Supreme Court stated that "[a] sum payable upon a contingency is not a debt, nor does it become a debt until the contingency happens." (*Doland v. Clark* (1904) 143 Cal. 176, 181 [76 P. 958].) And even earlier than that, the court stated that "[a] sum of money which is certainly and in all events payable is a debt, without regard to the fact whether it be payable now or at a future time. A sum payable upon a contingency, however, is not a debt, or does not become a debt until the contingency has happened." (*People v. Arguello* (1869) 37 Cal. 524, 525.)

Here, there is no "sum of money which is certainly and in all events payable" by the state because of its commitment in the Joint Powers Agreement to pay the excess mitigation costs. On the contrary, the state is not

---

[24] It has long been understood that "no indebtedness or liability is created, within the meaning of [section 1, article XVI of the California Constitution], when . . . the legislature, at the time of authorizing the obligation, appropriates money to meet such obligation." (*Riley v. Johnson* (1933) 219 Cal. 513, 520 [27 P.2d 760].)

obligated to pay anything until such time as the mitigation costs exceed the $133 million the Irrigation District, Coachella, and San Diego have committed to cover. Unless and until that contingency occurs, the state owes nothing. Thus, the state's obligation to pay the excess mitigation costs is not a debt within the meaning of section 1, article XVI of the California Constitution.

Support for this conclusion can be found in *Bickerdike*. That case involved an act of the Legislature (the Bounty Act of 1891) providing for the payment of a $5 bounty from the state's General Fund for every coyote killed. (*Bickerdike v. State, supra*, 144 Cal. at p. 683.) In a suit brought by a plaintiff who claimed to be the assignee of $72,330 worth of bounty claims, the state asserted the Bounty Act was invalid under section 1 of article XVI of the California Constitution. (*Bickerdike*, at pp. 685, 694.) The Supreme Court disagreed, writing as follows: "At the date of the passage of the Bounty Act of 1891 the indebtedness created by the legislature did not, so far as appears, exceed five thousand dollars. The legislature still had the power to create a further indebtedness of two hundred and ninety-five thousand dollars. The act of 1891, which provided for a bounty of five dollars for each coyote destroyed, to be paid to the person destroying it, did not of itself create any debt or liability. It was simply an offer upon condition, and only upon the performance of the condition by any person could a debt or liability arise on the part of the state. Upon such performance, however, by any person, the amount specified in the act—viz., five dollars for each coyote killed by him in accordance with the provisions of the act—would become due such person from the state, and, no appropriation having been provided to meet the claim, such amount would be a debt created by the legislature within the meaning of the constitutional provision. But the amounts which might become due to persons under the terms of said act would not necessarily exceed two hundred and ninety-five thousand dollars. The act could not, therefore, be held upon its face to violate the constitutional provision. The legislature had the power to create indebtedness to the extent of three hundred thousand dollars. The mere fact that the total amount that would ultimately be paid under the act was not named, and that under its terms, in the course of years, claims might possibly accrue and remain unpaid that, with other debts, would exceed the constitutional limit, would not affect the question as to the constitutionality of the act. The only possible effect of the constitutional provision in such a case would be to render void, as beyond the power of the legislature, any indebtedness incurred in excess of the constitutional limit." (*Id.* at pp. 696–697, italics omitted.)

Just like the enactment of the Bounty Act in *Bickerdike*, the signing of the Joint Powers Agreement "did not of itself create any debt or liability." (*Bickerdike v. State, supra*, 144 Cal. at p. 696.) "The mere fact that the total amount that would ultimately be paid under the [Joint Powers Agreement] was not named, and that under its terms, in the course of years, [excess

mitigation costs] might possibly accrue and remain unpaid that . . . would exceed the constitutional limit, would not affect the question as to the constitutionality of the [agreement]." (*Id.* at p. 697.) Because the agreement created only a *contingent* obligation, it did not create any debt and therefore did not and could not violate article XVI, section 1 of the California Constitution.

The County and Cuatro offer various arguments to counter this conclusion, but we are not persuaded by any of them. Cuatro argues that the "contingent obligation" exception[25] to section 1, article XVI of the California Constitution applies only "[i]n vastly different circumstances" than those presented here. More specifically, Cuatro suggests the contingent obligation exception applies only when a "limit" is placed on the state-created obligation and/or the obligation is "contingent upon ongoing contemporaneous consideration." We disagree.

It is true many of the cases in which the contingent obligation exception to the debt limitation of section 1, article XVI of the California Constitution has been applied—including *Doland v. Clark*—involved lease agreements that could be characterized (as Cuatro characterizes them) as involving "limits" on the ultimate amount of the obligation and "ongoing contemporaneous consideration" that was to be received in exchange for the obligation. For example, *Doland* involved city leases for two telegraph systems. (*Doland v. Clark, supra*, 143 Cal. at pp. 177–178.) The first lease provided for payment of $390 per month in rent for a period of five years, while the second provided for a payment of $300 per month for the same period. (*Id.* at p. 178.) Thus, the terms of the contracts at issue in *Doland* set an outside limit on the amount payable under the leases—the monthly rent times the number of months in the lease period—and those contracts could be understood as providing ongoing contemporaneous consideration—use of the telegraph systems—in exchange for the monthly payments that were due under the leases. In the end, however, the *legally significant* fact was that "[t]he monthly rental under both contracts . . . would not become due until the [lessor] had performed his contracts and put the systems contemplated by the contracts in operation" and thus "[t]he amounts to become due on completion of the contracts by [the lessor] might never become a liability upon the city." (*Id.* at p. 181.) It was immediately following the observation of *this* fact that the Supreme Court observed, "A sum payable upon a contingency is not a debt, nor does it

---

[25] As this court explained in *Taxpayers for Improving Public Safety v. Schwarzenegger* (2009) 172 Cal.App.4th 749 [91 Cal.Rptr.3d 370], the "exception to the constitutional debt limits [that] has been recognized where the governmental entity enters into a contingent obligation" is not really an "exception" at all; rather, it "is fundamentally a recognition that the transaction or legislation in question does not create a 'debt' owed by the governmental entity within the meaning of the debt limit provisions, but is instead a payment arrangement that falls entirely outside of those provisions." (*Id.* at p. 762.)

become a debt until the contingency happens." (*Ibid.*) Thus, as we read *Doland*, it is the *contingency*—that is, the uncertainty that the government will end up paying any money—that renders section 1 of article XVI of the California Constitution inapplicable. Such uncertainty is present here just as it was in *Doland*.

For its part, the County argues that the "attempt" of the water agencies and the state to "portray [the state's mitigation] commitment as a 'contingent debt' " "fails on multiple levels." Ultimately, however, the County's only argument that directly addresses the contingent obligation exception is that "[t]he present case more closely resembles ones in which commitments to fund open-ended and potentially unlimited amounts have violated constitutional debt limits." But the two cases the County cites are distinguishable because, unlike the case before us, those cases both clearly involved obligations that, while perhaps uncertain in amount, could in no way be characterized as "contingent."

Thus, in *Chester v. Carmichael* (1921) 187 Cal. 287 [201 P. 925], the obligation at issue was the obligation of the City of Sacramento to spend at least $5,000 a year until certain property deeded to the city had been improved into a park, which obligation was imposed as a condition of the conveyance of title to the city. (*Id.* at pp. 287–289.) The Supreme Court recognized that the completion of the improvements, "with a prescribed minimum expenditure therefor each year, was . . . the purchase price for the land, payable in yearly installments." (*Id.* at p. 291.) "So regarding the transaction," the Supreme Court concluded that "it falls within the inhibition of section 18 of article XI of the constitution, which precludes any city from incurring 'any indebtedness or liability in any manner or for any purpose' exceeding in any year the income and revenue provided for such year without the assent of two-thirds of the qualified electors thereof." (*Chester*, at p. 291.) In reaching this conclusion, the court specifically found that its earlier decision in *Doland* was "in no way in point" because in *Chester* (unlike in *Doland*) "the full liability [of the city] to the grantors was created *upon the acceptance of the deed* . . . ." (*Chester*, at pp. 293–294.) In other words, the city's obligation to turn the property into a park was not contingent on anything once the city accepted the deed to the property. In this case, however, as we have noted already, the state's obligation to pay the excess mitigation costs *was* contingent on there actually *being* excess mitigation costs.

In *Mahoney v. San Francisco* (1927) 201 Cal. 248 [257 P. 49], the obligation at issue was the obligation of the City and County of San Francisco under what purported to be a lease agreement to construct "a park and playground, including a wading and swimming pool," "which, it is

alleged, will call for large annual outlays of the city's income, which are not provided for in any manner." (*Id.* at pp. 255–256.) The Supreme Court concluded that "[t]he outstanding facts of [*Chester*] and legal principles announced therein cannot be distinguished from this case, nor do the minor differences of detail minimize its force as an authority here." (*Mahoney*, at p. 264.) In other words, just as in *Chester*, in *Mahoney* the city's obligation to construct the park was not contingent on anything once the city signed the agreement. Here, on the other hand, the state's obligation *was* contingent; it was contingent on there actually *being* excess mitigation costs to pay.

Because the state's commitment in the Joint Powers Agreement to pay the excess mitigation costs was contingent on there being excess costs to pay, the agreement did not create a "debt" within the meaning of section 1 of article XVI of the California Constitution and accordingly did not violate that constitutional provision. Thus, we cannot uphold the trial court's invalidation of the Joint Powers Agreement and the 11 other agreements on this basis.

B

*Other Challenges to the Joint Powers Agreement*

Some respondents argue that we should affirm the judgment invalidating the various agreements for reasons that do not relate to the constitutionality of the Joint Powers Agreement. We turn to those arguments now.

1. *Ultra Vires*

Cuatro argues that the Irrigation District's execution of the Joint Powers Agreement on October 10, 2003, was "ultra vires" because "material and significant changes were made to the [agreement] *after* the [Irrigation District's] board [of directors] approved the draft outline" of the agreement on October 2, 2003. We conclude this argument is not properly before us.

Cuatro's ultra vires argument is based on the fact that when the Irrigation District's board of directors adopted the resolution approving the various agreements (resolution No. 10-2003) on October 2, 2003, some of the agreements, including the Joint Powers Agreement, were not in final form. To address this situation, instead of authorizing the Irrigation District's officers to sign a particular version of the agreements, the board of directors authorized "the President or Vice President and the Secretary to sign the [agreements], upon determination by the General Manager and the Chief Counsel that said agreements are substantially in the same form and substance as those . . . submitted to the [b]oard [of directors] for review prior to approval of this Resolution."

■ Cuatro's position is that the final version of the Joint Powers Agreement signed on October 10, 2003, was "substantially different" than what the board of directors reviewed prior to adopting resolution No. 10-2003, and these "material changes to the [agreement] meant that it was no longer 'in the same form and substance' as the agreement approved by the [b]oard [of directors]." According to Cuatro, this means the Irrigation District's officers had no authority under resolution No. 10-2003 to sign the Joint Powers Agreement that *was* signed, and the agreement is therefore "ultra vires and void." (See generally *Foxen v. City of Santa Barbara* (1913) 166 Cal. 77, 82 [134 P. 1142] [a contract made by a public agency without authority is ultra vires and void].)

In its statement of decision, the trial court set forth what it believed to be the basic elements of the Irrigation District's prima facie case in the validation action; those elements did *not* include proof that the agreements the Irrigation District sought to validate were not ultra vires and void.[26] Cuatro has not asserted that the trial court erred in its determination of the elements of the Irrigation District's prima facie case. Thus, it follows that the question of whether the Joint Powers Agreement signed on October 10, 2003, was ultra vires and void because it was substantively different than what was submitted for the board of directors' review prior to adoption of resolution No. 10-2003 was a matter that had to be specifically pled and proved as an affirmative defense in one or more of respondents' answers to the Irrigation District's complaint.

■ Under general rules of civil procedure, an answer must contain "[t]he general or specific denial of the material allegations of the complaint controverted by the defendant" and "[a] statement of any new matter constituting a defense." (Code Civ. Proc., § 431.30, subd. (b)(1) & (2).) "The phrase 'new matter' refers to something relied on by a defendant which is not put in issue by the plaintiff. [Citation.] Thus, where matters are not responsive to essential allegations of the complaint, they must be raised in the answer as 'new matter.'" (*State Farm Mut. Auto. Ins. Co. v. Superior Court* (1991) 228 Cal.App.3d 721, 725 [279 Cal.Rptr. 116].)

Such "new matter" is also known as "an affirmative defense." (*Advantec Group, Inc. v. Edwin's Plumbing Co., Inc.* (2007) 153 Cal.App.4th 621, 627 [63 Cal.Rptr.3d 195].) Affirmative defenses must not be pled as "terse legal

---

[26] The trial court was "satisfied that [the Irrigation District] as plaintiff in these contract validation proceedings would have to prove, as a minimum, that (1) the plaintiff is a public agency with authority to approve the contracts in question, (2) the contracts are validatable, (3) the public agency's approval complied with open meeting requirements, (4) the approval of the contracts was by the required vote (here, majority), and (5) the public agency acted in a manner that was not 'arbitrary, capricious, or entirely lacking in evidentiary support.'"

conclusions," but "rather . . . as facts 'averred as carefully and with as much detail as the facts which constitute the cause of action and are alleged in the complaint.' " (*FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 384 [282 Cal.Rptr. 508].) "A party who fails to plead affirmative defenses waives them." (*California Academy of Sciences v. County of Fresno* (1987) 192 Cal.App.3d 1436, 1442 [238 Cal.Rptr. 154].)

Here, in its answer to the Irrigation District's second amended complaint, Cuatro alleged as its second affirmative defense that the Irrigation District was "without authority in whole or in part to take the actions addressed" and as its eighth affirmative defense that the Irrigation District "violated its fiduciary and other trust obligation[s] . . . by, executing the contracts at issue." To the extent Cuatro contends these allegations were sufficient to put at issue the ultra vires argument it now advances, we disagree. As we have noted, affirmative defenses cannot be pled as mere legal conclusions but must instead be alleged with as much factual detail as the allegations of a complaint. Cuatro's second and eighth affirmative defenses, which were alleged as mere legal conclusions, were not sufficient to put at issue the question Cuatro now argues on appeal, which is that the Joint Powers Agreement signed on October 10, 2003, was ultra vires and void because it was substantively different than what was submitted for the Board's review prior to adoption of resolution No. 10-2003.

Even if we were to assume that the ultra vires argument Cuatro now seeks to raise was adequately pled in Cuatro's answer, Cuatro abandoned its ultra vires defense before trial, because in its revised statement of issues, which "identifie[d] the specific challenges and affirmative defenses [Cuatro] intend[ed] to pursue at trial," Cuatro did not identify *any* ultra vires argument as an issue Cuatro intended to pursue at trial. Consistent with Cuatro's abandonment of its ultra vires defense in its statement of issues, the final list of issues to be litigated in phase 1A of the trial did not include the ultra vires issue Cuatro now attempts to advance on appeal, and Cuatro did not argue the ultra vires issue in its trial brief.

It is true "[a] party may raise a new issue on appeal if that issue is purely a question of law on undisputed facts." (*Phillips v. TLC Plumbing, Inc.* (2009) 172 Cal.App.4th 1133, 1141 [91 Cal.Rptr.3d 864].) Here, however, Cuatro has made no effort to show that its ultra vires argument falls within the scope of that exception to the general rule that new issues cannot be raised for the first time on appeal. (See *Giraldo v. Department of Corrections & Rehabilitation* (2008) 168 Cal.App.4th 231, 251 [85 Cal.Rptr.3d 371] [stating the general rule].) Given this failure, we decline to consider whether we should exercise our discretion to address this argument. (See *Resolution Trust Corp. v. Winslow* (1992) 9 Cal.App.4th 1799, 1810 [12 Cal.Rptr.2d 510]

[whether to consider an issue raised for first time on appeal " 'is largely a question of the appellate court's discretion' "].) Accordingly, the judgment invalidating the Joint Powers Agreement and the other agreements cannot be sustained based on this issue.

### 2. *Meeting of the Minds*

The Barioni/Krutzsch parties and the Morgan/Holtz parties both argue that there was no "meeting of the minds" between the parties to the Joint Powers Agreement, and this lack of mutual consent to the agreement's terms provides an independent basis for affirming the judgment in the validation action. We disagree.

The Barioni/Krutzsch parties essentially argue that, whether one looks solely at the face of the Joint Powers Agreement or one includes other "objective manifestations of the intent of the parties" in the analysis as well, "[a] reasonable person cannot say that the parties [to the agreement] have all agreed upon the same thing in the same sense as contemplated by Civil Code [section] 1580."[27] (Boldface and italics omitted.) The gist of their argument appears to be that the Irrigation District (and perhaps the other water agencies as well) had to have thought the state's obligation to pay the excess mitigation costs was not only unconditional but also unconditionally *enforceable*—i.e., enforceable without the need for an appropriation by the Legislature—while the state had to have thought otherwise.

For their part, the Morgan/Holtz parties contend the trial court actually *found* there was no meeting of the minds between the parties to the Joint Powers Agreement, and they contend this finding was supported by substantial evidence. Unlike the argument of the Barioni/Krutzsch parties, the meeting of the minds argument the Morgan/Holtz parties advance focuses—like Cuatro's ultra vires argument—on alleged differences between what was before the Irrigation District's board of directors when the board of directors adopted resolution No. 10-2003 approving the various agreements and the final version of the Joint Powers Agreement signed by the Irrigation District's

---

[27] One of the essential elements of a contract is mutual consent. (Civ. Code, § 1565.) "Consent is not mutual, unless the parties all agree upon the same thing in the same sense. But in certain cases defined by the chapter on interpretation, they are to be deemed so to agree without regard to the fact." (*Id.*, § 1580.)

officers.[28] In the view of the Morgan/Holtz parties, these differences mean that "the collective minds of the decision makers never met."[29]

The Irrigation District, Coachella, Metropolitan, and San Diego offer numerous arguments in response to the assertion that there was no meeting of the minds on the Joint Powers Agreement. Among other things, they contend that these meeting of the minds arguments involve "asserted defects in contract formation [that] are not properly before th[is] Court in this validation action" because "[c]ontract elements [we]re not part of [the Irrigation District]'s prima facie case in validation" and respondents did not plead or prove the lack of a meeting of the minds as an affirmative defense. For its part, the Irrigation District asserts (among other things) that trial was limited to identified issues, and "[n]o one identified a trial issue regarding intent, mutual assent, mutual mistake, or 'meeting of the minds.' "[30]

We have serious doubt as to whether these meeting of the minds arguments are properly before us, because whether they had to be pleaded and proved as affirmative defenses, they were not—as the Irrigation District points out—included in the final list of issues to be litigated in phase 1A of the trial. But even if we assume the arguments are properly before us, we find no merit in them.

First, we disagree with the Morgan/Holtz parties' assertion that the trial court actually *found* there was no meeting of the minds on the Joint Powers Agreement. It is true that under the subheading of "The IID Contract Approval Process" in its statement of decision—which in turn fell under the heading of "What are the relevant facts on the issue of whether [the Irrigation District]'s action was not arbitrary, capricious, or entirely lacking in evidentiary support?"—the trial court found that (1) "[t]he wording of the [Joint Powers] Agreement . . . was not settled on at the time of the [Irrigation

---

[28] Unlike Cuatro, however, the Morgan/Holtz parties focus largely on an October 2, 2003, draft of the Joint Powers Agreement that was not part of the administrative record considered by the trial court, but was brought forward for the first time in this court in connection with the supersedeas petitions.

[29] To the extent the Morgan/Holtz parties have included in the meeting of the minds section of their respondents' brief assertions relating to the Ralph M. Brown Act (Gov. Code, § 54950 et seq.)—even going so far as to assert that the trial court made a "factual finding . . . that a violation of the Ralph M. Brown Act (Gov. Code, § 54950.5 et seq.) structurally precluded any lawful agreement"—we disregard those assertions because they are not set forth under an appropriate separate heading or subheading and are asserted only perfunctorily. (See *Santa Teresa Citizen Action Group v. State Energy Resources Conservation & Development Com.* (2003) 105 Cal.App.4th 1441, 1451 [130 Cal.Rptr.2d 392].) We do note, however, that the trial court specifically asserted in its statement of decision that it was not "reach[ing] the open meeting issue."

[30] Coachella, Metropolitan, and San Diego make a similar point in a footnote, as confirmation of their assertion that no one pleaded this issue as an affirmative defense.

District] [b]oard's formal approval on October 2, 2003"; (2) "the [Joint Powers] Agreement . . . still had substantive terms remaining to be negotiated as of October 6, 2003"; and (3) "material portions of the [Joint Powers] Agreement were still being negotiated days after the October 2, 2003, approval by the [Irrigation District] [b]oard." These findings, however, do not amount to a finding that there was no meeting of the minds on the Joint Powers Agreement; nor do we see such a finding anywhere else in the statement of decision. Indeed, such a finding would have obviated the need for the trial court to consider what it found dispositive—whether the Joint Powers Agreement was constitutional—because if there was no meeting of the minds, then there was no contract, constitutional or otherwise. Thus, reading the statement of decision as a whole, it appears the trial court concluded there *was* a meeting of the minds—albeit a meeting on terms the trial court found unconstitutional (but we do not).

To the extent the Morgan/Holtz parties rely on alleged differences between what was before the Irrigation District board of directors and the version of the Joint Powers Agreement the Irrigation District's officers signed to argue there was no meeting of the minds, their premise is flawed. If there was a contract at all, it was the one all the contracting parties signed.[31] If, for some reason, the board of directors did not approve the contract the Irrigation District's officers ultimately signed, that might make the signed contract ultra vires and void but it would not provide the basis for a challenge based on the lack of mutual consent. Since the question of whether the Irrigation District's officers had the authority to sign the final version of the Joint Powers Agreement is not properly before us (as we have explained in rejecting Cuatro's ultra vires argument), we must presume the final version of the agreement is what the board of directors authorized, and the question of whether there was a meeting of the minds regarding *that* agreement is all that remains.

■ To the extent the Barioni/Krutzsch and Morgan/Holtz parties contend there *was* no meeting of the minds—as evidenced by the agreement itself and other "objective manifestations of the intent of the parties"—we are not persuaded. As we have previously suggested, "in determining whether there has been a mutual consent to contract the courts are not interested in the subjective intent of the parties, but only in their objective intent—that is[,] what would a reasonable man believe from the outward manifestations of consent." (*Leo F. Piazza Paving Co. v. Bebek & Brkich* (1956) 141 Cal.App.2d 226, 230 [296 P.2d 368].) "Mutual assent is determined under an objective

---

[31] The Joint Powers Agreement contains an integration clause, providing that "[t]his Agreement contains the entire understanding of the Parties with respect to the subject matter hereof, and supersedes any prior understanding between the Parties, except as set forth herein, whether written or oral."

standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." (*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 141 [127 Cal.Rptr.2d 145].) Furthermore, "[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . ." (Civ. Code, § 1639.) Thus, in a case like this involving a written contract, whether there was mutual consent—i.e., a meeting of the minds—must be determined from the written contract itself, and if a reasonable and lawful construction can be given to the contract, then that is where we must conclude the minds of the parties met.

Here, we have explained already in rejecting the constitutional challenges to the Joint Powers Agreement how the terms of the agreement can be reconciled, not only with each other but with constitutional requirements and limitations. Under California law, the parties must be deemed to have mutually consented to the reasonable and lawful interpretation we have given their agreement to save it from constitutional invalidity. That someone, subjectively, might have had a different understanding of the agreement is of no moment. Accordingly, the meeting of the minds arguments are without merit.

## C

### *Conflict of Interest*

The Morgan/Holtz parties argue that the judgment in the validation action should be affirmed because *all* the agreements the Irrigation District sought to validate were void as violating Government Code section 1090. The gist of their argument appears to be that members of the Irrigation District's "team" involved in negotiating the agreements had financial interests in connection with the agreements that were adverse to the Irrigation District and therefore "all parts of the . . . transaction—[including] the environmental documentation . . .—are void ab initio."

Specifically, the Morgan/Holtz parties allege the following people had conflicting financial interests: John Carter, the Irrigation District's chief

counsel; David Osias, special counsel for the Irrigation District; and Dr. Rodney Smith, an economist who advised the Irrigation District on pricing issues.[32]

The final list of issues for phase 1A of the trial included the Morgan/Holtz parties' assertion that the Irrigation District "violated Government Code section 1090 by allowing persons who are conflicted public officials within the meaning of the law to influence the [agreements] and transfers and hid that evidence from the public." The Morgan/Holtz parties argued this issue in their brief, but the trial court rejected the argument in its statement of decision. The court found that while "John Carter was, as [the Irrigation District's] Chief Counsel, a public official within the meaning of Government Code section 1090," there was no evidence that either "David Osias or Dr. Rodney Smith were public officials." Furthermore, as to Carter, the court found no evidence that he "had a 'financial interest' in the [agreements] as . . . required to establish a [Government Code] section 1090 violation."

On review, we find no error in the trial court's determinations. Government Code section 1090 provides in relevant part as follows: "Members of the . . . district . . . shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members. . . . [¶] As used in this article, 'district' means any agency of the state formed pursuant to general law or special act, for the local performance of governmental or proprietary functions within limited boundaries."

■ This statute "codifies the long-standing common law rule that barred public officials from being personally financially interested in the contracts they formed in their official capacities." (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1072 [103 Cal.Rptr.3d 767, 222 P.3d 214].) Government Code "section 1090 is concerned with ferreting out any financial conflicts of interest, other than remote or minimal ones, that might impair public officials from discharging their fiduciary duties with undivided loyalty and allegiance to the public entities they are obligated to serve. [Citation.] Where a prohibited interest is found, the affected contract is void from its inception [citation] and the official who engaged in its making is subject to a host of civil and (if the violation was willful) criminal penalties, including imprisonment and disqualification from holding public office in perpetuity [citations]." (*Id.* at p. 1073.)

■ "To determine whether [Government Code] section 1090 has been violated, a court must identify (1) whether the defendant government officials

---

[32] Osias is an attorney with Allen, Matkins, Leck, Gamble & Mallory LLP, the law firm the Irrigation District retained beginning in early 1997 to represent the Irrigation District in connection with the issues that ultimately led to the Quantification Settlement Agreement and the various related agreements.

or employees participated in the making of a contract in their official capacities, (2) whether the defendants had a cognizable financial interest in that contract, and (3) (if raised as an affirmative defense) whether the cognizable interest falls within any one of [Government Code] section 1091's or section 1091.5's exceptions for remote or minimal interests." (*Lexin v. Superior Court, supra*, 47 Cal.4th at p. 1074.) For purposes of Government Code section 1090, the making of a contract "encompasse[s] the planning, preliminary discussion, [and] compromises . . . that le[a]d up to the formal making of [a] contract." (*People v. Honig* (1996) 48 Cal.App.4th 289, 315 [55 Cal.Rptr.2d 555].) And while "[t]he types of financial interests prohibited by [Government Code] section 1090 are many and varied" (*ibid.*), "[t]he interest proscribed by Government Code section 1090 is an interest *in* the contract. The purpose of the prohibition is to prevent a situation where a public official would stand to gain or lose something with respect to the making of a contract over which in his official capacity he could exercise some influence" (*People v. Vallerga* (1977) 67 Cal.App.3d 847, 867–868, fn. 5 [136 Cal.Rptr. 429], italics added).

Under the foregoing principles, the Morgan/Holtz parties' Government Code section 1090 argument is easily resolved. Even assuming for the sake of argument that all three "negotiators" for the Irrigation District qualified as government officials or employees who participated in the making of the Quantification Settlement Agreement in their official capacities, no violation of Government Code section 1090 was shown here because the Morgan/Holtz parties fail to point to any evidence that any of the negotiators had a financial interest in any of the agreements the Irrigation District approved.

As to Osias, they assert "[h]e had professional, i.e., fiscal, relationships with others interested in the water transfer matters." In support of that assertion, the Morgan/Holtz parties cite the Irrigation District's retainer agreement with Osias's firm, in which Osias (in whose name the letter was written) stated that the firm was going to continue its representation of various other clients in "matters involving water issues in the Imperial and Coachella Valleys," as well as other clients "located within the Metropolitan Water District service area, San Diego County, [and] Imperial and Coachella Valleys in matters unrelated to water."

Based on this statement, the Morgan/Holtz parties argue that Osias was "disloyal [to the Irrigation District], placing himself in a position of temptation of putting [the Irrigation District] into a secondary position." At no point, however, do they explain what specific financial interest Osias or his firm had in any of the various agreements or how their continued representation of other clients in the area on water issues (as well as matters unrelated to water) impaired them from discharging their fiduciary duties with undivided

loyalty and allegiance to the Irrigation District. The Morgan/Holtz parties certainly do not point to any evidence that Osias and his firm stood to gain or lose financially in connection with their representation of those other clients based on the various agreements. Absent any such evidence, the Morgan/Holtz parties failed to establish the financial interest element of a Government Code section 1090 violation.

The same is true with respect to Smith. According to the Morgan/Holtz parties, Smith "chose to work for" San Diego—"a party directly adverse to" the Irrigation District—"during negotiations" of the agreements. In support of their assertion, the Morgan/Holtz parties point to evidence that while advising the Irrigation District with relation to the issues that led to the agreements, Smith undertook to provide "expert advice and consulting services" to San Diego "concerning financial issues pertaining to" Metropolitan. Again, however, the Morgan/Holtz parties fail to explain how Smith stood to gain or lose financially with respect to the services he was providing San Diego because of his role in negotiating the agreements for the Irrigation District. Thus, the Morgan/Holtz parties failed to show that Smith had a financial interest in those agreements.

Finally, with respect to Carter—chief counsel for the Irrigation District— the Morgan/Holtz parties offer no argument and point to no evidence to show he had a prohibited financial interest in the agreements. Instead, they limit their argument on this element to Osias and Smith, thus effectively conceding that the trial court was correct in finding no evidence that Carter "had a 'financial interest' in the [agreements] as . . . required to establish a [Government Code] section 1090 violation."

Because the Morgan/Holtz parties point to no evidence sufficient to establish that any of the three negotiators for the Irrigation District had a prohibited financial interest in any of the agreements, the judgment invalidating those agreements cannot be upheld based on this issue.[33]

---

[33] In a footnote in their Government Code section 1090 argument, the Morgan/Holtz parties complain that the trial court "precluded discovery on the [Government Code section] 1090 issues" and assert that "[t]o the extent that this Court finds an insufficient amount of evidence supporting the [Government Code section] 1090 violations, the Morgan/Holtz Parties assert that the denial of discovery was error that prejudiced their ability to obtain a favorable judgment on this issue." We decline to consider this claim of error because it is not set forth under an appropriate separate heading or subheading and is asserted only perfunctorily. (See *Santa Teresa Citizen Action Group v. State Energy Resources Conservation & Development Com., supra*, 105 Cal.App.4th at p. 1451; Cal. Rules of Court, rule 8.204(a)(1)(B).)

D

*Allegations of Misconduct*

The Morgan/Holtz parties argue that we should dismiss the appeals and affirm the judgment in the validation action because of what the Morgan/Holtz parties characterize as misconduct by the appellants during the trial court proceedings relating to the Joint Powers Agreement. We find no merit in this argument.

The basis for the argument is as follows: At trial in November 2009, David Osias, counsel for the Irrigation District, represented to the court that when the Irrigation District's board of directors approved the various agreements in October 2003 (by adopting resolution No. 10-2003), the Joint Powers Agreement was "in . . . outline form with the material terms only."[34] In his closing comments, Osias later reiterated that there was no draft of the Joint Powers Agreement in the administrative record.

As we have noted already, in its statement of decision the trial court found that "material portions of the [Joint Powers] Agreement were still being negotiated days after the October 2, 2003, approval by the [Irrigation District] Board." In support of this finding, the court relied in part on "the lack of any draft [Joint Powers] Agreement in the administrative record at the time of the [Irrigation District] [b]oard meeting."

In March 2010, in support of their petition for a writ of supersedeas, the Irrigation District, Coachella, Metropolitan, and San Diego filed with this court a declaration from John Carter, who at that time was special water rights counsel for the Irrigation District and had been the Irrigation District's chief legal counsel in 2003. In his declaration, Carter expressed his suspicion that "certain real parties in interest" would oppose the writ petition "on the grounds that the [Irrigation District's] Board of Directors . . . never approved the [Joint Powers] Agreement." Carter asserted that this accusation was "absolutely untrue," and in support of that assertion he explained that while the trial court was correct in noting the lack of a draft of the Joint Powers Agreement in the administrative record, that omission was inadvertent. Carter

---

[34] The administrative record contains a seven-page "Outline summary of the revised QSA and state legislation" dated September 30, 2003. That summary contains a section entitled "Mitigation fund agreement and mitigation funding limitation," which explained that the Department of Fish and Game, the Irrigation District, San Diego, and Coachella would "enter into a Joint Powers Authority (JPA) agreement for the payment of QSA-related mitigation obligations." The summary further explained that the Irrigation District, San Diego, and Coachella would be "obligated to pay no more than $133 million . . . and . . . [the state] will pay any unanticipated costs beyond $133 million."

asserted that "[a] draft of the [Joint Powers] Agreement was given to the [Irrigation District] [b]oard on October 2, 2003, at the open session before it voted in open session to approve the . . . agreements." He explained that copies of the draft of the Joint Powers Agreement were in his files, but it was not until the case "suddenly focused on the [Joint Powers] Agreement as trial approached" that Irrigation District "counsel discovered that the October 2, 2003 draft . . . was not in the [administrative record], but this was long after the record augmentation deadline set by the Superior Court."

It is Carter's declaration in support of the supersedeas petition in this court that provides the primary basis for the argument by the Morgan/Holtz parties that we should dismiss the appeals and affirm the judgment in the validation action. Essentially, the Morgan/Holtz parties posit that Carter's claim of inadvertent omission is incredible and the draft of the Joint Powers Agreement must have been intentionally withheld from the trial court despite knowledge by all of the appellants of its existence.[35] Relying on *Stephen Slesinger, Inc. v. Walt Disney Co.* (2007) 155 Cal.App.4th 736 [66 Cal.Rptr.3d 268], the Morgan/Holtz parties contend that "this Court is compelled to dismiss the appeal and enter a comprehensive judgment in favor of the [*sic*] all Respondents since the pervasive falsity cannot be purged."

The short answer to the Morgan/Holtz parties' argument is that *Slesinger*— the sole authority they cite—is entirely inapplicable to the situation before us. The appellate court in *Slesinger* held "that when a plaintiff's deliberate and egregious misconduct makes any sanction other than dismissal inadequate to ensure a fair trial, the trial court has inherent power to impose a terminating sanction." (*Stephen Slesinger, Inc. v. Walt Disney Co., supra*, 155 Cal.App.4th at p. 740.) In another statement of its holding, the court concluded "that California trial courts have inherent power to issue a terminating sanction when a plaintiff's misconduct is deliberate, is egregious, and makes lesser sanctions inadequate to ensure a fair trial." (*Ibid.*)

The misconduct in *Slesinger* was that over a period of at least three years a private investigator hired by the plaintiff had broken into the defendant's office buildings and secure trash receptacles and trespassed on other property to surreptitiously obtain thousands of pages of documents belonging to the defendant, including documents marked privileged and confidential, and for a period of approximately 10 years the plaintiff had concealed the investigator's activities from the defendant and the court. (*Stephen Slesinger, Inc. v. Walt Disney Co., supra*, 155 Cal.App.4th at p. 740.)

---

[35] The Morgan/Holtz parties assert that the draft of the Joint Powers Agreement "must have been . . . available to all other counsel [in addition to Carter] since it had been emailed to or from them."

 Frankly, the situation before us is nothing like *Slesinger*. *Slesinger* stands for the proposition that a trial court has inherent authority to dismiss a case when there is evidence before the trial court that the plaintiff has engaged in deliberate and egregious misconduct that makes a fair trial impossible. The Morgan/Holtz parties offer no rational explanation of how that rule can be applied here, by us, on appeal. *Slesinger* does not authorize us to do what the Morgan/Holtz parties advocate—which is to make a finding of litigation misconduct in the first instance, based on evidence from outside the appellate record.

Even if *Slesinger* could be read to give us authority to dismiss an appeal based on litigation misconduct by an appellant, just like a trial court can do to a case based on misconduct by a plaintiff, the circumstances presented here—even assuming everything the Morgan/Holtz parties want us to find is true—simply do not justify the imposition of such a drastic sanction. In *Slesinger*, no sanction short of dismissal could ensure the defendant a fair trial because, among other things, the plaintiff's "principals had gleaned information from the documents that no court order could dissipate." (*Stephen Slesinger, Inc. v. Walt Disney Co., supra*, 155 Cal.App.4th at p. 774.) In essence, there was no way to ensure that the plaintiff did not use information derived from the stolen documents during the trial. Here, even if we were to assume that one or more of the appellants deliberately concealed the draft of the Joint Powers Agreement from the trial court, the Morgan/Holtz parties fail to explain how the absence of that document prevented them from having a fair trial. To the extent the Morgan/Holtz parties believe the draft of the Joint Powers Agreement could have been used to show there was no meeting of the minds on the terms of that agreement, we have essentially rejected that argument already. Whether there was mutual consent among the contracting parties to the terms of the Joint Powers Agreement must be determined from the face of the agreement that was signed, not from some prior draft.

In short, even assuming the misconduct the Morgan/Holtz parties contend, no legitimate basis for dismissing these appeals and affirming the trial court's judgment in the validation action based on that supposed misconduct has been shown.

To the extent the Morgan/Holtz parties assert, in a related argument, that the Carter declaration "illustrates that this entire appeal is moot" and should be dismissed on *that* basis, we reject that assertion as well. Essentially the Morgan/Holtz parties contend the absence of the draft Joint Powers Agreement from the administrative record made that record "materially misleading." To the extent that contention is just another manifestation of their assertion that the absence of the draft agreement deprived them of a fair

trial,[36] we have rejected that argument already; no such showing has been made. And to the extent they really do mean to claim that the absence of the draft from the administrative record renders this appeal "moot," they are mistaken.

 "A question becomes moot when, pending an appeal from a judgment of a trial court, events transpire that prevent the appellate court from granting any effectual relief." (*Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413, 419 [67 Cal.Rptr.3d 317].) The Morgan/Holtz parties do not try to explain how the belated revelation of the existence of a draft of the Joint Powers Agreement prevents us from granting effectual relief in these appeals. Regardless of the existence of that draft, we can conclude—as we have—that the trial court erred in entering a judgment invalidating the 12 agreements the Irrigation District sought to validate based on the supposed unconstitutionality of the Joint Powers Agreement because that agreement is *not* unconstitutional. We can further conclude that no alternate basis for affirming the judgment in the validation action has been shown, and we can remand the validation action to the trial court for further proceedings—which may (or may not) include litigation over the significance of the draft Joint Powers Agreement.[37] Thus, we can grant "effectual relief" to the appellants notwithstanding the belated disclosure of the draft Joint Powers Agreement, and therefore these appeals are *not* moot on that basis.

Finally, we reject the Morgan/Holtz parties' argument that by failing to present the draft Joint Powers Agreement to the trial court, appellants somehow invited the trial court's error in its determination that the Joint Powers Agreement was unconstitutional. "Under the doctrine of invited error, when a party by its own conduct induces the commission of error, it may not claim on appeal that the judgment should be reversed because of that error." (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212 [285 Cal.Rptr. 99, 814 P.2d 1341].) Here, even assuming appellants deliberately failed to include the draft of the Joint Powers Agreement in the administrative record (a fact that has *not* been shown), we do not see how the absence of the draft induced the trial court to err in its constitutional analysis of the final version of the agreement that was the subject of the validation action. Frankly, the draft agreement is immaterial to the question of whether the final version of the agreement passes constitutional muster. Accordingly, the invited error doctrine does not apply here and provides no basis for affirming the judgment in the validation action.

---

[36] For example, the Morgan/Holtz parties assert that given the absence of the draft Joint Powers Agreement from the record, "an opinion—of whatever nature—[in this case] would be based on proceedings that no party claims were fairly conducted."

[37] In his declaration, Carter asserted that "[i]f the case is remanded for retrial, it is expected that a motion to augment the [administrative record to include the draft of the Joint Powers Agreement] will be made."

E

*Propriety of Validation*

Cuatro argues that *none* of the agreements the Irrigation District sought to validate were properly subject to validation, and "the entire case should have been heard as a declaratory relief action."[38] We reject that argument out of hand.

Water Code section 22762 specifically provides that "[a]n action to determine the validity of the Quantification Settlement Agreement defined in subdivision (a) of Section 1 of Chapter 617 of the Statutes of 2002,[39] or any action regarding a contract entered into that implements, or is referenced in, that Quantification Settlement Agreement, may be brought pursuant to Chapter 9 (commencing with Section 860) of Title 10 of Part 2 of the Code of Civil Procedure." The trial court concluded that 12 of the 13 contracts the Irrigation District sought to validate were "properly considered for validation by the Court under the authority of . . . Water Code section 22762."

Relying largely on *City of Ontario v. Superior Court* (1970) 2 Cal.3d 335 [85 Cal.Rptr. 149, 466 P.2d 693], Cuatro argues that the "legitimacy [of Water Code section 22762] cannot stand." The gist of Cuatro's argument appears to be that, notwithstanding the broad language of the statute, statutes like Water Code section 22762 "permitting validation of contracts executed between government agencies . . . are intended only for financing arrangements involving bonds and indebtedness." Because the various agreements at issue here did not involve such arrangements, the argument goes, they were not subject to validation. Cuatro is wrong.

In *City of Ontario*, the city—acting in conjunction with a private contractor—organized a nonprofit corporation to issue bonds to finance the construction of an automobile racing stadium in the city, and the nonprofit corporation

---

[38] It is not entirely clear that Cuatro intended this argument as an alternate basis for affirming the judgment invalidating the agreements, but in an abundance of caution—and because the argument is so easily refuted—we address it on that basis.

[39] " 'Quantification Settlement Agreement' means the agreement, the provisions of which are substantially described in the draft Quantification Settlement Agreement (QSA), dated December 12, 2000, and submitted for public review by the Quantification Settlement Agreement parties, and as it may be amended, and that shall include as a necessary component the implementation of the Agreement for Transfer of Conserved Water by and between the Imperial Irrigation District and the San Diego County Water Authority, dated April 29, 1998 (IID/SDCWA Transfer Agreement), and as it may be amended, and any QSA-related program that delivers water at the intake of the Metropolitan Water District of Southern California's Colorado River Aqueduct." (Stats. 2002, ch. 617, § 1(a), pp. 3461–3462.)

Cuatro does not dispute that the Quantification Settlement Agreement at issue in these appeals falls within the foregoing definition.

entered into various agreements to achieve that purpose. (*City of Ontario v. Superior Court, supra,* 2 Cal.3d at p. 338.) City taxpayers filed suit against the city and other defendants, alleging the city had entered into a scheme to establish "a commercial enterprise for the financial benefit of certain private parties, rather than for any public benefit . . . in such a manner as to evade legal restrictions placed on general law cities." (*Id.* at pp. 338–339.)

The city "moved to dismiss the entire action on the ground that the summons did not conform to the special requirements of Code of Civil Procedure sections 861 to 863," i.e., the validation statutes. (*City of Ontario v. Superior Court, supra,* 2 Cal.3d at p. 339.) "The [trial] court impliedly determined that the action was governed by [the validation statutes], but expressly found that [the] plaintiffs had shown 'good cause' to excuse their failure to comply with [Code of Civil Procedure] sections 861 and 861.1" and gave them permission to belatedly comply. (*City of Ontario,* at p. 339.) The city sought a writ of prohibition from the Supreme Court "to review that ruling and to prevent further proceedings in the action." (*Ibid.*)

On review, the Supreme Court discussed the "humble beginnings" of the validation statutes in 1961 and expressed concern that the enactment of Government Code sections 53510 and 53511 in 1963 had caused the statutes to grow "far beyond the scope originally conceived by the [Judicial] Council," which had first proposed enactment of the validation statutes. (*City of Ontario v. Superior Court, supra,* 2 Cal.3d at pp. 340–341.) In particular, the court noted that "rather than limiting this procedure to a specific class of acts by an agency, [Government Code] section 53511 extended [the validation statutes] to 'an action to determine the validity of [the agency's] bonds, warrants, contracts, obligations or evidences of indebtedness.'" (*Id.* at p. 341.)

The city contended that "the word 'contracts' in [Government Code] section 53511 [should be understood] to mean *any* contract into which the agency may lawfully enter . . . ." (*City of Ontario v. Superior Court, supra,* 2 Cal.3d at p. 341.) While noting that this construction of the statute would result in a "far-reaching expansion of the [validation] statute[s]" (*ibid.*), the Supreme Court ultimately did not decide whether Government Code section 53511 should be given the broad construction advocated by the city. Instead, the court ultimately decided that there was "one clear conclusion" in the case, namely, that "the question whether [the validation statutes] appl[y] to the case at bar presents a 'complex and debatable' issue." (*City of Ontario,* at p. 345.) "[A]ssuming arguendo that [the validation statutes] d[id] apply to th[e] case," the Supreme Court concluded that "a mistaken but reasonable decision by plaintiffs' counsel that [they] did *not* apply constitute[d] good cause for the trial court to permit belated compliance with [their] terms." (*Id.* at p. 346.) Accordingly, the court denied the city's writ petition. (*Id.* at p. 348.)

Ultimately, all the Supreme Court actually *decided* in *City of Ontario* was that the trial court there had good cause for allowing the plaintiffs in that action to belatedly comply with the particular requirements for service of summons in the validation statutes, assuming for the sake of argument that the validation statutes applied at all. The court certainly did not decide, as Cuatro suggests, that "statutes permitting validation of contracts executed between government agencies . . . are intended only for financing arrangements involving bonds and indebtedness."

To the extent that courts after *City of Ontario* have construed the word "contracts" in Government Code 53511 as having "a restricted meaning," encompassing "only those [contracts] that are in the nature of, or directly relate to a public agency's bonds, warrants or other evidences of indebtedness" (*Kaatz v. City of Seaside* (2006) 143 Cal.App.4th 13, 42 [49 Cal.Rptr.3d 95]), that conclusion has no bearing here on the intended scope of Water Code section 22762. In the latter statute, the Legislature specifically authorized validation of "the Quantification Settlement Agreement" and "any . . . contract entered into that implements, or is referenced in, th[e] Quantification Settlement Agreement." There simply can be no rational argument that by this broad and straightforward language, the Legislature intended to permit validation only of agreements that "involve bonds and indebtedness." Accordingly, we reject Cuatro's argument that the agreements the Irrigation District sought to validate in this action were not properly subject to validation.

F

*Further Issues in the Validation Action*

1. *What Is the Appropriate Disposition*

Having concluded that the trial court erred in finding the Joint Powers Agreement unconstitutional, and having rejected all of the other grounds offered for affirming the judgment in the validation action, we conclude the judgment in that action must be reversed. This conclusion obviates the need for us to address several other arguments offered by appellants relating to the validation action. Specifically, we need not consider the arguments by Coachella, Metropolitan, and San Diego that (1) the trial court misapplied California contract law when it invalidated 11 other agreements based on the invalidity of the Joint Powers Agreement and (2) even if the Joint Powers Agreement was invalid, for various reasons the trial court erred in invalidating "the three federal agreements." We also need not consider the argument of Vista and Escondido that, even if the Joint Powers Agreement was invalid, the trial court erred in invalidating the agreement known as the "Allocation

Agreement."[40] Finally, we need not consider the Irrigation District's argument that the various agreements relating to the Quantification Settlement Agreement the Irrigation District did *not* seek to validate in the validation action were validated by operation of law and this validation through nonaction precluded the invalidation of some of the other agreements the Irrigation District *did* seek to validate in this action.[41]

Even without these arguments, however, two questions remain with respect to the validation action. First, should we remand the validation action for further proceedings or for entry of judgment in favor of the Irrigation District? Second, even if we remand for further proceedings, are there any other issues for us to decide relative to the validation action?

On the first question, we note that none of the appellants—not even the Irrigation District—has asked us to remand with instructions to the trial court to enter judgment in favor of the Irrigation District in the validation action. Coachella, Metropolitan, and San Diego ask us to remand "for completion of the validation action." The state asks that we "remit the matter to the trial court for consideration of CEQA and other claims it did not reach." And for its part, the Irrigation District asks us to "find that the [Joint Powers] Agreement was constitutional, and that all other matters be sent back for trial."

That the trial court did not finish adjudicating all of the issues raised in the validation action before concluding the Joint Powers Agreement and the 11 other agreements were invalid is readily apparent. As just one example, although the trial court concluded that one of the elements of the Irrigation District's prima facie case in the validation action was whether the Irrigation District's approval of the agreements complied with open meeting requirements, the court specifically stated in its statement of decision that it did "not in this decision reach the open meeting issue." Since no one has argued the open meeting issue on appeal, we must remand for the trial court to finish adjudicating this issue at least, along with whatever other unadjudicated issues remain in the validation action.

---

[40] The Allocation Agreement refers to the Allocation Agreement among the United States of America, Metropolitan, Coachella, the Irrigation District, San Diego, the La Jolla, Pala, Pauma, Rincon and San Pasqual Bands of Mission Indians, the San Luis Rey River Indian Water Authority, Escondido and Vista.

[41] Even though it might have some bearing on remand, we need not reach this argument because, as noted below, the Irrigation District does not ask us to, but instead asks only that we "find that the [Joint Powers] Agreement was constitutional, and that all other matters be sent back for trial."

Moreover, because we do not reach the Irrigation District's "validation by operation of law" argument, we likewise do not reach Cuatro's responsive argument that validation by operation of law violates due process, or the Morgan/Holtz parties' related argument.

## 2. *Jurisdiction over Federal Clean Air Act and NEPA Claims*

Recognizing that we must remand the validation action to the trial court to complete its adjudication of the matter, we are faced with the question of whether any issues relating to the validation action remain for our resolution before we do so. We find one: the argument by Coachella, Metropolitan, and San Diego that the trial court erred in asserting jurisdiction over issues regarding compliance with the federal Clean Air Act and the NEPA. Although discussion of this issue is not necessary to our decision to reverse the judgment in the validation action and remand that action to the trial court for further proceedings, it is nonetheless properly before us for decision because (1) it is an issue of law; (2) the three water agencies raised the issue in their appeal; and (3) on remand in the validation action it appears the trial court will adjudicate claims and defenses based on these two federal laws unless we direct the court otherwise.[42] (See Code Civ. Proc., § 43 ["In giving its decision, if a new trial be granted, the [appellate] court shall pass upon and determine all the questions of law involved in the case, presented upon such appeal, and necessary to the final determination of the case."]; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 343, p. 394 ["the appellate court is not restricted to a review of just those matters necessary to support a reversal, but may (and should) consider matters that may arise on a retrial . . ."].)

The issue regarding compliance with the federal Clean Air Act and NEPA arose in the validation action as follows:

In its operative complaint, the Irrigation District alleged that it had "timely complied with all laws necessary for [the agreements] to be valid, legal, and binding, including without limitation, full compliance with . . . all applicable California and Federal Environmental Laws . . . ."

In its answer, the Air District denied that allegation and alleged in two affirmative defenses that the Transfer Agreement and the Quantification Settlement Agreement were both invalid because they violated the federal Clean Air Act.[43]

---

[42] In its statement of decision, the trial court specifically noted that it was "not reaching the . . . NEPA and Clean Air Act claims and defenses in" all three cases, including the validation action.

[43] In another affirmative defense in its answer to the Irrigation District's complaint, the Air District objected to the trial court determining "compliance with the [NEPA] in the absence of the United States," but alleged that if the court "exercise[d] jurisdiction notwithstanding this objection, . . . compliance with NEPA has not been achieved."

In June 2009, the Air District filed a motion for summary adjudication in the validation action, premised on the assertion that the "Delivery Agreement,"[44] the Quantification Settlement Agreement, and the Transfer Agreement violated the federal Clean Air Act "by causing and contributing to the discharge of air pollutants in violation of . . . 42 United States Code section 7506."[45] That statute provides in relevant part that "[n]o department, agency, or instrumentality of the Federal Government shall engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan after it has been approved or promulgated under section 7410 . . . ." (42 U.S.C. § 7506(c)(1).) The Air District argued that under this provision a conformity analysis had to be performed before the federal government approved the Delivery Agreement, but no such analysis occurred. According to the Air District, "In the absence of these legally mandated analyses, the [Quantification Settlement Agreement], [the Delivery Agreement], and other contracts cannot be validated because they were approved and executed in violation of the [federal Clean Air Act]."

In opposing the Air District's motion, the Irrigation District argued (among other things) that the trial court lacked jurisdiction to adjudicate whether the Secretary of the Interior should have conducted a conformity analysis under the federal Clean Air Act because such a challenge "may only be brought in federal court, against the federal agency alleged to be in violation, on the administrative record of the federal agency's action, and pursuant to a standard of review that inquires only whether the agency's action was 'arbitrary and capricious' or contrary to law."

In ruling on the Air District's motion, the trial court rejected the Irrigation District's jurisdictional argument. Specifically, the court concluded that "[t]he federal Clean Air Act issues do not raise a 'substantial' question of federal law, nor are those issues 'central' to the case, as those terms are used for purposes of determining whether a state court has jurisdiction to rule on federal law questions. There are a host of state law issues to be litigated . . . . Compliance with the federal Clean Air Act (and, for that matter, NEPA), are merely two ingredients in this multi-ingredient validation action. For the foregoing reasons, the Court has jurisdiction to rule on this motion." Turning to the merits, the court concluded there were material factual disputes that precluded the court from determining the issue of compliance with the federal Clean Air Act on summary adjudication. Accordingly, the trial court denied the Air District's motion.

---

[44] The Delivery Agreement refers to the "Colorado River Water Delivery Agreement," also known as the "Federal Quantification Settlement Agreement."

[45] The trial court identified this motion as "Contested Matter 147."

As the trial court's ruling shows, while the question of whether the court had jurisdiction over the issue of compliance with NEPA was not directly presented by the Air District's summary adjudication motion on the federal Clean Air Act, the court at the very least strongly implied that its conclusion regarding compliance with NEPA would be the same as its conclusion regarding the federal Clean Air Act, i.e., that the court has jurisdiction to address compliance with these federal laws in the validation action.[46]

On appeal, Coachella, Metropolitan, and San Diego contend the trial court erred in this conclusion. In their view, "state courts have general jurisdiction over federal law claims and can adjudicate such claims except when (1) Congress has specified that federal courts have exclusive jurisdiction over such claims . . . , or (2) when a necessary and indispensable party to a federal law claim has sovereign immunity and cannot be sued in state court. Both of these situations apply to the NEPA and [federal Clean Air Act] claims at issue" here.

For the reasons that follow, we agree with the water agencies that the trial court has no jurisdiction to adjudicate in this validation action the question of whether the responsible federal agencies complied with the federal Clean Air Act and/or NEPA.

### a. *State Court Jurisdiction over Federal Law Claims Generally*

■ "State courts generally have concurrent jurisdiction to determine rights and obligations arising under a federal statute . . . ," but this general rule is true only "where state jurisdiction is not denied by statute and there is no indication that federal jurisdiction is intended to be exclusive." (2 Witkin, Cal. Procedure, *supra*, Jurisdiction, § 82, p. 649, citing *Gulf Offshore Co. v. Mobil Oil Corp.* (1981) 453 U.S. 473, 477–478 [69 L.Ed.2d 784, 791, 101 S.Ct. 2870].) "Congress . . . may confine jurisdiction to the federal courts either explicitly or implicitly. Thus, the presumption of concurrent jurisdiction can be rebutted by an explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatibility between state-court jurisdiction and federal interests." (*Gulf Offshore Co.*, at p. 478 [69 L.Ed.2d at p. 791].)

---

[46] Coachella, Metropolitan, and San Diego did raise the issue of jurisdiction over compliance with NEPA when they sought partial judgment on the pleadings on the ground that the trial court did not have such jurisdiction, but the trial court denied that motion without reaching the merits of the question because (1) the water agencies are defendants in the validation action, and Code of Civil Procedure section 438 does not authorize a motion for judgment on the pleadings by a defendant directed at an affirmative defense asserted by another defendant and (2) the plaintiff in the action, the Irrigation District, did not properly join in the motions. Accordingly, the trial court never directly ruled on whether it had jurisdiction to determine compliance with NEPA.

Based on the foregoing, the question before us is whether Congress explicitly or implicitly confined jurisdiction over claims under the federal Clean Air Act and/or NEPA to the federal courts. Addressing each federal statute in turn, we conclude the answer is "yes" in both instances.

### b. State Court Jurisdiction over Claims Under the Federal Clean Air Act

Under federal law, judicial review of a claim under the federal Clean Air Act like the one the Air District asserts here, alleging a violation of the conformity provision in title 42 United States Code section 7506, must be sought under 5 U.S.C. section 702, part of the federal Administrative Procedure Act (APA) (5 U.S.C. § 551 et seq.). (*Conservation Law Foundation v. Busey* (1st Cir. 1996) 79 F.3d 1250, 1257–1263; see also *Environmental Council of Sacramento v. Slater* (E.D.Cal. 2000) 184 F.Supp.2d 1016, 1023 ["It is well established that challenges to agency determinations falling under the general provisions of the Clean Air Act are properly analyzed under the APA . . . ."].) As relevant here, the federal APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action *in a court of the United States* seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States . . . ." (5 U.S.C. § 702, italics added.)

It has long been recognized that this waiver of sovereign immunity, allowing the United States to be sued in an action under the federal APA, "applies only to actions brought in federal courts." (*Haddon Township Bd. of Education v. New Jersey Dept. of Education* (D.N.J. 1979) 476 F.Supp. 681, 687.) "Although Congress did not explicitly grant federal courts exclusive jurisdiction to entertain APA suits, we believe Congress implicitly confined jurisdiction to the federal courts when it limited the waiver of sovereign immunity contained in section 702 of the Act to claims brought 'in a court of the United States.' [Citations.] If Congress had intended the state courts to be proper fora for suits seeking judicial review under the APA Congress would have waived sovereign immunity for suits in state courts as well. By refusing to waive sovereign immunity for APA actions in the state courts Congress has implicitly vested exclusive jurisdiction over these actions in the federal courts." (*Federal National Mortgage Assn. v. LeCrone* (6th Cir. 1989) 868 F.2d 190, 193.)

Because a claimed violation of the conformity provision in the federal Clean Air Act can be adjudicated only under the federal APA, and because actions under the federal APA can be adjudicated only in federal court, it follows that the trial court here has no jurisdiction to adjudicate the Air District's claims based on an alleged violation of the federal Clean Air Act. While this conclusion is mandated by law, we also note that it makes perfect sense (which the law does not always do) in the context of a validation action like the one before us.

■■■ "A validation proceeding . . . is a lawsuit filed and prosecuted for the purpose of securing a judgment determining the validity of *a particular local governmental decision or act.*" (*Blue v. City of Los Angeles* (2006) 137 Cal.App.4th 1131, 1135, fn. 4 [41 Cal.Rptr.3d 10], citation omitted, italics added.) "A validating proceeding differs from a traditional action challenging a public agency's decision because it is an in rem action whose effect is binding on the agency and on all other persons." (*Millbrae School Dist. v. Superior Court* (1989) 209 Cal.App.3d 1494, 1497 [261 Cal.Rptr. 409].) Code of Civil Procedure "[s]ection 860 provides that a 'public agency may upon the existence of any matter which under any law is authorized to be determined pursuant to this chapter . . . bring an action . . . to determine the validity of such matter. The action shall be in the nature of a proceeding in rem.' [¶] ■■■ The term 'public agency' refers to the agency seeking a determination of the validity of its action. It does not refer to other parties that may be interested in the outcome of the action." (*Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 921 [100 Cal.Rptr.2d 173].) In such an action, "there are no indispensable parties beyond the public agency whose action is challenged." (*Id.* at p. 925.)

The purpose of the validation statutes is to serve " 'the acting agency's need to settle promptly all questions about the validity of its action.' " (*Friedland v. City of Long Beach* (1998) 62 Cal.App.4th 835, 842 [73 Cal.Rptr.2d 427].) Thus, by its very nature a validation action is focused on the validity of the actions taken by the agency that is seeking the determination of validity. Here, that agency is the Irrigation District. Consistent with this focus, the Irrigation District alleged in its complaint that *it* had "timely complied with all laws necessary for [the Settlement Agreements] to be valid, legal, and binding, including without limitation, full compliance with . . . all applicable California and Federal Environmental Laws . . . ." Even though the United States (or one of its agencies) is a party to more than one of the agreements the Irrigation District seeks to validate, this does not mean the validation action encompasses the validity of the actions taken *by the United States* in connection with those agreements. The validation action brought by

the Irrigation District necessarily encompasses only the validity of *the Irrigation District's* actions with respect to the agreements the Irrigation District seeks to validate.

Even assuming for the sake of argument that the federal government violated the federal Clean Air Act in signing one or more of the agreements— because no conformity analysis was performed before the agreements were signed—that fact has no bearing on *this* validation action brought by the Irrigation District to validate *its* actions in entering into those agreements. Thus, the proper scope of a validation action under Code of Civil Procedure section 860 et seq. and the limitations imposed by federal law on judicial review of an alleged violation of the conformity provision in the federal Clean Air Act mesh perfectly here. Consequently, the trial court has no jurisdiction in this validation action to adjudicate whether the Secretary of the Interior violated the federal Clean Air Act, and the court erred in concluding otherwise.[47]

### c. *State Court Jurisdiction over Claims Under NEPA*

Turning to NEPA, we first note that in the affirmative defense in which it raised NEPA, the Air District took a position largely consistent with our conclusion regarding the federal Clean Air Act, objecting that "[t]o the extent that the complaint seeks a determination of compliance with the [NEPA] in the absence of the United States, the complaint seeks adjudication of matters outside the jurisdiction of the Court." In an abundance of caution, the Air District nonetheless asserted that "[s]hould the Court exercise jurisdiction notwithstanding this objection, the [Air District] asserts in the alternative that compliance with NEPA has not been achieved."

As we have observed, Coachella, Metropolitan, and San Diego sought a decision from the trial court on whether the court had jurisdiction over NEPA compliance when they sought partial judgment on the pleadings on the ground that the trial court did not have such jurisdiction, but the trial court denied that motion without reaching the merits of the question. Nevertheless, in ruling (erroneously) that it had jurisdiction to determine compliance with the federal Clean Air Act, the trial court strongly implied that it likewise had jurisdiction to determine compliance with NEPA.

As with the federal Clean Air Act, however, "because NEPA creates no private right of action, challenges to agency compliance with the statute

---

[47] Our conclusion that the trial court has no jurisdiction to adjudicate compliance with the federal Clean Air Act applies not only in the validation action, but also in the two CEQA actions to the extent any such issue has been raised in those actions.

must be brought pursuant to the [APA], 5 U.S.C. § 551 *et seq.*" (*Karst Environmental Education & Protection v. E.P.A.* (D.C. Cir. 2007) 374 U.S. App.D.C. 420 [475 F.3d 1291, 1295].) And, as we have discussed already, Congress has limited jurisdiction over actions under the federal APA to the federal courts. Accordingly, it follows that the Air District was correct in the first instance—the trial court has no jurisdiction in this validation action to determine compliance with NEPA.[48]

### d. *The Air District's Arguments*

The Air District contends the complaint in the validation action, and its affirmative defenses, "put compliance with federal laws at issue" in that action. Not so.

First, the Irrigation District alleged in its complaint that *it* had "timely complied with all laws necessary for [the settlement agreements] to be valid, legal, and binding, including . . . all applicable . . . Federal Environmental Laws." That allegation did not put compliance with the federal Clean Air Act or NEPA at issue because not even the Air District asserts that the Irrigation District—as opposed to the federal government—had any obligation under either of those federal laws. Since the Irrigation District was not bound to comply with either the federal Clean Air Act or NEPA, its general allegation that it had complied with "all applicable . . . Federal Environmental Laws" could not put compliance with those laws at issue in this case.

For a similar reason, the Air District's affirmative defenses based on those laws could not put compliance with those laws at issue in this case. More importantly, however, "jurisdiction over the subject matter cannot be conferred by consent, waiver or estoppel." (*Summers v. Superior Court* (1959) 53 Cal.2d 295, 298 [1 Cal.Rptr. 324, 347 P.2d 668].) Because federal law vests jurisdiction over claims of noncompliance with the federal Clean Air Act and NEPA in the federal courts alone, nothing any of the parties alleged in their pleadings here could convey that jurisdiction on the trial court in this validation action.

To the extent the Air District argues that "legality and statutory compliance cannot be determined by solely examining what [the Irrigation District] did or did not do because [the Irrigation District] is not the only contract signatory," we have answered that argument already above. The validation action brought by the Irrigation District necessarily encompasses only the validity of *the Irrigation District's* actions with respect to the agreements the Irrigation

---

[48] As with the federal Clean Air Act issues, this lack of jurisdiction over any issue of compliance with NEPA extends to any such issue raised in the CEQA actions as well.

District seeks to validate; it cannot validate the actions of an entity—the United States—that is not before the court and the actions (or inactions) of which in compliance (or noncompliance) with federal law can be adjudicated only in federal court. The trial court erred in concluding otherwise.

Lest there be any fear that a judgment in favor of the Irrigation District in the validation action would somehow have the effect of immunizing from review the actions of the United States in connection with the agreements validated in that judgment,[49] section 870, subdivision (a) of the Code of Civil Procedure puts that fear to rest. That statute provides that "[t]he judgment [in a validation action], if no appeal is taken, or if taken and the judgment is affirmed, shall, notwithstanding any other provision of law . . . thereupon become and thereafter be forever binding and conclusive, *as to all matters therein adjudicated or which at that time could have been adjudicated . . . .*" (Italics added.) Because compliance with the federal Clean Air Act and NEPA cannot be adjudicated in this validation action, the judgment in the action will not be binding as to those issues.

## G

### *Conclusion*

As to the validation action, then, the judgment determining that "the subject contracts, identified as Contracts A through L in the Second Amended Complaint in Validation . . . , are void and invalid" must be reversed, and the action must be remanded to the trial court for that court to finish adjudicating the outstanding issues in the action. In doing so, the trial court shall not adjudicate any claims or defenses based on the federal Clean Air Act or NEPA because the court lacks subject matter jurisdiction over any such issues.

## II

### *The CEQA Actions*

Having fully resolved the appeals filed by the state, the Irrigation District, Coachella, Metropolitan, San Diego, Vista, and Escondido with respect to the judgment in the validation action, we now turn our attention to the arguments that address the trial court's resolution of the CEQA actions, specifically, the

---

[49] In an amicus curiae brief, the United States points out that "[i]n 2009, the Air District and Imperial County initiated an APA action against the Secretary [of the Interior] in federal district court, alleging that the Secretary violated the [federal Clean Air Act] and NEPA when executing the [Colorado River Water Delivery Agreement]."

arguments raised in the appeals filed by the County, the Air District, and POWER, and one remaining argument raised in the appeal by Coachella, Metropolitan, and San Diego.

Recall that, based on its (erroneous) determination in the validation action that 11 of the 12 agreements the Irrigation District sought to validate were unconstitutional, the trial court dismissed the two CEQA actions as moot, with the exception of the first cause of action in the County's CEQA action, as to which the trial court entered judgment against the County on the merits. As will be seen, before reaching this ultimate disposition of the CEQA actions, the trial court made some interim rulings that are now at issue on appeal. We begin with those rulings.

## A

### *Denial of Intervention*

In April 2008, the Air District filed motions to intervene in the two CEQA actions. The trial court denied both motions.

On appeal from the judgment with respect to the two CEQA actions, the Air District contends the trial court erred in not permitting it to intervene in those actions. We conclude this issue is not properly before us because the Air District failed to appeal from the order denying its motions to intervene.

 "An order denying a motion for leave to intervene is directly appealable because it finally and adversely determines the moving party's right to proceed in the action." (*Hodge v. Kirkpatrick Development, Inc.* (2005) 130 Cal.App.4th 540, 547 [30 Cal.Rptr.3d 303]; see also *Bowles v. Superior Court* (1955) 44 Cal.2d 574, 582 [283 P.2d 704]; *Dollenmayer v. Pryor* (1906) 150 Cal. 1, 3 [87 P. 616].)

 A notice of appeal from an appealable order must be filed no later than 180 days after entry of the order. (Cal. Rules of Court, rule 8.104(a)(3), (e).) Here, the order denying the Air District's motions to intervene was made on May 7, 2008. Obviously, the notice of appeal filed nearly two years later, on March 9, 2010, came much too late for any challenge to the trial court's ruling on the motions to intervene to be properly before this court. Accordingly, we do not address this issue further.[50]

---

[50] Because the Air District is not a party to the CEQA actions, we also will not consider any further arguments the Air District offers on appeal with respect to those actions. In any event, we note that the Air District's further arguments are essentially the same as the arguments of POWER and the County that we discuss below.

B

*The County's Cause of Action for Violation of the Wheeling*
*Statutes*

The County's first amended petition for writ of mandate in what we have referred to as its CEQA action actually contained two causes of action: one for various alleged violations of CEQA (which was denominated the second cause of action and was set forth in eight different counts) and another (denominated the first cause of action) for an alleged violation of the wheeling statutes (Wat. Code, §§ 1810–1814).[51] In April 2009, San Diego and Metropolitan moved for summary adjudication of the cause of action for violation of the wheeling statutes.[52] The trial court granted summary adjudication in their favor, apparently on two bases. First, the court concluded that the County's cause of action for violation of the wheeling statutes was, in effect, a challenge to the exchange agreement between Metropolitan and San Diego, which had already been validated by operation of law and thus was not subject to such a challenge. Second, the court concluded that the wheeling statutes apply only to "refusals (in one form or another) to allow use of unused capacity."

As we have noted, when the court entered judgment in the County's CEQA action in February 2010, the court entered judgment against the County on its cause of action for violation of the wheeling statutes and dismissed the remainder of the action (i.e., the second cause of action containing the CEQA claims) as moot.

---

[51] "Wheeling" refers to "[t]he use of a water conveyance facility by someone other than the owner or operator to transport water . . . ." (*Metropolitan Water Dist. v. Imperial Irrigation Dist.* (2000) 80 Cal.App.4th 1403, 1407 [96 Cal.Rptr.2d 314].)

[52] At the same time, San Diego and Metropolitan sought summary adjudication of certain affirmative defenses the County and the Air District had alleged in their answers in the validation action based on the wheeling statutes. The trial court's grant of summary adjudication encompassed not only the cause of action in the County's CEQA action but also two of the County's affirmative defenses in the validation action.

On appeal, it is not entirely clear whether the County's arguments regarding the wheeling statutes are directed at the trial court's ruling with respect to the County's affirmative defenses in the validation action as well as at the ruling on the County's cause of action in its CEQA action; however, inasmuch as (1) the County asserts that its "wheeling *claim*" must be reviewed on appeal (italics added) and (2) the County presents its argument regarding the wheeling statutes in support of its cross-appeal, rather than as part of its respondent's brief, we deem the County's argument as limited to the trial court's summary adjudication of the cause of action for violation of the wheeling statutes in the County's CEQA action. Nevertheless, the basis for our rejection of the County's arguments in the context of the cause of action in the CEQA action applies with equal force and logic to the affirmative defenses the County asserted in the validation action based on the wheeling statutes.

In its cross-appeal, the County essentially asserts that the trial court erred in adjudicating the cause of action for violation of the wheeling statutes in favor of San Diego and Metropolitan because, in the County's view, the wheeling statutes forbid any use of the Colorado River Aqueduct to effectuate "the [Quantification Settlement Agreement]'s principal [water] transfer" "unless the Imperial County Board of Supervisors finds the transfer environmentally and economically acceptable." As we will explain, we find no merit whatsoever in this argument.

The County's cause of action for violation of the wheeling statutes alleged substantially as follows: "In approving the [Quantification Settlement Agreement], respondents and each of them refused to recognize that they were required to comply with Water Code sections 1810–1814, and on that ground failed to implement those sections. [¶] . . . Respondents thereby breached their duty under Water Code section 1810 to include in the [Quantification Settlement Agreement] and its components, including the Transfer Agreement, a requirement to avoid unreasonable economic or environmental effects within the County of Imperial as determined by the County of Imperial."

■ In effect, the County's cause of action is based on the premise that under the wheeling statutes, before they acted to approve the Quantification Settlement Agreement and related agreements the four water agencies (the Irrigation District, Coachella, Metropolitan, and San Diego) had to obtain a finding from the County that the transfer of water from the Irrigation District to San Diego by means of Metropolitan's Colorado River Aqueduct would not unreasonably affect the overall economy or the environment of Imperial County. To determine the legitimacy of the County's premise, we must examine and interpret the wheeling statutes themselves. In doing so, we apply the fundamental rules of statutory interpretation: " 'Initially, "[a]s in any case of statutory interpretation, our task is to determine afresh the intent of the Legislature by construing in context the language of the statute." [Citation.] In determining such intent, we begin with the language of the statute itself. [Citation.] That is, we look first to the words the Legislature used, giving them their usual and ordinary meaning. [Citation.] "If there is no ambiguity in the language of the statute, 'then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs.' " ' " (*Smith v. Rae-Venter Law Group* (2002) 29 Cal.4th 345, 358 [127 Cal.Rptr.2d 516, 58 P.3d 367].)

Here, the plain meaning of the wheeling statutes unequivocally refutes the County's argument that the four water agencies had to obtain a finding from the County about the economic and environmental effects of the transfer of water from the Irrigation District to San Diego before they could approve the Quantification Settlement Agreement.

The wheeling statutes consist of five statutes. Water Code section 1810, which is the primary provision in the wheeling statutes, provides as follows:

"Notwithstanding any other provision of law, neither the state, nor any regional or local public agency may deny a bona fide transferor of water the use of a water conveyance facility which has unused capacity, for the period of time for which that capacity is available, if fair compensation is paid for that use, subject to the following:

"(a) Any person or public agency that has a long-term water service contract with or the right to receive water from the owner of the conveyance facility shall have the right to use any unused capacity prior to any bona fide transferor.

"(b) The commingling of transferred water does not result in a diminution of the beneficial uses or quality of the water in the facility, except that the transferor may, at the transferor's own expense, provide for treatment to prevent the diminution, and the transferred water is of substantially the same quality as the water in the facility.

"(c) Any person or public agency that has a water service contract with or the right to receive water from the owner of the conveyance facility who has an emergency need may utilize the unused capacity that was made available pursuant to this section for the duration of the emergency.

"(d) This use of a water conveyance facility is to be made without injuring any legal user of water and without unreasonably affecting fish, wildlife, or other instream beneficial uses and without unreasonably affecting the overall economy or the environment of the county from which the water is being transferred."

Water Code section 1811 defines the terms " '[b]ona fide transferor,' " " '[e]mergency,' " " '[f]air compensation,' " " '[r]eplacement costs,' " and " '[u]nused capacity.' "

Water Code section 1812 provides that "[t]he state, regional, or local public agency *owning the water conveyance* facility shall in a timely manner determine the following: [¶] (a) The amount and availability of unused capacity. [¶] (b) The terms and conditions, including operation and maintenance requirements and scheduling, quality requirements, term or use, priorities, and fair compensation." (Italics added.)

Water Code section 1813 provides that "[i]n making the determinations required by this article, *the respective public agency* shall act in a reasonable

manner consistent with the requirements of law to facilitate the voluntary sale, lease, or exchange of water and shall support its determinations by written findings. In any judicial action challenging any determination made under this article the court shall consider all relevant evidence, and the court shall give due consideration to the purposes and policies of this article. In any such case the court shall sustain the determination of the public agency if it finds that the determination is supported by substantial evidence." (Italics added.)

Finally, Water Code section 1814 provides that "[t]his article shall apply to only 70 percent of the unused capacity."

■ Construed together, the wheeling statutes are unambiguous. They prohibit the *owner of a water conveyance facility* that has unused capacity—whether the state, a regional public agency, or a local public agency—from denying a bona fide transferor[53] of water the use of that facility if fair compensation is paid. (Wat. Code, § 1810.) The requirement that the owner make its facility available for such "wheeling," however, is subject to the conditions set forth in Water Code section 1810.

When a bona fide transferor seeks to make use of the unused capacity of a water conveyance facility, the owner of the facility must timely determine the amount and availability of unused capacity and the terms and conditions of the use, including what constitutes fair compensation. (Wat. Code, § 1812.) In making those determinations, the owner must act in a reasonable manner and must make written findings. (*Id.*, § 1813.) The owner's determinations are subject to judicial review for substantial evidence. (*Ibid.*)

■ As the appellate court in *Metropolitan Water Dist. v. Imperial Irrigation Dist., supra,* 80 Cal.App.4th 1403 explained, the wheeling statutes were enacted to "address[] a potential impediment to wheeling transfers. Public and private water rights holders who desired to sell surplus water to other parties could do so only by agreement with water conveyance system owners. Otherwise, there was no practical way to move the water from seller to buyer. Some water conveyance system owners had refused to wheel water or had allowed the movement of water only after protracted negotiations. The Legislature recognized that the sale of excess water could be a source of income for farmers and others experiencing economic hardship while also promoting efficient use of this scare resource. Consequently, the [w]heeling [s]tatutes prohibit state, regional, or local public agencies from withholding

---

[53] A bona fide transferor is "a person or public agency . . . with a contract for sale of water that may be conditioned upon the acquisition of conveyance facility capacity to convey the water that is the subject of the contract." (Wat. Code, § 1811, subd. (a).)

use of their water conveyance systems by others provided, inter alia, unused capacity is available and fair compensation is paid for the use." (*Id.* at p. 1409.)

The wheeling statutes do not expressly provide that anyone—let alone the county from which the water is being transferred—must make a finding that the transfer will not unreasonably affect the overall economy or the environment of the county before a water transfer can be authorized, as the County argues here. Water Code section 1810 does allow the owner of a water conveyance facility that has unused capacity to deny a bona fide transferor the use of the facility if the transfer in question will unreasonably affect the overall economy or the environment of the county from which the water is being transferred. But to the extent this provision implies the necessity of a finding of unreasonable effect, the finding is obviously to be made by *the owner of the water conveyance facility* which is denying the use of its facility on that basis. The terms of the statute do not, by any stretch of the imagination, impose a requirement that *the county of origin* must make a finding that there will be no such effect before the transfer can occur.

Because the County's cause of action for violation of the wheeling statutes is based on a premise that is unsupported by the terms of those statutes, we find no error in the trial court's grant of summary adjudication against the County of that cause of action.

C

*Adjudication of the Merits of the CEQA Actions*

As we have noted, with the exception of the County's cause of action for violation of the wheeling statutes, the trial court dismissed POWER's and the County's CEQA actions on the ground they were moot because they were "predicated upon contracts the Court has found invalid." Inasmuch as we have concluded the trial court erred in invalidating the agreements the Irrigation District sought to validate, and the validation action must be remanded for the trial court to finish adjudicating the issues in that action, it follows that the trial court also erred in finding the CEQA actions moot. It also appears to follow that the proper disposition of those actions is to reverse the judgment and remand them to the trial court to adjudicate them.

POWER and the County argue, however, that instead of remanding the CEQA actions to the trial court, *we* should adjudicate those actions ourselves in the first instance. They complain that the trial court "persistently refused" to adjudicate their CEQA claims, despite the statutory preference accorded

them (see Pub. Resources Code, § 21167.1), and they ask us to adjudicate the CEQA issues without remand to avoid further delay.

In assessing the more than six years that passed between the filing of the CEQA actions in the fall of 2003 and the trial court's judgment in February 2010, we find several points of particular significance. First, while the actions were commenced in the fall of 2003, they did not get coordinated and in front of the coordination judge in Sacramento until the summer of 2004. Thereafter, in January 2005, the trial court sustained demurrers without leave to amend in two of the other coordinated actions the County had filed on the ground that the County did not name Metropolitan and Coachella as parties within the statute of limitations. The County sought writ relief from this court, and on March 30, 2005, this court issued an alternative writ and stayed all proceedings in the coordinated cases. Ultimately, this court affirmed the trial court's ruling. (*County of Imperial v. Superior Court, supra*, 152 Cal.App.4th at p. 13.) It was not until August 14, 2007, however, that the stay on the coordinated proceeding was lifted. Thus, the two CEQA actions at issue now did not move forward for nearly two and one-half years because of the stay this court imposed. That delay can hardly be blamed on the trial court.

As far as we can tell, the coordination judge here did the best he could under the circumstances managing multiple coordinated cases, with all of the various parties and the tens of thousands of pages of paper that make up the administrative records and the trial court file. More importantly, though, regardless of our view on how fast these matters have or have not been adjudicated, the question posed by the requests of POWER and the County is whether we should adjudicate the CEQA actions in the first instance. Upon consideration of their arguments, we conclude the answer to that question is "no."

POWER and the County both argue that because the parties thoroughly briefed the CEQA actions in the trial court, and because the record of the administrative proceedings underlying both actions was admitted in the trial court and is now before us, "[t]his Court can proceed to the merits." In support of this assertion, they cite two cases, but neither of those cases is applicable.

In *Californians for Alternatives to Toxics v. Department of Pesticide Regulation* (2006) 136 Cal.App.4th 1049 [39 Cal.Rptr.3d 393], this court addressed arguments made in a mandamus petition the trial court had found moot, based on the principles that "if a matter is of general public interest and is likely to recur in the future, a resolution of the issue by the court is appropriate" and "cases are not moot when they present questions that are

capable of repetition, yet evade review." (*Id.* at p. 1069.) Similarly, in *Watershed Enforcers v. Department of Water Resources* (2010) 185 Cal.App.4th 969 [110 Cal.Rptr.3d 876], the appellate court exercised its inherent discretion to consider a moot issue of statutory interpretation on its merits because of the importance of the issue and the likelihood it would recur. (*Id.* at p. 978.)

Those cases do not apply here because we have determined the issues raised in the two CEQA actions are *not* moot. Neither POWER nor the County offers any authority for the proposition that this court, in the exercise of its appellate jurisdiction (see Cal. Const., art. VI, § 11), can or should decide *in the first instance* an issue that is not moot and is within the original jurisdiction of the superior court (see *id.,* § 10), like the issues raised in the CEQA actions at issue here.

"[T]he ordinary and widely accepted meaning of the term 'appellate jurisdiction' is simply the power of a reviewing court to correct error in a trial court proceeding." (*Leone v. Medical Board* (2000) 22 Cal.4th 660, 666 [94 Cal.Rptr.2d 61, 995 P.2d 191].) "An appeal is not a trial but simply a method given litigants of rectifying errors, legal or factual, that may have occurred at a preceding hearing generally referred to as a trial. An appellate court is a reviewing court, and (except in special cases where original jurisdiction is conferred upon it) not a trial court or court of first instance. The jurisdiction of an appellate tribunal is generally confined to the correction of errors committed in the trial court . . . ." (*Sanborn v. Pacific Mut. Life Ins. Co.* (1940) 42 Cal.App.2d 99, 105 [108 P.2d 458].)

Here, on the cross-appeals filed by POWER and the County in their CEQA actions, we properly exercise our appellate jurisdiction by determining that the trial court erred in dismissing those actions on the ground of mootness. The proper remedy for that error is obviously reversal. To the extent POWER and the County argue that, in addition to reversing the judgments of dismissal in those actions, we should also take the further step of adjudicating the merits of those actions ourselves—something the trial court itself never reached—POWER and the County have not proven to our satisfaction that we are authorized to do so in the exercise of our appellate jurisdiction under the circumstances presented here.

And even if we assume for the sake of argument that we have the power to adjudicate the CEQA actions in the first instance on these appeals, we decline to do so. Although we often exercise de novo review in CEQA cases, the trial court's role of adjudicating those cases in the first instance is not inconsequential. "[I]n many such cases, trial courts provide us with a thorough written opinion which helps to clarify issues for appeal," and "[a]lthough it is

possible a new appeal may follow the hearing on remand, . . . it is also likely such appeal will be narrowed, relieving the burden on this court."[54] (*Koster v. County of San Joaquin* (1996) 47 Cal.App.4th 29, 44–45 [54 Cal.Rptr.2d 565].)

■ Citing *County of Inyo v. Yorty* (1973) 32 Cal.App.3d 795 [108 Cal.Rptr. 377], the County contends the CEQA actions qualify for this court's *original* jurisdiction. Coachella, Metropolitan, and San Diego disagree. For two reasons, however, the County is correct on this point. First, a proceeding to attack a decision by a public agency on the grounds of noncompliance with CEQA is customarily brought as a petition for a writ of mandate. (See *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 566 [38 Cal.Rptr.2d 139, 888 P.2d 1268] ["A party may seek to set aside an administrative decision for failure to comply with CEQA by petitioning for either administrative mandamus (Code Civ. Proc., § 1094.5) or traditional mandamus (*id.*, § 1085)."]; *Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165, 171 [105 Cal.Rptr.2d 214, 19 P.3d 567] ["mandate is a remedy authorized by CEQA to review and set aside a public agency action taken without CEQA compliance"].) Second, under the California Constitution the Supreme Court, the Courts of Appeal, *and* the superior courts "have original jurisdiction in proceedings for extraordinary relief in the nature of mandamus."[55] (Cal. Const., art. VI, § 10.)

Thus, a writ petition initiating a CEQA action *can* be filed in this court in the first instance. Because such a petition can also be filed in the superior court, however, a party who chose to seek relief from this court in the first instance would have to "explain why the reviewing court should issue the writ as an original matter." (Cal. Rules of Court, rule 8.486(a)(1).) "In form, this is a rule of pleading; in effect, however, it expresses the policy of the Supreme Court and Courts of Appeal to refuse to exercise their original jurisdiction in the first instance, unless the circumstances are exceptional." (8 Witkin, Cal. Procedure, *supra*, Extraordinary Writs, § 144, p. 1040.) Thus, while in theory we have jurisdiction to consider as an original matter a petition for a writ of mandate alleging a public agency's noncompliance with CEQA, in practice we will ordinarily not exercise that jurisdiction but instead will leave it to the superior courts to do so in the first instance.

■ While the County is correct that we exercised our original jurisdiction over a matter arising under CEQA in *County of Inyo*, the circumstances

---

[54] On this latter point, it is worth noting that the trial court—presumably with substantial input from the parties—scheduled *15* court days for the trial of the CEQA issues in these coordinated cases.

[55] Indeed, in a CEQA action brought "against the Public Utilities Commission the writ of mandate shall lie only from the Supreme Court to such commission." (Pub. Resources Code, § 21168.6.)

in that case were markedly different from those before us now. In *Yorty*, the County of Inyo filed a complaint against the City of Los Angeles and others seeking injunctive relief "to halt the extraction of subsurface waters from the Owens Valley in Inyo County until the filing by defendants of an [EIR] and a determination of the environmental effect of the continued and expanded extraction of subsurface water." (*County of Inyo v. Yorty, supra*, 32 Cal.App.3d at pp. 797–798.) After the trial court denied a preliminary injunction and dissolved a previously issued temporary restraining order, the county appealed and filed a petition for writ of supersedeas. (*Ibid.*) This court treated the supersedeas petition as a petition for a writ of mandate, apparently in order to expedite review of whether "[t]he trial court erred in its determination that CEQA did not apply to City's activities because of its view that such action was a continuation of a pre-existing activity or project born before the effective date of CEQA." (*Yorty*, at pp. 797–798.) In that sense, although the matter was deemed before this court on a writ petition, the matter was still one within the court's appellate jurisdiction, rather than its original jurisdiction, because an appellate court exercises its appellate jurisdiction whenever it reviews a trial court decision, whether by means of a direct appeal or a writ petition. (See *Leone v. Medical Board, supra*, 22 Cal.4th at p. 666.) In granting relief in *Yorty*, however—after concluding an EIR was required—this court did not reverse and remand the matter to the trial court, but instead issued a writ of mandate "directing City to prepare, certify and file in accordance with law an EIR, and further directing City, pending such preparation, certification and filing to limit forthwith its underground-water extraction in the affected area." (*County of Inyo v. Yorty, supra*, 32 Cal.App.3d at p. 816.) It was in granting this relief that the court stated that it was exercising its "original jurisdiction to issue its writ of mandate." (*Id.* at p. 815.)

Obviously, the circumstances before us are nothing like those in *Yorty*. Here, POWER and the County are not asking us to exercise our original jurisdiction to resolve the relatively simple question of whether an EIR was required after the trial court decided that question against them. Instead, to the extent they are asking us to exercise our original jurisdiction at all,[56] they are asking us to review in the first instance a substantial number of issues arising under CEQA in two different actions—issues to which the trial court was prepared to devote at least 15 days of trial. And they are doing so based on claims of "prejudice to the environment" that are vehemently disputed. They are also doing so based on what we believe to be unfair accusations against the trial court of undue delay up to this point in the proceeding and unfounded suggestions that there will be further such delay if we remand the case to the trial court. As the Irrigation District observes, "[i]nsofar as trial of

---

[56] Surprisingly, the County says it is not "urg[ing] this Court to assert original jurisdiction."

CEQA issues in Phases 1B and 1C were fully briefed and ready to proceed below, [POWER and the County] have no basis to assert any further unreasonable delay."

In determining whether we should adjudicate the CEQA issues, it is also important to remember that, as we have determined already, the validation action must be remanded to the trial court so that court can finish adjudicating the outstanding issues in that action. If we were to adjudicate the merits of the two CEQA actions, however, further litigation of the validation action would have to be suspended while we did so, because we cannot send the validation action back to the trial court while retaining the CEQA actions for further review. This delay in the validation action to allow for our review of the CEQA actions would give unjustified preference to the adjudication of the CEQA actions, when both validation actions and CEQA actions have the same statutory preference. (Compare Code Civ. Proc., § 867 [validation actions "shall be given preference over all other civil actions before the court in the matter of setting the same for hearing or trial, and in hearing the same, to the end that such actions shall be speedily heard and determined"] with Pub. Resources Code, § 21167.1, subd. (a) [courts must give CEQA actions "preference over all other civil actions, in the matter of setting the action or proceeding for hearing or trial, and in hearing or trying the action or proceeding, so that the action or proceeding shall be quickly heard and determined"].)

Based on the foregoing, we decline the invitation of POWER and the County to adjudicate the merits of the CEQA actions ourselves in the first instance and instead will remand those actions to the trial court for that court to adjudicate.

D

*Dismissal of the County's CEQA Action for Failure to Join Indispensable Parties*

Coachella, Metropolitan, and San Diego contend the trial court abused its discretion when it denied a pretrial motion to dismiss the County's CEQA action with prejudice because the County had failed to name as real parties in interest the United States and the "Indian Settlement Parties" (defined below). We are not persuaded.

In April 2009, San Diego and Metropolitan filed a joint motion to dismiss the County's CEQA action based on their assertion that the United States and La Jolla, Pala, Pauma, Rincon, and San Pasqual Bands of Mission Indians and the San Luis Rey Indian Water Authority (collectively, the Indian

Settlement Parties) were not only "recipients of an approval under Public Resources Code section 21167.6.5(a)," but further were "indispensable parties under Code of Civil Procedure section 389(b)" that the County had not timely named in the action as real parties in interest.

In ruling on the motion to dismiss, the trial court determined that the United States and the Indian Settlement Parties were "recipients of approval" for purposes of subdivision (a) of Public Resources Code section 21167.6.5 because (1) the County's CEQA action "indisputably challenges the [Quantification Settlement Agreement] PEIR, and would if successful set it aside" and (2) "[t]he 'project' covered by the [Quantification Settlement Agreement] PEIR includes not only the state [Quantification Settlement Agreement] but also . . . the Allocation Agreement, to which . . . the Indian Settlement Parties, and the U.S. are parties." The trial court further ruled, however, that the United States and the Indian Settlement Parties were "not indispensable." Accordingly, the trial court denied the motion to dismiss.

The determination of whether a party is indispensable is governed by Code of Civil Procedure section 389, which "first sets out, in subdivision (a), a definition of persons who ought to be joined [in an action] if possible (sometimes referred to as 'necessary' parties). Then, subdivision (b) sets forth the factors to follow if such a person cannot be made a party in order to determine 'whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed without prejudice, the absent person being thus regarded as *indispensable*.' (Italics added.) The subdivision (b) factors 'are not arranged in a hierarchical order, and no factor is determinative or necessarily more important than another.' " (*County of San Joaquin v. State Water Resources Control Bd.* (1997) 54 Cal.App.4th 1144, 1149 [63 Cal.Rptr.2d 277].)

In a CEQA action like the one before us, Public Resources Code section 21167.6.5 provides that "any recipient of an approval that is the subject of [the] action" must be named as a real party in interest. (Pub. Resources Code, § 21167.6.5, subd. (a) (section 21167.6.5(a)).) Thus, section 21167.6.5(a) makes any such recipient a necessary party in a CEQA action, just as those persons described in subdivision (a) of Code of Civil Procedure section 389 are necessary parties. But a recipient of an approval, while a necessary party, is not necessarily an indispensable party, such that the CEQA action must be dismissed in the absence of that party. Instead, if a court finds that "unnamed parties received approvals, [the court must] then consider whether under Code of Civil Procedure section 389, subdivision (b) [the unnamed parties] qualify as indispensable parties, requiring dismissal of the action." (*County of Imperial v. Superior Court, supra*, 152 Cal.App.4th at p. 31.)

Here, as we have noted, the trial court determined the United States and the Indian Settlement Parties were recipients of an approval for purposes of section 21167.6.5(a). Of course, Coachella, Metropolitan, and San Diego "do not challenge this finding." The County argues, however, that "neither the United States nor the Indian [Settlement Parties] received an 'approval' from the three parties that signed the [Quantification Settlement Agreement] at issue in [the County's CEQA action]." (Fn. omitted.)

In reply, Coachella, Metropolitan, and San Diego contend "the County is precluded from challenging" "the trial court's ruling that the U.S. and Indian [Settlement Parties] were necessary parties in" the County's CEQA action because "[t]he County's Notice of Cross-Appeal specified the issues which the County intended to argue in this Court," and "[t]he Notice did not include the trial court's [necessary parties] ruling." The two cases on which the water agencies rely to support their argument, however, do not do so because each of those cases dealt with the distinguishable situation in which the notice of appeal (or cross-appeal) clearly states an intent to appeal *from only part of a judgment*. (See *Glassco v. El Sereno Country Club, Inc.* (1932) 217 Cal. 90, 91–92 [17 P.2d 703] [the notice of appeal stated the appeal was " 'from so much of the judgment . . . as denies relief to the plaintiffs against [a particular] defendant' "]; *Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 623 [12 Cal.Rptr.2d 741] [the notice of cross-appeal stated the cross-appeal was from the judgment on two specific causes of action].) In such cases, "[i]t is elementary that an appeal from a portion of a judgment brings up for review only that portion designated in the notice of appeal." (*Glassco*, at p. 92.)

Here, the County stated in its notice of cross-appeal that it was taking a "cross-appeal from the final judgment (including the applicable incorporated statement of decision and rulings on contested matters) entered on February 11, 2010." The fact that the County went on to identify in its notice of cross-appeal seven specific "grounds" for its cross-appeal does not make the cases on which the water agencies rely applicable here, nor do the water agencies cite any authority for the proposition that a party that chooses to specify grounds for appeal in its notice is limited to only those grounds thereafter in its briefing and argument.

More importantly, though, the County's argument on the "recipient of approval" issue is not part of its cross-appeal, but instead is part of its response to the appeal by Coachella, Metropolitan, and San Diego. The County had no reason to challenge in its cross-appeal the trial court's determination that the United States and the Indian Settlement Parties were recipients of an approval that was the subject of the County's CEQA action because the trial court's determination of that issue was only part of a ruling

in which the trial court ultimately *denied* San Diego and Metropolitan's motion to dismiss the County's CEQA action—a decision favorable to the County. It is axiomatic that the County could not challenge, on its cross-appeal, a ruling by which it was not aggrieved. (See Code Civ. Proc., § 902.) Instead, the County raises the "recipient of approval" issue only in support of its argument—in response to the appeal by Coachella, Metropolitan, and San Diego—that the trial court did not err in denying the motion to dismiss. This is an argument the County is absolutely entitled to raise, and the water agencies' argument to the contrary has no merit.

Thus, in addressing the argument by Coachella, Metropolitan, and San Diego that the trial court erred in denying the motion to dismiss, we begin with the question of whether the trial court properly concluded that the United States and the Indian Settlement Parties were recipients of an approval for purposes of section 21167.6.5(a) with respect to the County's CEQA action.

 Because section 21167.6.5(a) speaks in terms of "an approval that is the subject of an action or proceeding brought pursuant to Section 21167, 21168, or 21168.5," to determine whether section 21167.6.5(a) applies to a particular person or entity not joined in a CEQA action the court must first determine what approval is "the subject of" that action. Only then can the court determine whether that person or entity can be deemed a recipient of that approval.

 To determine what approval was the subject of the County's CEQA action, we must look more closely at CEQA and at the petition in the action. We begin with the relevant provisions of CEQA to help us understand what "approval" is to be deemed the subject of the action for purposes of section 21167.6.5(a). In CEQA, we find "a 'substantive mandate' requiring public agencies to refrain from *approving* projects with significant environmental effects if 'there are *feasible* alternatives or *mitigation measures*' that can substantially lessen or avoid those effects." (*County of San Diego v. Grossmont-Cuyamaca Community College Dist.* (2006) 141 Cal.App.4th 86, 98 [45 Cal.Rptr.3d 674], first italics added; see Pub. Resources Code, § 21002 ["it is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects . . ."].) "CEQA requirements and procedures are triggered by any proposed public or private project that is not exempted by statute. Those procedures are intended to ensure that public agencies identify any potential significant environmental impact of a proposed project and condition *approval* of that project on implementation of feasible mitigation measures that will avoid or substantially lessen the potential environmental

impact." (*Friends of Sierra Madre v. City of Sierra Madre, supra*, 25 Cal.4th at p. 184, italics added.) "To achieve the objectives of CEQA, the Legislature has mandated the preparation and consideration of an EIR before any public agency *approves* a project that is not statutorily exempt unless the lead agency issues a negative declaration, i.e., a declaration that the proposed project will not have a significant effect on the environment. [Citations.] The purpose of an EIR is to inform the agency and the public, in detail, about the effect the project is likely to have on the environment and the ways available to minimize that impact." (*Id.* at pp. 184–185, italics added, fns. omitted.)

From the foregoing, it is apparent that the word "approval" in section 21167.6.5(a) refers to the approval of a project that is either subject to CEQA review or is determined to be exempt from CEQA review.[57] In essence, then, we can read the statute as applying to the "approval [of a project] that is the subject of [a CEQA] action."[58] But because the statute applies only to project approvals that are "the subject of" a CEQA action, we must turn our attention to the allegations of the petition that defines the action to determine what project approval is to be deemed the subject of that action. Only then can we determine who the recipients of that approval were for purposes of section 21167.6.5(a).

Examination of the petition reveals that the County's allegations focused on the alleged insufficiency of the Quantification Settlement Agreement PEIR, which the County admitted was prepared "for the QSA." In essence, the County claimed the PEIR did not comply with CEQA in numerous regards, set forth in eight different counts. In its prayer for relief, the County asked for a writ of mandate "setting aside the certification of" the Quantification Settlement Agreement PEIR and "setting aside the decisions of respondents to carry out the QSA." The County also asked to "[e]njoin the transfer of water pursuant to the QSA until and unless respondents lawfully approve [it]."

Because, as the County's petition alleges, "the QSA" is the project for which the PEIR was prepared, the approval of "the QSA" appears to be the

---

[57] That even the approval of a project determined to be exempt from CEQA falls under section 21167.6.5(a) is apparent from the fact that (1) section 21167.6.5(a) applies to "an approval that is the subject of an action or proceeding brought pursuant to Section 21167" and (2) subdivision (d) of Public Resources Code section 21167 refers to "[a]n action or proceeding alleging that a public agency has improperly determined that a project is not subject to [CEQA]."

[58] The trial court reached essentially the same conclusion when it noted that "the 'approval' [for purposes of section 21167.6.5(a)] may be a building permit, land use approval, agreement, or other action for which CEQA compliance is required. The most typical 'recipient of approval' would be the developer whose project has been approved by the local land use authority."

subject of the County's CEQA action for purposes of section 21167.6.5(a). What remains to be determined, however, is this—just what is "the QSA," the approval of which is the subject of the County's action?

The ambiguity in the term "the QSA" runs throughout these coordinated proceedings. In its narrowest sense, "the QSA" refers to the Quantification Settlement Agreement between the Irrigation District, Coachella, and Metropolitan. Use of the term in its narrowest sense can be found, for example, in the Quantification Settlement Agreement itself, which defines the term "QSA" as "[t]his Agreement, the Quantification Settlement Agreement."

In its broadest sense, however, "the QSA" refers to the Quantification Settlement Agreement *and* all of the related agreements. Use of the term in a broad sense like this can be found in the Quantification Settlement Agreement PEIR the County challenged in its CEQA action. In various places, the PEIR provides that "[t]he QSA is composed of related agreements, activities and projects, which, when taken together, support the consensual agreement among the four co-lead agencies regarding the use of Colorado River water."

In this broad sense, one of the components of "the QSA" is the Allocation Agreement, to which the Irrigation District, Metropolitan, Coachella, San Diego, the United States, and the Indian Settlement Parties were all parties. According to the recitals in the Allocation Agreement, the parties entered into that agreement "to provide for the allocation of an amount of Colorado River water equal to the amount conserved from the Title II works," which referred to certain works designed to limit water losses from the All American Canal and the Coachella Canal.[59] Indeed, the Quantification Settlement Agreement PEIR specifically identifies as components of "the QSA" the transfer of water equivalent to the amount of water conserved by lining portions of the All American Canal and the Coachella Canal and identifies each lining project as "a component of the Proposed Project," i.e., a component of "the QSA."

That the transfer of water pursuant to the Allocation Agreement is part of "the QSA" in its broad sense is also confirmed by the fact that when the Irrigation District, in resolution No. 10-2003, certified the Quantification Settlement Agreement PEIR ("as modified and supplemented by the Amended and Restated Addendum thereto dated September 2003"), it also approved "the QSA, on the terms and conditions set forth in the agreements and documents set forth" in an exhibit to the resolution. That exhibit consisted of

[59] According to the Allocation Agreement, under "Title II" the Secretary of the Interior was "authorized to construct a new lined canal or to line the previously unlined portions of the All-American Canal from the vicinity of Pilot Knob to Drop 4 and the Coachella Canal from Siphon 7 to Siphon 32, or to construct seepage recovery facilities in the vicinity of Pilot Knob to Drop 4 . . . ."

a "LIST OF QSA AGREEMENTS," which included the Allocation Agreement. Thus, with respect to the Irrigation District at least, the "project" the agency approved in reliance on the Quantification Settlement Agreement PEIR was "the QSA" in its broad sense, which encompassed the water transfers to be accomplished pursuant to the Allocation Agreement.[60]

This is consistent with the Quantification Settlement Agreement PEIR as a *program* EIR. "A program EIR is an EIR which may be prepared on a series of actions that can be characterized as one large project . . . ." (Cal. Code Regs., tit. 14, § 15168, subd. (a).) Here, that "series of actions" was the Quantification Settlement Agreement *and* the various related agreements and actions that were addressed in the PEIR.

With the foregoing in mind, we turn back to the question of what project approval was "the subject of" the County's CEQA action: was it the approval of "the QSA" in its narrow sense—meaning only the Quantification Settlement Agreement between the Irrigation District, Metropolitan, and Coachella—or was it the approval of "the QSA" in its broad sense, which includes the water transfers under the Allocation Agreement? The resolution of this question is crucial because if the project approval that is the subject of the County's action was the approval that encompassed the Allocation Agreement, then the determination of whether the United States and the Indian Settlement Parties were "recipients" of that approval seems a foregone conclusion, as they were named parties to that agreement.

In the trial court, the County's position about what project was the subject of its CEQA action shifted back and forth. In opposing a demurrer filed by Coachella and San Diego, the County asserted there was no "lack of clarity" in its petition, which was "unequivocally directed at, and only at, the Quantification Settlement Agreement and associated CEQA compliance" and "no other agreement."

Later, however, when San Diego moved to limit the County's CEQA action to challenges to the Quantification Settlement Agreement, the County argued that "the operative reference in the County's pleadings is to the QSA *and its components*" and "it is clear that the way that the QSA is being looked at in the coordinated actions is in reference to the QSA *and the associated agreements*." (Italics added.) Thereafter, in ruling on San Diego's motion, the court noted that "[t]he County's First Amended Petition for Writ of Mandate could be read to define the 'QSA' as not limited to the QSA itself, but also the related agreements," and "[t]he scope of [the action] thus does not appear to be limited to the QSA."

---

[60] As Coachella, Metropolitan, and San Diego succinctly point out, "[r]ather than analyzing each QSA agreement, the PEIR analyzed QSA components that correlated with specific contractual provisions of specific QSA agreements."

But when San Diego and Metropolitan moved to dismiss the County's CEQA action based on the County's failure to join the United States and the Indian Settlement Parties, the County returned to arguing that the action was directed only at the Quantification Settlement Agreement and not at any of the related agreements.

In ruling on the motion to dismiss, the trial court noted "the apparently inconsistent assertions by the County regarding the scope of its pleading." Ultimately, however, the trial court determined that the United States and the Indian Settlement Parties were recipients of an approval that was the subject of the County's CEQA action without reference to the County's varying characterizations of its action. Instead, the trial court focused on the fact that the County's action "indisputably challenges the PEIR, and would if success-ful set it aside." The trial court reasoned that "[t]he 'project' covered by the PEIR includes not only the state [Quantification Settlement Agreement] but also the variety of related actions," including "the Allocation Agreement . . . . In other words, the PEIR is intended to function as CEQA compliance (at least in part) for the Allocation Agreement."

■ We agree with the trial court's reasoning on this point and find it determinative of what project approval is to be deemed "the subject of" the County's CEQA action for purposes of section 21167.6.5(a). What the County claims is the subject of its action is not the touchstone.[61] Rather, where (as here) a CEQA action challenges the adequacy of an EIR, the approval that is "the subject of" that action is the approval of the project that was the subject of the EIR. Here, that project was more than just the Quantification Settlement Agreement; it was that agreement *and* all of the related actions addressed in the Quantification Settlement Agreement PEIR that were approved based on the certification of the PEIR. Those related actions included the water transfers under the Allocation Agreement, to which the United States and the Indian Settlement Parties were parties.

■ The question that remains then, for purposes of section 21167.6.5(a), is whether the United States and the Indian Settlement Parties are to be considered "recipients" of the approval of the Allocation Agreement and the water transfers provided for therein, which were part of the "QSA" project that was the subject of the Quantification Settlement Agreement PEIR and thus the subject of the County's CEQA action. In concluding they were, the trial court observed that "[t]he U.S. and the Indian Settlement Parties appear to be primary parties actively involved in the water transfer conduct, which is part of the subject of the environmental review." The court further concluded that in enacting section 21167.6.5(a), the Legislature "indicat[ed] that the

---

[61] In this court, the County once again claims it "was not" "challenging the [A]llocation [A]greement" in its CEQA action.

parties to an agreement for which CEQA compliance is provided by the challenged EIR, at least where they are actively involved in the conduct which is the subject of the agreement and of the environmental review . . . are 'recipients of approval'." We agree. In determining who is a recipient of an approval under section 21167.6.5(a), "we look to their status in the underlying transaction . . . ." (*County of Imperial v. Superior Court, supra*, 152 Cal.App.4th at p. 33.) Here, the United States and the Indian Settlement Parties were, as the trial court observed, "primary parties actively involved in the water transfer conduct" that was the subject of the Allocation Agreement, and the effectiveness of that agreement was dependent on its execution by all four of the respondents in the County's CEQA action. Thus, when the Irrigation District certified the Quantification Settlement Agreement PEIR and approved "the QSA" (in its broad sense, including the Allocation Agreement) in resolution No. 10-2003, the United States and the Indian Settlement Tribes were recipients of that approval for purposes of section 21167.6.5(a).

The County offers no persuasive argument to the contrary. To the extent the County argues that "the obligation of the United States to provide water to the Indian [Settlement Parties] will remain in place" "[e]ven if the Allocation Agreement is invalidated along with the related QSA agreements," that argument is of no moment. The County's argument in this regard is directed at the elements that determine who is to be considered a necessary person under subdivision (a) of Code of Civil Procedure section 389. But section 21167.6.5(a) supplants the former statute in a CEQA action. If an entity is a recipient of an approval for purposes of section 21167.6.5(a), that entity is a necessary party in a CEQA action challenging the EIR for the project that was approved, and no further showing need be made under subdivision (a) of Code of Civil Procedure section 389 to make that entity a necessary party.

Having concluded that the trial court properly determined the United States and the Indian Settlement Parties were necessary parties to the County's CEQA action under section 21167.6.5(a), "we must next determine whether the trial court correctly concluded they were [not] indispensable parties under Code of Civil Procedure section 389, subdivision (b)." (*County of Imperial v. Superior Court, supra*, 152 Cal.App.4th at p. 35.) In addressing that issue, "we consider the four factors listed in the statute" and review for abuse of discretion the trial court's determination under the statute that in equity and good conscience the County's CEQA action should proceed even in the absence of the United States and the Indian Settlement Parties. (*County of Imperial*, at p. 35.) In conducting this review, we keep in mind that the burden is on Coachella, Metropolitan, and San Diego, as the appellants, to establish an abuse of discretion (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193]), which is shown only if "the trial court exceeded the bounds of reason, all of the circumstances before it being

considered" (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 598 [153 Cal.Rptr. 423, 591 P.2d 911]).

 The first factor for our consideration is "to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties." (Code Civ. Proc., § 389, subd. (b), factor (1).) The trial court found that "the Indian Settlement Parties could be prejudiced if the County succeeds in its . . . CEQA challenge" because even though the obligation of the United States to provide water to the Indian Settlement Parties under the San Luis Rey Water Rights Settlement Act "appears to be" "independent" of "the QSA" (in its broad sense), "the QSA" "is providing a mechanism" for the United States to meet that obligation, and invalidation of the PEIR could interfere with that.

Obviously Coachella, Metropolitan, and San Diego, which advocate the conclusion that the United States and the Indian Settlement Parties are indispensable to the County's CEQA action, do not challenge this finding by the trial court. Nor does the County. Accordingly, we turn to the second factor.

 "Under Code of Civil Procedure section 389, subdivision (b), factor (2) the court considers whether protective provisions in the judgment can ameliorate or eradicate prejudice to the unnamed parties." (*County of Imperial v. Superior Court, supra*, 152 Cal.App.4th at p. 37.) As we have noted, in opposing the motion to dismiss, the County returned to arguing that its CEQA action was directed only at the Quantification Settlement Agreement and not at any of the related agreements. In evaluating whether the potential prejudice to the absent parties could be lessened, the trial court now "accept[ed] this concession by the County" and determined that it would "henceforth view [the County's CEQA action] as limited to challenges to the [Quantification Settlement Agreement]." Based on this determination, the trial court apparently concluded the potential prejudice of a judgment in the County's CEQA action to the United States and the Indian Settlement Parties would be less if invalidation of the Quantification Settlement Agreement PEIR did not also result in invalidation of the Allocation Agreement.

 Coachella, Metropolitan, and San Diego argue that notwithstanding the trial court's acceptance of the County's concession, "the absent parties would still be prejudiced by a judgment rendered in their absence," and "[t]he trial court ignored evidence of this fact." Indeed, this element of the indispensable party determination is the focus of the water agencies' argument. They are of the view that because "[l]imiting the County's challenge to the [Quantification Settlement Agreement] was not sufficient to *eliminate* the prejudice," "[t]he trial court's findings of prejudice . . . *compelled* the finding

that those parties were not simply necessary, but indispensable." (Italics added.) In other words, the water agencies' view of the matter appears to be this: If an absent party in a CEQA action is a recipient of an approval that is the subject of that action, and will be prejudiced by an adverse ruling in that action, the action *cannot* go forward in that party's absence unless the trial court can figure out a way to eliminate that prejudice entirely. That is simply not the law, however. Under subdivision (b) of Code of Civil Procedure section 389, the test for whether a party is indispensable, such that the action should not proceed in that party's absence, comes down to "equity and good conscience." One—and only one—of the factors that goes into deciding what should happen "in equity and good conscience" is "the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be *lessened or avoided*." (Italics added.) Under this provision, if the prejudice to the absent parties can be "lessened," even though it cannot be entirely "avoided," that factor weighs in favor of allowing the action to go forward in their absence. In such a circumstance, the inability to avoid or eliminate the prejudice in its entirety does *not*, as the water agencies would have it, require a finding that the action should not go forward.

There are some cases that suggest any amount of prejudice to an absent party means that party is indispensable, and Coachella, Metropolitan, and San Diego cite one of those cases in their reply brief. Specifically, in *Sierra Club, Inc. v. California Coastal Com.* (1979) 95 Cal.App.3d 495 [157 Cal.Rptr. 190], the court stated that "[w]here the plaintiff seeks some type of affirmative relief which, if granted, would injure or affect the interest of a third person not joined, that third person is an indispensable party." (*Id.* at p. 501.) In support of that statement, however, the *Sierra Club* court cited *Bank of California v. Superior Court* (1940) 16 Cal.2d 516 [106 P.2d 879], which was decided at a time when Code of Civil Procedure section 389 was a vastly different statute than it is now (and was in 1979). In 1940, as stated in the *Bank of California* opinion, the statute provided in pertinent part that " '[t]he court may determine any controversy between parties before it, when it can be done without prejudice to the rights of others, or by saving their rights . . . .' " (*Bank of California v. Superior Court, supra*, 16 Cal.2d at p. 520.) In 1971, however, the Legislature revised Code of Civil Procedure section 389 "to substitute practically in its entirety Rule 19 of the Federal Rules of Civil Procedure for former Section 389." (Cal. Law Revision Com. com., reprinted at 14 West's Ann. Code Civ. Proc. (2004 ed.) foll. § 389, p. 418.) Under the revised version of the statute, prejudice to an absent party is only one factor to be considered in determining whether that party is indispensable, rather than being the *only* determinative factor as it was under the previous version of the statute. Thus, statements like those in the *Sierra Club* case, on which the water agencies rely, are outdated.

Here, the trial court could have reasonably determined that limiting the County's CEQA action to a challenge to the Quantification Settlement Agreement would lessen, even if it would not avoid entirely, the potential prejudice to the absent United States and Indian Settlement Parties from an adverse judgment. Coachella, Metropolitan, and San Diego have not shown that such a determination was unreasonable.

██ "Under Code of Civil Procedure section 389, subdivision (b), factor (3) the court considers whether a judgment entered in the absence of [the United States and the Indian Settlement Parties] will be adequate." (*County of Imperial v. Superior Court, supra,* 152 Cal.App.4th at p. 37.) In assessing this factor, the trial court reached no clear conclusion. The court acknowledged that while "the U.S., the Indian Settlement Parties, and the water agencies are quite different in character," their "interests . . . are aligned in terms of defending the [Quantification Settlement Agreement] for purposes of reaping the benefits it represents to them, respectively." The trial court could not determine, however, whether this was "sufficient alignment" to conclude that the existing parties would adequately protect the interests of the absent parties.

Coachella, Metropolitan, and San Diego argue that "[f]ailure to join the U.S. and the Indian [Settlement Parties] would result in an inadequate judgment because of the risk of inconsistent obligations that would exist if the County succeeded in this action without the U.S.'s and the Indian [Settlement Parties'] participation." The third factor in subdivision (b) of Code of Civil Procedure section 389, however, "calls attention to the extent of the relief that can be accorded among the parties joined." (Advisory Com. note, reprinted at 14 West's Ann. Code Civ. Proc., *supra,* foll. § 389, p. 422.) The water agencies fail to explain how "a risk of conflicting obligations for the Water Agencies" that would supposedly result from a judgment in the absence of the United States bears on "the extent of the relief that can be accorded among the parties joined." The fact is that, even in the absence of the United States and the Indian Settlement Parties, the trial court in the County's CEQA action could void the certification of the Quantification Settlement Agreement PEIR and halt the water transfers between the water agencies under the Quantification Settlement Agreement, which would be adequate relief from the County's perspective.

To the extent Coachella, Metropolitan, and San Diego complain of the possibility they will face conflicting obligations in the event of a judgment obtained in the County's CEQA action in the absence of the United States, that complaint is properly considered under the first factor in the statute, which involves consideration of the "extent a judgment rendered in the person's absence might be prejudicial to him *or those already parties.*" (Code

Civ. Proc., § 389, subd. (b), factor (1), italics added.) In fact, the trial court addressed this issue in its analysis of the first factor, when it noted the water agencies' contention regarding "the risk of conflicting obligations," but concluded "[t]his may or may not be true." In any event, the water agencies' argument on this point on appeal is too incomplete to be persuasive. They assert that if the Quantification Settlement Agreement "were overturned, [they] would not take water deliveries pursuant to the terms of that agreement, yet the U.S. would still insist, as Watermaster on the River, that deliveries be made under the [Colorado River] Water Delivery Agreement." Unfortunately, that is the extent of their argument on this point. Without more, we are not persuaded that this argument has any tendency to show the trial court's indispensable party ruling amounted to an abuse of discretion.

■■■ Under the fourth factor in subdivision (b) of Code of Civil Procedure section 389, "the court considers whether the plaintiff . . . will have an adequate remedy if the action is dismissed for nonjoinder." (*County of Imperial v. Superior Court, supra,* 152 Cal.App.4th at p. 39.) On this point, the trial court noted that because the other CEQA actions then pending did not involve the sufficiency of the Quantification Settlement Agreement PEIR, the validation action was "the only other case that involves the . . . PEIR, by way of proposed validation of certain of the agreements addressed in the . . . PEIR." The court further noted that "the only way in which the PEI[R] is in issue [in the validation proceeding] is in the generic claim of the [Irrigation District] that it has done all things necessary to generate valid agreements, which presumably includes CEQA compliance in part via the PEIR. This would be a very limited alternate remedy."

In essence, the trial court appeared to recognize (1) that the Quantification Settlement Agreement PEIR is at issue in the validation action only by virtue of the answering parties' denial of the Irrigation District's allegation that it "complied with all laws necessary for contracts A through M to be valid, legal, and binding, including . . . all applicable California . . . Environmental Laws" and (2) that the only remedy the County will have a possibility of obtaining in the validation action is a judgment that the agreements that are the subject of that action are not valid. What the County will *not* be able to obtain in the validation action is any relief directly involving the Quantification Settlement Agreement PEIR, including a "writ of mandate setting aside the certification of . . . the[] PEIR," which is part of the relief the County is seeking in its CEQA action.

On appeal, Coachella, Metropolitan, and San Diego complain that the trial court abused its discretion in determining that the validation action provides "a very limited remedy" for the County "because this Court's decision in *County of Imperial* previously determined that the . . . validation action

provided a sufficient alternative forum for the County's CEQA issues." But this court determined no such thing. We did observe that the County could "mount a CEQA challenge [to a different EIR] in [another] coordinated case and in its opposition to [the] validation action." (*County of Imperial v. Superior Court, supra*, 152 Cal.App.4th at p. 40.) But that observation simply supported the conclusion that the trial court did not abuse its discretion "in applying the Code of Civil Procedure, section 389, subdivision (b) factors" *in that case*. (*County of Imperial*, at p. 40.) Our conclusion there has no bearing here and certainly does not compel the conclusion that the validation action necessarily provides the County with a "sufficient alternative forum" to address its challenges to the Quantification Settlement Agreement PEIR such that it was an abuse of discretion for the trial court to allow the County's CEQA action to go forward.

Coachella, Metropolitan, and San Diego next argue that the trial court "disregarded settled law that: (a) an alternative remedy need not be perfect; and (b) an adequate remedy is just one of several factors to be considered in a [Code of Civil Procedure] section 389 analysis." But there is absolutely no support for this argument in the trial court's ruling, and the water agencies do not attempt to muster any support for the argument, so we will not consider it any further.

The water agencies complain that "[t]he trial court based its ruling on the lack of input from either the U.S. or the Indian [Settlement Parties] regarding the impact of a judgment rendered in their absence." Again, this argument is not supported by the record. It is true the trial court once noted it did not "have input from either the U.S. or the Indian Settlement Parties" and then later noted that "neither the U.S. nor the Indian Settlement Parties have in any way participated in this proceeding." These observations were offered, however, only to explain why the court could not reach a clear or definitive conclusion on some of the subissues involved in determining whether the County's CEQA case should proceed in the absence of the United States and the Indian Settlement Parties. In no way did the trial court "base its ruling on the lack of input" from the absent parties.

Finally, Coachella, Metropolitan, and San Diego complain that in denying the motion to dismiss, the trial court considered—adversely to the water agencies—the fact that they did not bring the motion until very late in the proceedings. The water agencies contend an indispensable party objection can be raised at any time, and they filed their motion to dismiss at "the earliest opportunity in the litigation schedule" after they learned "[f]or the first time" from the County's statement of issues "that the challenge in [the County's CEQA action] included all approvals that relied on the PEIR," not just the Quantification Settlement Agreement.

The issue of timing came up because the County argued in opposition to the motion to dismiss that it was barred by laches. In assessing this argument, the trial court agreed with San Diego and Metropolitan "that case law generally allows motions to dismiss based upon indispensable parties to be brought very late." The court also observed, however, that "[t]he scope of the . . . PEIR has been known since it came into existence," and "[t]he most significant facts upon which the instant motion to dismiss is predicated have been in existence since 2002, the date of the final PEIR." The court ultimately declined to deny the motion based on laches, but found "it appropriate to take the iterative and less than thorough approach on the part of the water agencies to addressing the indispensable party issue into account in weighing the equities."

The water agencies have utterly failed to show any abuse of discretion in this aspect of the trial court's ruling. The fact that the indispensable party issue can be raised at any time does *not* mean the court cannot consider the complaining party's diligence (or lack thereof) in raising the issue as a factor under subdivision (b) of Code of Civil Procedure section 389 in deciding whether "in equity and good conscience the action should proceed among the parties before it, or should be dismissed without prejudice."

As for the water agencies' suggestion that they acted as diligently as they could under the circumstances, the trial court's view of matters was eminently reasonable on this point as well. Essentially, the court recognized that from the very outset of the County's CEQA action, the water agencies had everything needed to assert that the action should not go forward in the absence of the United States and the Indian Settlement Parties. They never needed to know (as they contend) what approvals the County *contended* its CEQA action encompassed. What they needed to know was that (1) the County's CEQA action challenged the adequacy of the Quantification Settlement Agreement PEIR; (2) the Quantification Settlement Agreement PEIR was the environmental document that was used to support the water agencies' approval of the various actions that were analyzed in the PEIR, including the water transfers provided for in the Allocation Agreement; and (3) the United States and the Indian Settlement Parties were integral parties to the Allocation Agreement but were not before the court. With knowledge of these facts, the water agencies could have demurred to the County's CEQA action based on the absence of the United States and the Indian Settlement Parties much, much earlier in the proceeding, just as they demurred to the actions that were the subject of our decision in *County of Imperial v. Superior Court, supra*, 152 Cal.App.4th 13.

In the end, then, just as the County failed to do in *County of Imperial*, the water agencies here have not persuaded us that the trial court exceeded the

bounds of reason "in applying the Code of Civil Procedure, section 389, subdivision (b) factors." As we did there, "we find the trial court's application of the factors both fair and well within its discretion." (*County of Imperial v. Superior Court, supra*, 152 Cal.App.4th at p. 40.) Accordingly, we find no error in the trial court's denial of the motion to dismiss the County's CEQA action.

## DISPOSITION

The judgments in *Imperial Irrigation Dist. v. All Persons Interested* (Super. Ct. Imperial County, No. ECU01649/Super. Ct. Sac. County, No. 04CS00875), *POWER v. Imperial Irrigation Dist.* (Super. Ct. Imperial County ECU01653/Super. Ct. Sac. County, No. 04CS00877), and *County of Imperial v. Metropolitan Water Dist. of Southern California* (Super. Ct. Imperial County, No. ECU01656/Super. Ct. Sac. County, No. 04CS00878) are reversed, and the cases are remanded to the trial court for further proceedings consistent with this opinion. The writ of supersedeas, having served its purpose, is discharged upon the finality of this decision.

The Irrigation District, the state, Coachella, Metropolitan, San Diego, Vista, and Escondido shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

Butz, J., and Murray, J., concurred.

Petitions for a rehearing were denied January 4, 2012, and the petitions of appellants County of Imperial and Protect Our Water and Environmental Rights and respondents Michael W. Morgan, Donald V. Barioni and Cuatro Del Mar for review by the Supreme Court were denied March 14, 2012, S199424.